**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas

APR 1 6 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| **CITY OF SAN BENITO,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **V.** | § | **C. A. NO. B03-080** |
| | § | **JURY TRIAL REQUESTED** |
| **TEJAS GAS PIPELINE COMPANY, ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

**AFFIDAVIT AUTHENTICATING DOCUMENTS IN SUPPORT OF DEFENDANTS'**
**RESPONSE TO PLAINTIFF'S MOTION TO RECONSIDER DISMISSAL ORDER**

BEFORE ME, the undersigned authority, personally appeared Jeffrey David Palmer, known to me to be the person whose name is subscribed below and, after being duly sworn, upon his oath, did depose and state as follows:

My name is Jeffrey David Palmer. I am an attorney representing Tejas Gas Pipeline Company, Tejas Gas Pipeline, L.L.C., Tejas Gas Pipeline, L.P., Tejas Gas, L.L.C., Tejas Gas Marketing, L.L.C., Gulf Energy Marketing Company, Gulf Energy Marketing L.L.C., Coral Energy Services L.L.C., Coral Energy Resources L.P., Shell Gas Trading Company, and Transco Petro Source Company in this matter. I am over the age of twenty-one, and am otherwise competent and authorized to make and give this Affidavit in connection with the above numbered and entitled cause. The facts and statements set forth in this Affidavit are true and correct based upon my personal knowledge.

Attached as Exhibits to Defendants' Response to Plaintiff's Motion to Reconsider Dismissal Order are true and correct copies of the following documents:

1.   January 15, 2004 letter from Osborne J. Dykes, III to Adam Poncio

2.   January 20, 2004 letter from Osborne J. Dykes, III to Adam Poncio

3.   January 28, 2004 letter from Osborne J. Dykes, III to Adam Poncio

30688298.2

10

Further Affiant sayeth not.

Jeffrey David Palmer

SUBSCRIBED AND SWORN TO before me on April _15_, 2004.



Notary Public in and for
The State of Texas

Kimberly Glaize
Printed Name of Notary

My Commission Expires: _12/21/07_

Case 1:03-cv-00080    Document 72    Filed in TXSD on 04/16/2004    Page 3 of 102
Received 02/27/2004 14:4?    04:12 on line [10] for JD00304 Printed 02,    2004  14:50 * Pg 3/17
02/27/2004  14:43    210-21_ 5880              CERDA & PONCIO, .C                PAGE  03

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| CITY OF SAN BENITO, | § |
| | § |
| Plaintiff, | § |
| | § |
| V | § |
| | § |
| TEJAS GAS PIPELINE COMPANY, ET AL | § |
| | § |
| Defendants | § |

C. A. NO. B03-080

### CITY OF SAN BENITO'S FIRST REQUEST FOR PRODUCTION
### TO DEFENDANT TRANSCO PETRO SOURCE COMPANY (NOW KNOWN AS
### TRANSCO P-S COMPANY)

TO:    Defendant, TRANSCO PETRO SOURCE COMPANY
        (NOW KNOWN AS TRANSCO P-S COMPANY)
        NKA VASTAR GAS MARKETING, INC.
        By and through their attorneys of record:
        Osborne J. Dykes, III
        1301 McKinney, Suite 5100
        Houston, Texas 77010

        COMES NOW the City of San Benito, and Pursuant to the Texas Rules of Federal Procedure,

serve the following First Request for Production to Defendant TRANSCO PETRO SOURCE (NOW

KNOWN AS TRANSCO P-S COMPANY).

Received 02/27/2004 14:4    04:12 on line [10] for JD00304 Printed 02    2004  14:50 * Pg 4/17
02/27/2004  14:43    210-21 -5880              CERDA & PONCIO,  r^C                    PAGE  04

Respectfully submitted,


ADAM PONCIO
State Bar No. 16109800
LAW OFFICES OF CERDA & PONCIO
A Professional Corporation
924 McCullough Ave.
San Antonio, Texas 778215-1642
Telephone (210) 212-7979
Facsimile (210) 212-5880

ATTORNEY FOR PLAINTIFF

Case 1:03-cv-00080    Document 72    Filed in TXSD on 04/16/2004    Page 5 of 102
Received 02/27/2004 14:4⌐  04:12 on line [10] for JD00304 Printed 02 ⌐2004  14:50 * Pg 5/17
02/27/2004  14:43    210-21_ -5880                    CERDA & PONCIO, ⌐C              PAGE  05

## CERTIFICATE OF SERVICE

I do hereby certify that on this _27_ day of February, 2004, forwarded a true and correct copy

of the above document to all counsel of record:

Frances I. Gandy                                **VIA FACSIMILE**
148 American Bank Plaza
Corpus Christi, Texas 78475

Ramon Garcia                                    **VIA FACSIMILE**
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, Texas 78539

OSBORNE J. Dykes, III                           **VIA FACSIMILE**
Jeffrey D. Palmer
FULBRIGHT & JAWORSKI, LLP
1301 McKinney, Suite 5100
Houston, Texas 77010

Julie L. Ezell                                  **VIA FACSIMILE**
CINERGY MARKETING & TRADING, L.P.
1000 East Main Street
Plainfield, Indiana 46168

Randy Beevis                                    **VIA FACSIMILE**
1100 Louisiana, Suite 4900
Houston, Texas 77002

J.D. Page                                       **VIA FACSIMILE**
3040 Post Oak Boulevard, Suite 85G
Houston, Texas 77056

Bradley Whalen                                  **VIA FACSIMILE**
DOYLE, RESTREP, HARVING & ROBBINS,
L.L.P
4700 Chase Tower
600 Travis Street
Houston, Texas  77002

Rene G. Oliveira                                **VIA FACSIMILE**
David G. Oliveira
ROERIG, OLIVEIRA & FISHER
855 West Price Road, Suite 9

Received 02/27/2004 14:4  04:12 on line [10] for JD00304 Printed 02, 2004 14:50 * Pg 6/17
02/27/2004  14:43    210-21 -5880                CERDA & PONCIO, r'C                              PAGE  06

Brownsville, Texas 78520

Robert Galligan                                    **VIA FACSIMILE**
JONES, GALLIGAN, KEY & LOZANO, L.L.P.
2300 W. Pike, Suite 300
P. O. Drawer 1247
Weslaco, Texas 78599-1247


_____
**ADAM PONCIO**

Case 1:03-cv-00080    Document 72    Filed in TXSD on 04/16/2004    Page 7 of 102
Received 02/27/2004 14:4?    04:12 on line [10] for JD00304 Printed 02    2004  14:50 * Pg 7/17
02/27/2004  14:43    210-21_ 5880    CERDA & PONCIO, .C    PAGE  07

## FIRST REQUEST FOR PRODUCTION

1)    Please produce the original or copies of each contract controlling each sale of natural gas
made by Defendant within the corporate limits of the City of San Benito, Texas.

RESPONSE:

2)    Please produce the original or copies of each contract controlling each sale of natural gas
made by Defendant within the corporate limits of the City of San Benito, Texas.

RESPONSE:

3)    Please produce the original or copies of all checks or other negotiable instruments used by
defendant for each sale of natural gas within the corporate limits of the City of San Benito,
Texas.

RESPONSE:

4)    Please produce the original or copies of all checks or other negotiable instruments used by
Defendant to pay for each sale of natural gas within the corporate limits of the City of San
Benito, Texas.

RESPONSE:

5)    All documents, conveyances, deeds, instruments, recordings, or other written material which
would show that Defendant was the owner and/or operator of any pipelines, main and
auxiliary lines, appurtenances and fixtures for the sale and distribution of natural gas within
the corporate limits of the City of San Benito, Texas.

RESPONSE:

6)    All documents, conveyances, deeds, instruments, recordings, or other written material which
would show that the defendant sold any gas, natural gas or other petroleum products within
the corporate limits of the City of San Benito, Texas

RESPONSE:

7)    All documents, conveyances, deeds, instruments, recordings, or other written material which
would show the amount of natural gas sold or distributed by Defendant within the corporate
limits of the City of San Benito, Texas.

Received 02/27/2004 14:45    04:12 on line [10] for JD00304 Printed 02/  2004  14:50 * Pg 8/17
02/27/2004  14:43    210-212 -5880                    CERDA & PONCIO, PC                    PAGE  08

RESPONSE:

8)    All documents, conveyances, deeds, instruments, recordings, or other written material which
      would show the amounts of gas that Defendant owned or sold within the corporate limits of
      the City of San Benito, Texas from January 1, 1941 until the present.

RESPONSE:

9)    All documents which would show the ownership, use and/or maintenance by Defendant of
      any main and/or auxiliary lines, appurtenances and/or fixtures for the sale and/or distribution
      of natural gas in any of the streets, alleys, parks or other public places within the corporate
      limits of the City of San Benito, Texas.

RESPONSE:

10)   All documents which would show the ownership, use and/or maintenance by Defendant of
      any main and/or auxiliary lines, appurtenances and/or fixtures used for the sale and/or
      distribution of natural gas within the corporate limits of the City of San Benito, Texas.

RESPONSE:

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **CITY OF SAN BENITO,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V** | § | **C. A. NO. B03-080** |
| | § | |
| **TEJAS GAS PIPELINE COMPANY, ET AL** | § | |
| | § | |
| **Defendants** | § | |

## CITY OF SAN BENITO'S SECOND REQUEST FOR PRODUCTION
## TO DEFENDANT TRANSCO PETRO SOURCE COMPANY
## (NOW KNOWN AS TRANSCO P-S COMPANY)

TO:    Defendant, TRANSCO PETRO SOURCE COMPANY
       (NOW KNOWN AS TRANSCO P-S COMPANY)
       By and through their attorneys of record
       Osborne J, Dykes, III
       1301 McKinney, Suite 5100
       Houston, Texas 77010

COMES NOW the City of San Benito and, Pursuant to Rule 26 of the Texas Rules of Federal

Procedure, serves the following Second Request for Production to Defendant TRANSCO PETRO

SOURCE COMPANY (NOW KNOWN AS TRANSCO P-S COMPANY).

Respectfully submitted,

ADAM PONCIO
State Bar No. 16109800
LAW OFFICES OF CERDA & PONCIO
A Professional Corporation
924 McCullough Ave.
San Antonio, Texas 778215-1642
Telephone (210) 212-7979
Facsimile (210) 212-5880

ATTORNEY FOR PLAINTIFFS

## SECOND REQUEST FOR PRODUCTION

With regard to Defendant, documents requested include those documents for any related entity, acquired entity, successor in interest, subsidiary and/or entity whose interests were acquired or obtained by Defendant in any manner.

1. Produce documents concerning any revenues you received from the sale or transportation of natural gas to any consumer located within the City of San Benito.

2. Produce documents concerning any revenues you received from the sale or transportation of natural gas to any other person or entity for which the point of delivery, point of redelivery, or the point of interconnection with any natural gas pipeline owned by someone other than you, was located within the City of San Benito.

3. Produce documents concerning your ownership or lease of any real property, any personal property or intangible assets valued in excess of one thousand dollars ($1,000.00), and any easement obtained by condemnation, judgment, purchase or other means, that is located within the City of San Benito.

4. Produce any agreements, correspondence or communications between you and CP&L that concern the sale, transportation or purchase of any natural gas consumed at or delivered to the San Benito electric power generating plant.

5. Produce all reports of local sales of natural gas made to the City of San Benito.

6. Produce all reports of natural gas sold to CP&L or to any San Benito based consumer made to the Texas Railroad Commission, the Texas State Comptroller, the Texas Public Utilities Commission, the Federal Energy Regulatory Commission, or any other federal, state, or local governmental agency.

7. Produce any permit, consent, or other agreement or authorization to occupy any public property or rights of way located within the City of San Benito.

8. Produce documents concerning any natural gas pipeline owned or operated by you located in whole or part within the City of San Benito.

9. Produce documents concerning any agreement between you and any other person or entity owning or operating a natural gas pipeline located in whole or part within the City of San Benito.

10. Produce documents concerning any tax (including sales and ad valorem taxes), rental, permit fee, or any other remuneration paid by you or on your behalf to the City of San Benito.

## CERTIFICATE OF SERVICE

I do hereby certify that on this _27_ day of February, 2004, forwarded a true and correct

copy of the above document to all counsel of record:

Frances I. Gandy                              **VIA FACSIMILE**
148 American Bank Plaza
Corpus Christi, Texas 78475


Ramon Garcia                                  **VIA FACSIMILE**
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, Texas 78539


OSBORNE J. Dykes, III                         **VIA FACSIMILE**
Jeffrey D. Palmer
FULBRIGHT & JAWORSKI, LLP
1301 McKinney, Suite 5100
Houston, Texas 77010


Julie L. Ezell                                **VIA FACSIMILE**
CINERGY MARKETING & TRADING, L.P.
1000 East Main Street
Plainfield, Indiana 46168


Randy Beevis                                  **VIA FACSIMILE**
1100 Louisiana, Suite 4900
Houston, Texas 77002


J.D. Page                                     **VIA FACSIMILE**
3040 Post Oak Boulevard, Suite 85G
Houston, Texas 77056


Bradley Whalen                                **VIA FACSIMILE**
DOYLE, RESTREP, HARVING & ROBBINS,
L.L.P
4700 Chase Tower
600 Travis Street
Houston, Texas   77002


Rene G. Oliveira                              **VIA FACSIMILE**
David G. Oliveira
ROERIG, OLIVEIRA & FISHER
855 West Price Road, Suite 9

Brownsville, Texas 78520

Robert Galligan                    **VIA FACSIMILE**
JONES, GALLIGAN, KEY & LOZANO, L.L.P.
2300 W. Pike, Suite 300
P. O. Drawer 1247
Weslaco, Texas 78599-1247


**ADAM PONCIO**

Case 1:03-cv-00080    Document 72    Filed in TXSD on 04/16/2004    Page 14 of 102
Received 02/27/2004 14:49    04:12 on line [10] for JD00304 Printed 02,  2004 14:50 * Pg 9/17
02/27/2004  14:43    210-21  5880                     CERDA & PONCIO, . C                   PAGE  09

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| **CITY OF SAN BENITO,** § | |
| § | |
| **Plaintiff,** § | |
| § | |
| **V** § | **C. A. NO. B03–080** |
| § | |
| **TEJAS GAS PIPELINE COMPANY, ET AL§** | |
| § | |
| **Defendants** § | |

**CITY OF SAN BENITO'S FIRST REQUEST FOR ADMISSIONS**
**TO DEFENDANT TRANSCO PETRO SOURCE COMPANY**
**(NOW KNOWN AS TRANSCO P-S COMPANY)**

TO:    Defendant, TRANSCO PETRO SOURCE COMPANY
       (NOW KNOWN AS TRANSCO P-S COMPANY)
       By and through their attorneys of record
       Osborne J. Dykes, III
       1301 McKinney, Suite 5100
       Houston, Texas 77010

COMES NOW the City of San Benito and, Pursuant to Rule 26 of the Texas Rules of Federal

Procedure, propounds the following first requests for admissions to Defendant TRANSCO PETRO

SOURCE COMPANY (NOW KNOWN AS TRANSCO P-S COMPANY).

Case 1:03-cv-00080    Document 72    Filed in TXSD on 04/16/2004    Page 15 of 102
Received 02/27/2004 14:4⌐  04:12 on line [10] for JD00304 Printed 02 ⌐2004 14:50 * Pg 10/17
02/27/2004  14:43    210-21_-5880    CERDA & PONCIO, ✓C    PAGE  10

Respectfully submitted,

ADAM PONCIO
State Bar No. 16109800
LAW OFFICES OF CERDA & PONCIO
A Professional Corporation
924 McCullough Ave.
San Antonio, Texas 778215-1642
Telephone (210) 212-7979
Facsimile  (210) 212-5880

ATTORNEY FOR PLAINTIFFS

Case 1:03-cv-00080    Document 72    Filed in TXSD on 04/16/2004    Page 16 of 102
Received 02/27/2004 14:4⌐  04:12 on line [10] for J000304 Printed 02  2004 14:50 * Pg 11/17
02/27/2004  14:43    210-21_ 5880                        CERDA & PONCIO, ∩C                    PAGE  11

## CERTIFICATE OF SERVICE

I, the undersigned attorney of record, do hereby certify that I have on this ⟨2⟩7 day of

February, 2004, forwarded a true and correct copy of the above document to counsel of record as

follows, pursuant to Rule 5 of the Federal Rules of Civil Procedure:

Frances I. Gandy                                    **VIA FACSIMILE**
148 American Bank Plaza
Corpus Christi, Texas 78475

Ramon Garcia                                        **VIA FACSIMILE**
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, Texas 78539

OSBORNE J. Dykes, III                               **VIA FACSIMILE**
Jeffrey D. Palmer
FULBRIGHT & JAWORSKI, LLP
1301 McKinney, Suite 5100
Houston, Texas 77010

Julie L. Ezell                                      **VIA FACSIMILE**
CINERGY MARKETING & TRADING, L.P.
1000 East Main Street
Plainfield, Indiana 46168

Randy Beevis                                        **VIA FACSIMILE**
1100 Louisiana, Suite 4900
Houston, Texas 77002

J.D. Page                                           **VIA FACSIMILE**
3040 Post Oak Boulevard, Suite 85G
Houston, Texas 77056

Bradley Whalen                                      **VIA FACSIMILE**
DOYLE, RESTREP, HARVING & ROBBINS,
L.L.P
4700 Chase Tower
600 Travis Street
Houston, Texas   77002

Rene G. Oliveira                                    **VIA FACSIMILE**
David G. Oliveira

ROERIG, OLIVEIRA & FISHER
855 West Price Road, Suite 9
Brownsville, Texas 78520

Robert Galligan                          **VIA FACSIMILE**
JONES, GALLIGAN, KEY & LOZANO, L.L.P.
2300 W. Pike, Suite 300
P. O. Drawer 1247
Weslaco, Texas 78599-1247


_____
**ADAM PONCIO**

Case 1:03-cv-00080   Document 72   Filed in TXSD on 04/16/2004   Page 18 of 102

Received 02/27/2004 14:4⌐   04:12 on line [10] for JD00304 Printed 02  ⌐2004  14:50 * Pg 13/17
02/27/2004  14:43   210-2⌐_-5880                        CERDA & PONCIO, ⌐C                    PAGE  13

## REQUESTS FOR ADMISSIONS

REQUEST FOR ADMISSION NO. 1:       Admit that exhibit 1 attached hereto is a true and correct copy of ordinance no. 478 under which the City of San Benito is basing its suit against the Defendants herein.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 2:       Admit that exhibit 1 attached hereto is a true and correct copy of ordinance no.478 under which the City of San Benito is basing its claim against the Defendant on whom this request for admissions has been served.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 3:       Admit that after January 1, 1941, the Defendant did use the streets, highways, alleys, parks, or other public places within the City of San Benito, Texas, for the sale and distribution of natural gas.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 4:       Admit that after January 1, 1941, the Defendant did sell and/or distribute natural gas within the corporate limits of the City of San Benito, Texas.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 5:       Admit that after January 1, 1941, the Defendant did own or operate any pipelines within the City of San Benito, Texas.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 6:       Admit that after January 1, 1941, the Defendant did own or operate any fixtures and appurtenances for the sale and distribution of natural gas within the City of San Benito, Texas.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 7:       Admit that after January 1, 1941, the Defendant did use or maintain any pipelines within the City of San Benito, Texas.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 8:       Admit that after January 1, 1941, the Defendant did use and maintain any main and auxiliary lines, appurtenances and fixtures for the sale and distribution of natural gas in any of the streets, alleys, parks or other public places within the corporate limits of the City of San Benito, Texas.

Case 1:03-cv-00080    Document 72    Filed in TXSD on 04/16/2004    Page 19 of 102
Received 02/27/2004 14:4⌐  04:12 on line [10] for JD00304 Printed 02  2004 14:50 * Pg 14/17
02/27/2004  14:43    210-21_ -5880             CERDA & PONCIO, ^C              PAGE  14

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 9:      Admit that after January 1, 1941, the Defendant did operate as a gas utility within the City of San Benito, Texas.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 10:      Admit that Defendant did sell any natural gas for heat, power, or other purposes within corporate limits of the City of San Benito, Texas.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 11:      Admit that Defendant has ever owned any gas pipelines within the corporate limits of the City of San Benito, Texas.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 12:      Admit that Defendant has used and/or maintained any lines for the sale and distribution of natural gas within the corporate limits of the City of San Benito, Texas.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 13:      Admit that the Defendant has evidence that Defendant used and/or maintained any main or auxiliary lines, appurtenances and/or fixtures for the sale and distribution of natural gas in the City of San Benito, Texas.

ADMIT OR DENY:

REQUEST FOR ADMISSION NO. 14:      Admit that the Defendant has evidence that Defendant used and/or maintained any main or auxiliary lines, appurtenances and/or fixtures for the sale and distribution of natural gas in any of the streets, alleys, parks and other public places within the corporate limits of the City of San Benito, Texas.

ADMIT OR DENY:

Received 02/27/2004 14:4⌒  04:12 on line [10] for JD00304 Printed 02  ⌒2004 14:50 * Pg 15/17
02/27/2004  14:43    210-21_ -5880              CERDA & PONCIO, ⌐C            PAGE  15

# EXHIBIT 1

Case 1:03-cv-00080   Document 72   Filed in TXSD on 04/16/2004   Page 21 of 102
Received 02/27/2004 14:4?   04:12 on line [10] for JD00304 Printed 02   2004  14:50 * Pg 16/17
02/27/2004  14:43   210-21_ 5880   CERDA & PONCIO, .C   PAGE  16

ORDINANCE NO. 478

AN ORDINANCE FIXING RENTALS TO BE PAID BY NATURAL GAS UTILITIES FOR
THE PRIVILEGE OF USING WITH THEIR NATURAL GAS AUXILIARY LINES, APPUR-
TENANCES AND FIXTURES, THE STREETS, ALLEYS AND PUBLIC WAYS, WITHIN
THE CORPORATE LIMITS OF THE CITY OF SAN BENITO, TEXAS: PROVIDING
THAT SUCH UTILITIES SHALL MAKE SEMI-ANNUAL REPORTS, PROVIDING
PENALTIES FOR THE VIOLATION HEREOF, REPEALING ALL LAWS IN CON-
FLICT HEREWITH, AND DECLARING AN EMERGENCY.

BE IT ORDAINED BY THE CITY COMMISSION OF THE CITY OF SAN BENITO, TEXAS:

SECTION 1.

That all persons and corporations using and maintaining any main
and auxiliary lines, appurtenances and fixtures for the sale and dis-
tribution of natural gas in any of the streets, alleys, parks and other
public places within the corporate limits of the City of San Benito,
Texas shall within thirty (30) days after the 30th day of September
and the 31st day of March of each year file with the City Secretary a
report sworn to by the auditor of such person or corporation showing
the gross receipts derived from the sale by gas utilities of natural
gas sold for heat, power or other purposes from consumer of such
natural gas located within and using such natural gas within the cor-
porate limits of the City of San Benito, Texas, for the six (6) months
preceding each of said dates.

SECTION 11.

That upon the 1st day of November and the 1st day of May of each
year hereafter every person or corporation using the streets, highways,
alleys, parks or other public places within the City of San Benito, Texas,
with main and/or auxiliary lines, fixtures and appurtenances for the
sale and distribution of natural gas to consumers, shall pay to the
City of San Benito, Texas, a rental equal to two per cent. (2%) of the
gross receipts received by such person or corporation from its sale of
natural gas for heat, power and for other purposes derived from con-
sumers of such natural gas located within and using within the cor-
porate limits of the City of San Benito, Texas, for the six (6) months
preceding September 30th and March 31st of each year, which sum shall
be paid to the Tax Collector of the City of San Benito, Texas, who
shall thereupon deliver to the person or corporation paying the same
a receipt for the amount so paid as rental.

SECTION 111.

Any special taxes, rentals, contributions or charges accruing
before the effective date of this ordinance under the terms of any pre-
existing ordinance contract or franchise against any such person or cor-
poration, when paid to said City, shall be credited on the amount owed
by such person or corporation as a charge or rental imposed for the use
of the streets, alleys and other public places and ways within the said
City, and the Tax Collector of said City is hereby authorized to give
credit to such person or corporation when it or they pay the street
rental charges in the manner described herein for all sums and for
special taxes, rentals, contributions, charges or otherwise under the
terms of any pre-existing ordinance, contract or franchise.

SECTION IV.

That any person or corporation and the local manager or agent of
any such person or corporation, willfully failing or refusing after
thirty (30) days written notice from the City to make the report re-
quired above herein shall, upon conviction in the Corporation Court of
the said City, be fined in a sum not to exceed $50.00, and each day's
failure or refusal shall be deemed a separate offense.

SECTION V.

All ordinances and parts of ordinances in conflict herewith are
hereby repealed.

EXHIBIT 1

Case 1:03-cv-00080    Document 72    Filed in TXSD on 04/16/2004    Page 22 of 102

Received 02/27/2004 14:4~    04:12 on line [10] for JD00304 Printed 02    2004  14:50 * Pg 17/17
02/27/2004  14:43    210-2~  5880                    CERDA & PONCIO, ~C                    PAGE  17

### SECTION VI.

The fact that the legislature of the State of Texas, has, by proper enactment permitted incorporated cities and towns to levy a tax against all persons and corporations occupying the public streets, alleys, public ways and places; as a rental or charge for the use and occupancy of said streets, alleys, public ways and places, and the fact that the general fund of said City is in need of immediate replenishment, creates and emergency, and the rule requiring the reading of all ordinances at two separate meetings is hereby suspended and this ordinance shall take effect immediately upon its passage, approval, and publication as provided by the charter of the City of San Benito.

Passed and approved this 25th day of June, A.D. 1941.

                                        LOUIS S. VITTE, Mayor

Attest:

J. O. RUSSELL, City Secretary.

EXHIBIT 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3    _____    )
                                      )
      CITY OF SAN BENITO              )
 4                                    )
                                      ) CIVIL ACTION NO.
 5    VS.                             ) CA B-03-080
                                      )
 6    TEJAS GAS PIPELINE, ET AL       )
      _____     )
 7

 8

 9

               INITIAL PRETRIAL & SCHEDULING CONFERENCE
10             BEFORE THE HONORABLE ANDREW S. HANEN
                        OCTOBER 27, 2003
11

12

13    APPEARANCES:

14    For the Plaintiff:        MR. ADAM PONCIO
                                Law Office of Cerda & Poncio
15                              924 McCullough
                                San Antonio, Texas  78215-1642
16
      For Tejas Gas Pipeline:   OSBORNE J. DYKES, III
17                              JEFFREY D. PALMER
                                Fulbright & Jaworski
18                              1301 McKinney, Suite 5100
                                Houston, Texas  77010-3095
19
      For Cinergy:             MS. JULIE L. EZELL
20                              Cinergy Services
                                1000 East Main Street
21                              Plainfield, Indiana  46168

22

23    For Pennzoil:            MR. JOHN DAVID PAGE
                                Attorney At Law
24                              3040 Post Oak Blvd., Suite 850
                                Houston, Texas  77056
25
```

**CERTIFIED COPY**

```
1    APPEARANCES (Continued)

2    For Gulf Coast Energy:        MR. CHARLES SWEETMAN
                                   Sweetman, Skaggs, Lawler & Franz
3                                  855 E. Harrison Street
                                   Brownsville, Texas  78520
4

5    Transcribed by:               BARBARA BARNARD
                                   Official Court Reporter
6                                  600 E. Harrison, Box 301
                                   Brownsville, Texas  78520
7                                  (956)548-2591

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1         THE COURT:  Thank you, counsel.  Be seated, please.

2     All right.  We're here this afternoon on City of San Benito

3  versus Tejas Gas, et al, B-03-80.

4     And, Mr. Poncio, you're here representing the city?

5         MR. PONCIO:  Yes, Your Honor.

6         THE COURT:  And, Mr. Dykes, you're here representing how

7  many of the defendants.

8         MR. DYKES:  I have to count to tell you that.

9         THE COURT:  Well, what defendants are you not

10  representing?

11        MR. DYKES:  Well --

12        THE COURT:  Maybe that will be easier, or is there just

13  a number of those too?

14        MR. DYKES:  There are a total of 65 defendants, and I

15  represent eight to ten of them.  And I can name them precisely

16  if you'd like.

17        THE COURT:  Okay.  Why don't you do that for the record.

18        MR. PONCIO:  We're representing Tejas Gas Pipeline

19  Company, Tejas Gas Pipeline, L.L.C., Tejas Gas Pipeline L.P.,

20  Tejas Gas, L.L.C., Tejas Gas Marketing, L.L.C., Coral Energy

21  Services, L.L.C., Coral Energy Resources, L.P., Gulf Energy

22  Marketing Company, Gulf Energy Marketing, L.L.C., and Shell Gas

23  Trading Company.

24        THE COURT:  Okay.  All right.  And with you is

25  Mr. Palmer?

```
 1              MR. PALMER:  Yes, Your Honor.

 2              THE COURT:  And, Ms. Ezell, you represent Cinergy?

 3              MS. EZELL:  Yes.  Originally we were named in the

 4      lawsuit as Producers Energy Marketing, L.L.C.

 5              THE COURT:  Okay.  Now, does Cinergy own Cinergy Field

 6      in Cincinnati?

 7              MS. EZELL:  Well, it's no longer Cinergy Field.  It's

 8      been imploded.

 9              THE COURT:  Along with the gas market.

10          All right.  Y'all can be seated.

11          Mr. Sweetman, you represent?

12              MR. SWEETMAN:  Chuck Sweetman for Gulf Coast Energy,

13      Inc. appearing for Mr. Gandy.

14              THE COURT:  Mr. Sweetman has filed a motion to appear on

15      behalf of Gulf Coast.  Does anybody have a problem with that?

16              MR. PONCIO:  No opposition, Your Honor.

17              MR. DYKES:  None, Your Honor.

18              THE COURT:  All right.  Let me first of all say we're

19      sorry we had a little false start here.

20          Come in.

21              MR. PAGE:  I apologize for being late, Your Honor.

22              THE COURT:  Okay.  And you are?

23              MR. PAGE:  J.D. Page.

24              THE COURT:  Representing Pennzoil?

25              MR. PAGE:  Yes, Your Honor.
```

1    THE COURT:  I had a blank here for who the Pennzoil

2  lawyer was.

3    Let me back up now to the lawyers and who they represent.

4  Are these all the defendants that have been served, or are we

5  going to see some more defendants appear in this?

6    MR. PONCIO:  Your Honor, actually none of the defendants

7  were served.  What we did was we filed a petition where we named

8  them all, sent them a letter saying, "We're naming you.  We'd

9  like to try to negotiate on this issue."  And that's when Tejas

10  came in.  Pennzoil filed an answer.  Tejas came in, filed a

11  notice for removal after Cinergy had already filed an answer,

12  but they did not join in the consent to removal, et cetera, et

13  cetera, et cetera.

14    THE COURT:  What are we going to do with the rest of the

15  defendants?  Let's assume for my purposes that I'm not

16  prejudging your motion to remand, but what are we going to do

17  with the rest of these defendants?  Are we going to bring them

18  in the lawsuit or --

19    MR. PONCIO:  No.  With regard to the rest of the

20  defendants, Your Honor, what I would like to do is, to the

21  extent you consider them in this case, non-suit as to those

22  defendants so that we can take whatever action we need to with

23  regard to those defendants separately.

24    THE COURT:  Okay.  My only hesitation in that,

25  Mr. Poncio, is I don't want to create unnecessary -- you know, I

1    don't want another 30 lawsuits if we just have -- if we can

2    resolve everything in one.

3            MR. PONCIO:  Well, I'll tell you that with regard to the

4    practice in other cases in which I'm now involved, I think in,

5    for example, the City of Victoria case, which they conferred

6    with me on last week, I think only two or three actual

7    defendants filed removals in that case because they filed

8    individual lawsuits against those defendants.

9            THE COURT:  Okay.

10           MR. PONCIO:  So for practical purposes, you probably

11   wouldn't have the other 45 to 50 defendants.  It might actually

12   be simpler on this court.

13           THE COURT:  Okay.  Now, the City of Victoria cases, are

14   they -- you referenced in your pretrial stuff three different

15   Victoria cases.  Are they ongoing and alive and well?

16           MR. PONCIO:  Those are ongoing in that particular venue,

17   Your Honor.  I'm not specifically joined in those yet.  I

18   anticipate that I will be to some extent.  In fact, Mr. Dykes is

19   involved --

20           THE COURT:  Okay.

21           MR. PONCIO:  -- in those as well.

22           THE COURT:  Are those ongoing lawsuits, Mr. Dykes?

23           MR. DYKES:  That is correct, Your Honor.

24           THE COURT:  All right.  Now, the case that was here that

25   this got removed from or got severed from and then removed, is

1    it over, the Cameron County case?

2         MR. PONCIO:  Yes, Your Honor.  That was actually a class

3    action.  It didn't actually involve this particular case.  In

4    fact, the class action itself didn't involve the street rental

5    ordinance whatsoever.  The reason the City of San Benito severed

6    itself out of that case is that they found that they did have a

7    street rental ordinance.

8         THE COURT:  All right.

9         MR. PONCIO:  So different issues.

10        THE COURT:  Okay.  Y'all be seated.  Well, one of the

11   reasons I wanted to meet with y'all is obviously I want to get a

12   scheduling order in place.  As I started to say a minute ago, we

13   apologize for the fact that Judge Black had to recuse himself;

14   but actually, we have pretty strict federal recusal rules.

15   And -- I mean, they're not optional.  I mean, even if you guys

16   would have given your consent, he couldn't have heard it, and so

17   that's why he had to do that.

18        Let me -- somebody in state court has a venue motion?  Is

19   there a lurking venue motion?  I'm not talking about the remand

20   and whether we're supposed to be here, but --

21        MR. DYKES:  Your Honor, if the state court rules for us,

22   venue -- motion for transfer of venue must be asserted initially

23   if it's ever going to be asserted.  And we didn't file an answer

24   in state court, but we also wanted to preserve our venue

25   position.

1  THE COURT:  In case you got remanded back.

2  MR. DYKES:  In case we got remanded.  And we would like

3  also to reserve the right to move for a transfer of venue in

4  this court.  I'm not representing that we would do it, but that

5  might be a matter to be put on a scheduling order, to file a

6  motion for change of venue if one is ever going to be filed.

7  THE COURT:  Okay.  Yeah.  Well, I'll probably allow you

8  to do that, Mr. Dykes.  You're going to have to do some heavy

9  duty convincing of me that a case involving the City of San

10  Benito shouldn't be heard in this county; but, you know, you're

11  pretty creative.  You may come up with a way that convinces me.

12  All right.  So I'm taking it from what you said, though,

13  that it's not something that I necessarily need to deal with in

14  order to move forward today?

15  MR. DYKES:  We do not believe it's necessary to deal

16  with the venue motion before the removal-remand issue.

17  THE COURT:  Okay.  Okay.  Let me talk first about

18  scheduling, and then -- because I want to give y'all time to

19  talk to me about the remand.  Now, the defendants have proposed

20  more or less a bifurcated procedure, which I know the plaintiff

21  has not acquiesced in; in fact, do not want to go on that

22  procedure.

23  Mr. Dykes, why do you -- and I'm asking Mr. Dykes these

24  questions.  Any of y'all are welcome to chime in from the

25  defense side.  Why do you prefer a bifurcated proceeding?

1    MR. PAGE:  Your Honor, J.D. Page on behalf of Pennzoil.

2  We prefer the bifurcated proceeding because we've seen

3  absolutely nothing that would suggest that my client, at least,

4  has any business being sued in this.  Based upon what we

5  understand the lawsuit is about, we don't belong here.

6    We've asked Mr. Poncio for any documents that would

7  substantiate the claim that has been made.  It looks otherwise

8  like it's just sort of a shotgun approach to anybody and

9  everybody that might ever, ever possibly have business that

10  somehow touched the City of San Benito.  We've never gotten any

11  documents.

12    Until we get the threshold documents, something that makes

13  it look like there's maybe a liability issue as to us, we don't

14  think we ought to have to spend the enormous amount of time that

15  would be necessary for the damages issue.

16    THE COURT:  Let me ask what may be a naive question.

17  But, I mean, wouldn't you know if you owned a pipeline under the

18  City of San Benito or not?

19    MR. PAGE:  Yes, Your Honor, and we've said we don't own

20  a pipeline under the City of San Benito.  We've never owned one.

21  And that's exactly where we started.  And I think Mr. Poncio has

22  a claim which we do not believe is in any way supported by the

23  case law or by statute that we should be liable anyway,

24  Mr. Poncio.  And I look to Mr. Poncio, notwithstanding the fact

25  that I'm arguing or answering your question, Your Honor, because

1    I don't mean to misstate it.  But I think Mr. Poncio, having

2    nodded, has confirmed for me my understanding of his position.

3    Even though we don't own a pipeline, he contends that we should

4    be liable.

5        It is precisely because we don't own a pipeline that we

6    think that at the threshold, we should not be involved in any

7    lawsuit wherever it is brought.  And that's why, backing up to

8    the issue of bifurcation, we thought we should have a very

9    straightforward resolution in this court of whether there should

10   be any liability whatsoever before we spend, again, all the time

11   that would be necessary on the damages issues.

12       THE COURT:  Anyone else from the defense side want to

13   address that?

14       MR. DYKES:  I might just emphasize Mr. Page's point;

15   that the damages research, if it's necessary to undertake that,

16   would be an enormous labor.  Mr. Poncio has sued all the

17   defendants in this case for a period going back over 60 years,

18   back to 1941 when this ordinance was enacted.  And these

19   companies, many of them are that old, and they've had mergers

20   and acquisitions; they've had dispositions of pipeline assets.

21   If it were necessary to research all or any significant part of

22   that 60-year period, the labor involved would be -- could be, it

23   depends from company to company, but it could very well be quite

24   staggering.

25       THE COURT:  Okay.  Mr. Poncio, what's -- why doesn't

1    their position make sense?

2         MR. PONCIO:  Your Honor, the difficulty in this

3    particular case -- well, first of all, with regard to severing

4    or bifurcating, the damage documents are going to be the same

5    documents that establish liability.  For example, you're going

6    to have actual sales documents that show sales within the city.

7    The difficulty is the way gas companies and gas marketing

8    companies conduct themselves.

9         They create layer upon layer of shell companies in order to

10   avoid liability, as we've shown in other cases we've been

11   involved in, where they may say, "We don't technically own the

12   pipeline in the company, but one of our other companies do," and

13   they perform these types of transactions in order to avoid this

14   type of liability.  And our intent is to show a form of fraud

15   and manipulation of these shell companies in order to avoid

16   direct liability, but we intend to show liability based on those

17   transactions and occurrences.

18        THE COURT:  Well, here's what -- here's what strikes me.

19   I understand your point.  You can sit down.

20        MR. PONCIO:  Thank you.

21        THE COURT:  There ought to be a neutral point to this or

22   at least a common denominator in here.  There ought to be some

23   showing that at least we know or have to find out whether

24   Pennzoil owns a pipeline under there or owns a company that owns

25   a pipeline or some, you know, second cousin third time removed

1    that they actually control somehow, and I understand that.

2        On the other hand, it seems somewhat backwards, if you will,

3    to make Mr. Page -- Mr. Page's client go through a bunch of

4    hoops producing a bunch of production documents, if you will, or

5    witnesses with regard to how much gas they sell if they don't

6    have any that runs under the City of San Benito.  And I'm, in a

7    way, opening this a little bit for discussion, but I think there

8    ought to be a way that you ought to be able to satisfy yourself,

9    and you ought to be allowed the discovery you need to satisfy

10   yourself that there is no hanky-panky corporate shell game going

11   on, at the same time without making them produce a million

12   documents since 1941 to bring it up to date.  And I'm -- I mean,

13   I would think that we ought to be able to establish a two-tier,

14   if you will, or two-stage discovery setup where you get to

15   figure out the ownership issues.

16       And pending a positive answer to that, you go forward into

17   the next stage.  And with a negative answer, you'd either come

18   to the court, perhaps, and voluntarily dismiss them, or that the

19   defendants would file a motion for summary judgement and say,

20   you know, "Me no Alamo.  I've never owned a pipeline there, and

21   I shouldn't be sued and shouldn't have to pay any rent for

22   pipeline rent."

23       What kind of information do you need to establish -- now,

24   what comes to mind is immediately some kind of interrogatory or

25   some kind of request for admission with an interrogatory

1    attached to it, something that basically says, "Mr. Defendant,

2    have you now or have you in the last 60 years since 1941 owned a

3    pipeline that runs under the City of San Benito or had any

4    ownership interest in a company that owned a pipeline that had

5    any ownership interest in gas that ran under the City of San

6    Benito?"  I mean, how does it -- tell me about that.

7         MR. PONCIO:  I think we could formulate something, Your

8    Honor, if you're talking about a two-tiered level of discovery.

9    What I didn't want to do was work towards a liability trial,

10   then start all over again working towards a damage trial.

11        THE COURT:  Yeah.  I'm not really -- and I know the

12   defendants might prefer that.  I'm not leaning toward that.  I'm

13   leaning toward, though -- but I do understand the "Don't make us

14   jump through every hoop and produce every accounting record we

15   have for every ounce of gas we've ever sold," or MCF of gas or

16   however this is sold so that -- only to eventually come forward

17   with our motion for summary judgment saying, "We haven't been

18   near the City of San Benito."

19        MR. PONCIO:  I think if Your Honor, once you've made

20   your decision on the motion to remand, if you could give me a

21   two-week period to formulate some sort of proposed discovery

22   plan towards that end that you just relayed to us, I think I can

23   come up with that for you, Your Honor.

24        THE COURT:  Gentlemen, what would be wrong with that?

25   Or gentlemen and lady?

1    MR. DYKES:  Your Honor, Mr. Poncio and I have talked

2    going back to when I first learned of this lawsuit.  I think

3    that was sometime a few months after it was filed, and I think

4    this is useful to recount -- this was an attempt at discovery on

5    my part, so I think it's relevant to what we're talking about.

6        I asked him why he believed that these companies had

7    pipelines or sales or any other connection with the City of San

8    Benito.  And he'll correct me if I'm wrong, but I believe I

9    understood him to say that he had gone to the Railroad

10   Commission and had been at a warehouse with some ancient records

11   that everyone thought had been discarded, and that he had found

12   records that named each of the defendants, each of the 65

13   defendants in this case, and in each case in such a way as to

14   justify suing that defendant.  And he offered, which I

15   appreciated, to give me the records for the companies I was

16   interested in.  I did ask for those companies.  He has been, I

17   know, extremely busy in trial and other matters, but I don't

18   have them yet.

19       Now, if we can just get that information, if we can find out

20   why it is -- if he can focus us on what it is that he believes

21   about each company, this makes it so much more doable from our

22   standpoint.  If there's any question, pipeline ownership, for

23   example, ownership of a company that owns a pipeline that

24   extends back 60 years, the burden for Shell and for Kinder

25   Morgan, which now effectively is some of these companies, is

1   staggering.  If we can avoid that 60-year search without any

2   focus, that's -- that's my aim in proceeding further on

3   discovery.

4       We have -- when we talked back on August the 15th, and this

5   is reflected in the -- in the joint discovery case management

6   plan that we -- that we filed, we had agreed with Mr. Poncio

7   that he would file his initial disclosure from whatever date we

8   were looking at, and that we would then have -- after we got a

9   look at these -- at this evidence that he felt that he had, we

10  would then have 60 days to do our research on those identified

11  areas.  And if we -- I would submit, Your Honor, that that is a

12  logical plan.

13          THE COURT:  Is that problematic for you?

14          MR. PONCIO:  We don't have any problem with that.  We

15  talked before you came out, Your Honor, and said using that same

16  plan that we had set out, just setting a 30-day period from

17  whatever date you've decided on the motion to remand, then we

18  can work using that same trial plan initially.

19          THE COURT:  All right.  Here's what -- let me do this.

20  It's the 27th.  And unfortunately, I have two conferences, one

21  this week and one next week.  But let's take it as quasi-gospel

22  that I will rule on the motion to remand by the 14th of

23  November.

24      All right.  Then, Mr. Poncio, what I want the plaintiffs to

25  do -- and I'm going to give you to the end of the year to do

1    this.   That's six weeks, but I know the holidays are sitting in

2    the middle of that; not only Thanksgiving, but Christmas as

3    well -- to produce your information that you gleaned to name

4    these defendants.   And it sounds -- I mean, was he right?   Were

5    we talking Railroad Commission documents or whatever?   But let

6    me not limit it to that, though.   I mean, if you have City of

7    San Benito documents or some correspondence between any of these

8    defendants to the city or whatever that says, "Oh, by the way,

9    we've got a pipeline running down Main Street," I mean, I want

10   you to produce that too, okay?

11       All right.   And then I will go out to the -- let me change

12   calendars -- okay.   Let's just say yours is due -- Mr. Poncio,

13   that's due the 31st of December, so, I mean, right at year's

14   end.   On the 27th of February, in that six -- almost two months

15   there, you know, I want the defendants to do the research that

16   goes along with that, having received these documents to find

17   out exactly where you are.

18       And I'm trying to think the best way of bringing that issue

19   to a resolution.   It may be by, Mr. Poncio, you then sending out

20   the discovery that we talked about.

21       MR. PONCIO:   Right.

22       THE COURT:   You know, give me a list of every company

23   you've ever owned a piece of, you know, however you want to

24   phrase it.   But design it enough to where you pick up not only

25   the defendants, but any subsidiary or parent corporation or

1    whatever you think you need.  But that will give them two months

2    to gather the information they'll need to answer that, and just

3    send them a regular interrogatory.  And why don't you plan on

4    sending that by the -- by February 27th.  And then the

5    defendants will have until March 31st to answer that.

6        All right.  And at that point, we ought to be in a position

7    that by the end of April, that either you can file a motion to

8    dismiss if you've accidentally named somebody that doesn't

9    belong here; or if there's a disagreement about whether they

10   belong here or not, if they feel strongly about it, they can

11   file a motion for summary judgment saying, "We've never been

12   here."

13       Now, having said that, I may allow at that point, depending

14   on what the motion looks like, Mr. Poncio to take further

15   discovery, because it may not be extensive enough to allow him

16   some solace.  I mean, it may be -- he may be put in a situation

17   where he's saying, "I just don't know enough to let you out, and

18   I don't want to get sued for malpractice."  But it may also be

19   clear enough, and I'll go ahead and rule on the motion for

20   summary judgment in that case.

21       Okay.  Now, talk to me about what the other issues in this

22   case will be.  I mean, the one issue will be do they have the --

23   a pipeline.  The second issue, no doubt, would be the amounts

24   that they've delivered in the last -- since 1941.  I take it

25   none of these people have ever paid according to that ordinance?

1      MR. PONCIO:  Except for certain defendants, Your Honor,

2   that had separate franchise fee agreements subject to the

3   ordinance.

4      THE COURT:  Okay.  And so the main issue, once you've

5   established whether a pipeline exists or not or was ever owned

6   or not by these defendants, will be amounts and rent due from

7   your standpoint?

8      MR. PONCIO:  (Nod indicated.)

9      THE COURT:  Now, there may be some -- from the

10  defendants' standpoint, they may have some -- you know, hey,

11  we've been doing this for 60 years.  Where have you been for the

12  last 60 years kind of issues that they want to bring up,

13  although I'm not sure limitations can run against a city, but

14  that's a -- you know, a bridge we'll cross when we get to it.

15     But I would think at this point, once you get their response

16  on the 31st, that you could then frame whatever discovery you

17  need regarding the amount of gas and the -- and, I guess, the

18  price, because it's a percentage of the price is the way I read

19  that, right?

20     MR. PONCIO:  Yes, Your Honor.  And then by June, they'll

21  pay me plus interest, I think.

22     THE COURT:  Well, I wouldn't advise -- not that I give

23  advisory opinions, but I wouldn't advise holding your breath on

24  that.

25     All right.  What's wrong with that scheme, guys from the

```
 1   defense side?  Why can't that work?
 2             MR. DYKES:  I think that sounds very workable.
 3             THE COURT:  And that will give, Mr. Page, your client,
 4   if he truly has never owned a pipeline down here, doesn't own
 5   anybody that's owned a pipeline, never seen a pipeline, and the
 6   dog didn't bite me and I don't own a dog, you get an opportunity
 7   to -- let's answer those issues first before you have to go
 8   through and search every accounting folder known to mankind to
 9   find your gas sales in South Texas.
10             MR. PAGE:  I think that sounds great.  If Mr. Poncio has
11   a further theory, though -- and, frankly, fraud is something
12   that I -- I'm not sure I had ever really understood, and I
13   thought we had been very straightforward in answering that we
14   don't own a pipeline and haven't owned a pipeline.  And I'm
15   certainly not aware of my clients ever having committed some
16   fraud or subterfuge regarding the ownership of the pipeline, and
17   had never understood that to be even the allegations, if there's
18   something beyond that.
19             THE COURT:  Well, if that's still alive, you can include
20   that in your motion for summary judgment, and then he's going to
21   have to explain it to me or convince me that he's got a cause of
22   action.
23             MR. PAGE:  Actually I've got a motion for summary
24   judgment I can file in short order.
25             THE COURT:  Well, I'm going to let him do this discovery
```

1    first.

2         MR. PAGE:  Well, I'm just saying, I have a motion for

3    summary judgment I can file in short order because not only a

4    pipeline, and certainly not being aware that we were even

5    being -- that anybody even suggested that if we did own one, we

6    must have engaged in some sort of fraud, we would like to get

7    out and not to go too much further with it.  But I really kind

8    of thought it was inappropriate that we should have been sued in

9    the first place unless somebody could really establish that we

10   owned a pipeline or had some good faith basis.  I don't remember

11   exactly how the rule puts it, but unless somebody really had a

12   good faith basis for bringing us into this lawsuit when we don't

13   own a pipeline and otherwise don't seem to come under the

14   statute.

15        THE COURT:  Well, I'm going to let him do the discovery

16   I talked about, Mr. Page --

17        MR. PAGE:  Yes, sir.

18        THE COURT:  -- and you can file your motion whenever you

19   want to file it, but I'm telling you I'm not ruling on it --

20        MR. PAGE:  Yes.

21        THE COURT:  -- until we get through these stages.

22        MR. PAGE:  I understand, Your Honor.

23        MR. PONCIO:  And just to clarify, Your Honor, we never

24   brought him into the lawsuit.  They decided to join the lawsuit.

25   Just to clarify for the court, they voluntarily came in, even

1    though they've never been served, even though it was sent, the

2    petition was sent with a courtesy letter saying, "We're not

3    joining you as a defendant right now.  We're just sending this."

4         THE COURT:  Well, they've been sued, though.  I know

5    what you're saying, and I'm not --

6         MR. PONCIO:  But I'm just saying, I hear his threats;

7    and I'm just telling him, we never joined you.

8         THE COURT:  I'm not worried about that.  I'm not worried

9    about that.

10        All right.  Let's assume, counsel, that either one or more

11   of the counsel sitting at defense counsel table will be here

12   with a viable defendant.  Mr. Poncio is going to be here with a

13   viable plaintiff.  When can we try this case?  Next summer?

14        MR. PONCIO:  I think that's what we're looking at, Your

15   Honor, after -- you're talking about -- excuse me.  You're

16   talking about the motion to dismiss or a motion for summary

17   judgment by the end of April.  If we do this initial discovery,

18   you're probably talking late summer for damage calculations and

19   probably expert depositions.

20        THE COURT:  See, that's what I would think would be the

21   time consuming and costly part of this case, will be deposing

22   their accountants --

23        MR. PONCIO:  Right.

24        THE COURT:  -- their expert economist or gas expert or

25   whatever and vice versa, their deposing yours.

1    MR. PONCIO:  So you're probably looking at, I would

2    anticipate, probably next September; next August, next September

3    for doing that.

4         THE COURT:  What do you think?  Is that too optimistic?

5         MR. DYKES:  We had pencilled in November of '04, so

6    we're not far off.

7         MR. PONCIO:  That's fine, Your Honor.  September,

8    October of next year.  Even November would work.

9         THE COURT:  Let's see what I -- okay.  Let's do this.

10    We're going to pick juries -- a jury in this case on

11    November 4th at 9:00 o'clock.  Do y'all want to do the voir

12    dire?

13         MR. DYKES:  Yes, Your Honor, we do request lawyer voir

14    dire.

15         THE COURT:  Mr. Poncio?

16         MR. PONCIO:  Your Honor, I -- I don't know that it's

17    really a jury trial issue.

18         THE COURT:  I think there's a jury request that's been

19    made, though.  Didn't I see one?

20         MR. PONCIO:  That's right, Your Honor, but I think when

21    you're looking at the damage calculations -- well, if they're

22    selecting voir dire, I'll be glad to take that, Your Honor.  I

23    just don't see it as a --

24         THE COURT:  Well, let's leave it this way.  Unless y'all

25    decide to try it to the bench, and you can always opt to do

```
 1    that, and I'm fine with that, we'll assume that counsel are

 2    going to do the voir dire.

 3              MR. PONCIO:  Sure.

 4              THE COURT:  Any objection to that from anybody?

 5              MR. PONCIO:  No, Your Honor.

 6              THE COURT:  All right.  Now, by saying that, of course,

 7    I don't -- I'd like it to be a little something less than your

 8    final jury argument.  Mix a question in there every once in a

 9    while, but we'll assume that.

10         Now, I'd prefer a 12-person jury.  Now, you know in federal

11    court, you're going to get a six.  I prefer 12 and with the

12    standard like we do in state court, 10/2 verdict or above.  Are

13    there any objections to that?

14              MR. PONCIO:  No, Your Honor.

15              MR. DYKES:  No, Your Honor.

16              THE COURT:  All right.

17              MR. SWEETMAN:  No objection.

18              THE COURT:  That's what we'll do.  Ms. Ezell?

19              MS. EZELL:  No.

20              THE COURT:  All right.  On Thursday, the 28$^{th}$ of October

21    at 1:30, and we may have to play a little bit with this time,

22    but for your scheduling purposes at 1:30, we're going to have

23    basically a pretrial conference.  And at that, I'm going to want

24    to go through, you know, every issue that we're going to be

25    arguing about.  I'd like to go ahead and admit the exhibits.
```

1   I'd like to go ahead and talk about jury issues, although I

2   probably won't finalize them by then, and I'd like to go

3   ahead -- and, obviously, if there's going to be some bone of

4   contention that's going to come up, although this fact situation

5   doesn't lend itself to, you know, some smoking gun that you

6   don't want the other side to know about necessarily, I don't

7   want any surprises in front of the jury that are going to cause

8   me to have to send them home early and send me to the library.

9   So I want to flush those out that Thursday.

10        On Thursday the 14th, I want your joint pretrial order, and

11   that will have all the exhibits, motion in limine, you know, the

12   whole gamut that's under the rules.  All right.

13        MR. PAGE:  Do you have the Louis Moore ace in the hole

14   rule?

15        THE COURT:  I'm sorry, I didn't hear you.

16        MR. PAGE:  Do you have the Louis Moore ace in the hole

17   rule?

18        THE COURT:  Which means?

19        MR. PAGE:  Judge Moore, I remember trying a case in his

20   court, and he said, you know, "No surprises unless you have an

21   ace in the hole."

22        THE COURT:  Well, it better be a really good ace, is all

23   I can say, if it's a surprise to me.

24        MR. PAGE:  I'm just trying to understand the --

25        THE COURT:  I don't want -- this doesn't lend itself to

1    it, but a personal injury case would; you know, something where

2    the defendant is sitting there, and he knows the guy has been

3    convicted ten times of, you know, murder, and he's sitting on

4    those convictions, and all of a sudden in front of the jury

5    stands up and starts pulling those convictions out.  I don't

6    want to be surprised by that, and I don't want to lose my jury

7    over that.

8        What I'm really talking about is if you know something is

9    going to be controversial, you know you have a piece of evidence

10   you want to get in, you know Mr. Poncio is going to fight like

11   the dickens to keep it out and vice versa, let's go ahead and

12   have the fight before we have a jury in the box.  I mean, you --

13   rarely is there going to be something.  I mean, if it's

14   absolutely a surprise, I'm not going to keep either side, if

15   it's otherwise admissible, from using it.  But if -- you know,

16   any more we discover these cases to death; rarely is there

17   really a surprise.  I mean, you know, Mr. Poncio comes up with

18   an e-mail that says, "Gee, whatever you do, don't tell the city

19   we snuck a pipeline under their main street."  I mean, you know,

20   he knows you're not going to want that into evidence, and you

21   know you're going to fight it.  So let's go ahead and have the

22   fight before the jury is in the box.  That's all I'm saying.

23       The last couple times I tried a case in Louis Moore's court,

24   by the time we got to trial, neither one of us wanted to face

25   him, so we settled somehow.

1    Mr. Poncio, when can you name experts?  End of June?

2         MR. PONCIO:  I think that's fine, Your Honor.  I mean,

3    pretty much that's fine, Your Honor.

4         THE COURT:  June 30th?

5         MR. PONCIO:  Sure.  Any date is fine.

6         THE COURT:  Let me see what day of the week that is.

7         COURT CLERK:  It's a Wednesday, Judge.

8         THE COURT:  Okay.  June 30th.

9    And then why don't the defendants name experts on

10   August 13th.  That will give you time to depose each other, and

11   I know people will also still have vacations lurking around in

12   there.

13       By October -- I'm sorry, September 17th, I want any

14   dispositive motions filed that I haven't already had.  I mean, I

15   would imagine from the defense side, you guys are going to run

16   in as soon as you possibly can and file your motions for summary

17   judgment.  But if there's something that comes up and you figure

18   out, "Gee, we said we owned this pipeline, but we really don't,"

19   that will be a creative affidavit, but I'd like to have it filed

20   by the 17th of September.  And then discovery cutoff will be

21   October 8th.

22       Now, any of these deadlines, with the exception of the

23   pretrial order, the pretrial conference, and the jury selection,

24   y'all can move around by agreement.  And I don't -- you don't

25   have to file a motion.  I'd like a letter from counsel saying

1    we've agreed to move this deadline from here to here just so I

2    have a record of it.   But anything y'all agree to do is fine

3    with me.

4        All right.   Before -- anything else we need to talk about

5    before we talk about whether you're actually here or not?

6        Okay.   Mr. Dykes, why don't you lead off, and let's talk

7    about your removal of this case, and then I want Mr. Poncio to

8    respond to it.

9            MR. DYKES:   Your Honor, if I may, I'd like to call on

10   Mr. Palmer to address that issue.

11           THE COURT:   That's fine.

12           MR. PALMER:   Your Honor, we removed on the basis of the

13   plaintiff's petition because plaintiffs requested declaratory

14   relief, including injunctive relief, and based on *Grynberg*,

15   decision by the Chief Judge Schell, Eastern District of Texas.

16   And in Texas law, when you plead for an injunction, that makes

17   part of the plaintiff's prima facie case to negate all

18   inferences and essentially brings in the federal constitutional

19   law into the case.

20       In fact, Chief Judge Schell said, "Thus, in an injunction

21   suit under Texas substantive law, many things which might

22   otherwise be characterized as defenses are really not defenses,

23   but essentially elements of the plaintiff's prima facie case."

24           THE COURT:   Okay.   Now, does it make a difference in

25   that -- that case was based on, for lack of a better term,

1    federal common law.  This case is based on state law.  Does it

2    change the rule?

3              MR. PALMER:  No, Your Honor.  Once they seek an

4    injunction, part of their prima facie case then is to negate

5    those inferences; and, therefore, that doesn't matter.

6    Essentially you start looking at what could prevent them from

7    obtaining that injunction, and here you have federal

8    constitutional law.  Essentially we have issues with the taking

9    clause, commerce clause, substantive due process, as well as

10   equal protection.

11        I know plaintiff was talking -- he raised the Tax Injunction

12   Act.  But you will see the cases basically stand for the

13   proposition that that's not applicable where you're seeking to

14   collect taxes.  That's only applicable if we're seeking to

15   enjoin taxes.

16        We would hold that this whole case isn't about taxes; it's

17   about street rental ordinance and street rents.  It's about

18   rentals, not taxes.  And it's pretty clear from the ordinance

19   itself, which is entitled "Street Rental Ordinance" and also

20   refers several times to rentals.

21        He's also raised consent.  And when we filed the removal,

22   Pennzoil Gas Company joined in and consented to the removal.  We

23   had Cinergy, which essentially filed an answer in state court

24   three hours prior to us removing -- filing the actual

25   notification of removal, effectuating removal in state court.

1   And then Gulf Cost answered approximately five days later after

2   the case had already been removed.  Once we found out about

3   Cinergy and Gulf Coast, we contacted them and got them to

4   consent to the removal.

5       If, for whatever reason, you still find consent was not met,

6   the 5th Circuit has adopted the exceptional circumstances

7   exceptions procedural requirements for removal, and we would say

8   this is just a case like that where you have 60-some-odd

9   defendants who have been named, and no one knows who's been

10  served.  And apparently no one has been served, and no one knows

11  who is answering.  We had no idea that anyone was going to

12  answer; and then all of a sudden, we found out Pennzoil

13  answered, and that's why -- although we don't think we had to,

14  we wanted to make sure that we got an answer and removed it

15  within 30 days of their answer, Your Honor.

16          THE COURT:  All right.  Mr. Poncio, you want to talk

17  about why you don't belong here?

18          MR. PONCIO:  Sure, Your Honor.  Just a couple of things.

19  I think everything is pretty clearly set out.

20      But with regard to removal, Your Honor, we think they have

21  the burden to determine who had filed answers before the

22  removal.  They had plenty of time to make that determination.

23  It was noted in the clerk's records.  Nevertheless, they didn't

24  obtain consent.

25      With regard to removal pursuant to 1331, I have a couple of

1   case cites, Your Honor, and I'll follow-up with a letter to the

2   court.

3            THE COURT:  Okay.

4            MR. PONCIO:  But one particular case, the *Appling County*

5   *Case*, which is 621 F.2d, 1301, a 5th Circuit case, 1980.  It

6   says that the federal court has subject matter jurisdiction only

7   when the plaintiff's statement of his own cause of action shows

8   that it is based on federal law.

9        Clearly, we demonstrate in our petition that it's not based

10  on federal law, but simply state law and a local ordinance.

11  With regard to the *Grynberg* case, it's simply a district court

12  case which has no compelling authority, I believe, in light of

13  these other 5th Circuit opinions.

14       With regard to the injunction act, Your Honor, one other

15  case we'd like to cite, the *A Bonding Company* case, 629 F.2d,

16  1127, another 5th Circuit case out of 1980, which says that the

17  defendant in that case, where we're arguing the Tax Injunction

18  Act and the abstention as to tax issues applies, the defendant

19  in that case did not contend that state remedies are inadequate

20  for the disposition of the case so that the federal court in

21  that particular case must dismiss.  We have the same instance

22  here where they haven't demonstrated that even in light of these

23  other federal issues that they're raising, that the state court

24  is not an adequate -- is not inadequate in order to protect

25  their federal issues.

1    The second point to that case, Your Honor, the court must

2    assume that the state's equitable remedies are sufficient to

3    protect the defendant's federal rights; and, therefore, the

4    federal court must dismiss in light of those particular issues.

5    They cite one particular case arguing that this ordinance

6    is, in fact, not a tax.  That particular case was limited to its

7    issues.  They cite a footnote which is simply dicta and not

8    governing law in that case.  I think it's clear that this is a

9    tax issue with regard to the city.

10    Also, Your Honor, with regard --

11    THE COURT:  Doesn't the ordinance itself say rent?

12    MR. PONCIO:  It says rent, Your Honor; but I think any

13    and all rents are classified as a form of tax when you look at

14    the purpose, and that's to raise money for the city, which is

15    what typically is a tax.

16    With regard to the *City of Santa Monica* case, Your Honor,

17    which they cite as authority, it says that, "To show equal

18    protection issues, you must demonstrate unfair or improper

19    application," which you do not have a demonstration of in this

20    case.  And we think the case was improperly removed, and I don't

21    need to take up too much more of the court's time.

22    THE COURT:  Did you -- in your pleading, Mr. Poncio, you

23    mentioned that some years ago that this court was actually faced

24    with that.  Did you ever find the ruling on that?

25    MR. PONCIO:  Your Honor, I went down to our district

1     court -- I mean the direct clerk's office.  They don't have

2     records going back that far.  But I think if you're not going to

3     rule until the 14th, if I could have another week, I think I

4     could dredge it up.

5          THE COURT:  I think all the old records are kept up in

6     Fort Worth in some -- maybe they're microfilmed, I don't know,

7     but I think that's where they are.  But I think if you contacted

8     them and had the style of the case --

9          MR. PONCIO:  It's a *Rio Grande Valley Gas Company versus*

10    *San Benito* case, Your Honor.  I have the style.

11         THE COURT:  I think they might be able to come up with

12    it.

13         MR. PONCIO:  I think I can obtain that for you, but it

14    was based on the same issues.  And in that case, they argued

15    that the -- they held that the Injunction Act did apply and

16    dismissed the case of Rio Grande Valley Gas Company.

17         THE COURT:  Well, I'd like to see that if you could

18    possibly come up with it.

19         MR. PONCIO:  Okay.  I'll try to get that, Your Honor.

20         THE COURT:  I realize it's 60 years ago, and so it's not

21    going to be an easy thing.

22         MR. PONCIO:  Let me also point out to the court.  If you

23    look at Tejas Gas' answer, they specifically look to it arguing

24    that it's a tax because they say that certain -- it says,

25    "Defendants plead the following sections of the Texas Tax Code

1    which exempts certain sales from the imposition of a sales tax."

2        Then at paragraph 4, they say that it -- "While it may be a

3    tax of a public utility, it may not exceed the amount or amounts

4    prescribed by the statute for sales within the City of San

5    Benito."  I think it's clear from their answers that they're

6    arguing that it is a tax, just for the court's benefit.

7        THE COURT:  I mean, you're not going to take the

8    position, are you, that this wouldn't be interstate commerce,

9    are you; I mean, a pipeline, gas pipeline?

10        MR. PONCIO:  Well, it depends, Your Honor.  I think if

11    you look at the *City of Santa Monica* case, it's only dealing

12    with actual sales within the city in this particular case.  It's

13    not dealing with an issue where you're making sales to another

14    provider who intends to transport them outside of the state,

15    because you don't have that.  It deals with only sales and

16    transport for sale within the city to consumers as that may be

17    defined.

18        THE COURT:  Well, but if they had to go, for instance,

19    and dig up their pipelines and move it, wouldn't that affect

20    interstate commerce?

21        MR. PONCIO:  No.  I think what the cases say, Your

22    Honor, is that they have the right to go to private landowners

23    to create their right of way.  They can go outside the city to

24    create their right of way.  But my argument is even if it does

25    apply, even if interstate commerce would apply, that they have

1    not met the burdens under the Tax Injunction Act which say,

2    well, you've got to show that this state court is inadequate to

3    protect your federal rights, and you haven't done that.

4             THE COURT:  Okay.  All right.  Any reply from the

5    defendants?

6             MR. PALMER:  Yes, Your Honor.  I apologize.  I probably

7    should have started off with this.  Essentially, the defendant

8    has a fundamental right to a federal forum once you establish

9    subject matter jurisdiction.  That's based on not the

10   characterization of the plaintiff in his lawsuit, but on the

11   face of the petition.  It's very clear in his -- in plaintiff's

12   petition, they're seeking an injunction causing defendants to

13   remove any and all pipelines and/or facilities from the City of

14   San Benito's city limits or right of way.

15        As far as that we had the burden of finding out who had

16   answered lawsuits, like I said -- and I don't know if Mr. Poncio

17   disagrees -- but our records show that Cinergy essentially filed

18   an answer three hours before.  We had already gotten certified

19   copies of the state pleadings.  We had no idea whatsoever that

20   they had answered; and as soon as we found that out, we got

21   their consents.

22        And again, I want to give you a citation for the exceptional

23   circumstances.  It's *White versus White*, 32 F. Supp. 2d, 890.

24   And the pinpoint is 893.  And there they found exceptional

25   circumstances where it appeared plaintiff's counsel was taking

1    the ordinance, speaking of the one in issue in that case, "The

2    ordinance required all telegraph, telephone, electric and gas

3    companies using the streets or other public places within the

4    corporate limits of the city to pay, for the privilege of such

5    occupancy, a rental."

6        And it comes back to that point at the end of the opinion

7    and again on rehearing.  And I don't want to take a long time to

8    go into that, but I'll just read this one sentence from the

9    rehearing opinion of the Texas Supreme Court in that case.  It

10   said, "The authority has recognized a distinction between a

11   rental charge and a tax or charge for the privilege of doing

12   business."  So that distinction is not one that has escaped the

13   courts.  It's specifically recognized.

14       Cities have essentially three ways, besides gifts, perhaps

15   other unusual ways for a city to get assets or revenue.  They

16   have essentially three ways to get revenue.  One of them is

17   taxes, one of them is rentals, and one of them is regulatory

18   fees.  And the court recognizes that there, perhaps, in this

19   case was some confusion about which was being talked about, but

20   the court wasn't confused and made it very, very plain that it's

21   talking about rental.  And that's the same thing that Mr. Poncio

22   is making claim for.  It's very plain from the ordinance that he

23   is suing on as well as from the case that he cites.

24            THE COURT:  All right.  Counsel, anything else?

25   Here's -- let me tell you.  If you need to communicate with the

1    court, and you've done this so far, feel free to call Ms. Soto.

2    Irma is in our office multiple times during the day and she

3    communicates directly with me, so there's no problem, but that's

4    the way I'd like you to confer with the court.

5        As I said earlier, if you want to change things by

6    agreement, I -- you don't even have to ask, but I do want to

7    know about it, other than those three or four things that I

8    mentioned.

9        I will not grant any kind of motion without a certificate of

10   conference.  So -- and just as a matter of housekeeping, let me

11   reiterate that, because it will sit there because I'm not going

12   to do anything without a certificate of conference one way or

13   the other, even if it's unopposed or represented to be unopposed

14   in the style.

15       And then secondly, I do consider -- and the local rules

16   provide for this, and I know some judges do and some judges

17   don't, but I do consider an unresponded to motion as being

18   unopposed.  So if somebody files a motion and you don't like it,

19   you'd better respond to it; because otherwise, I'm going to

20   grant it.

21       All right.  Any other questions?  Okay.  We will reduce

22   today's hearing into -- into an order, and you'll get a written

23   order on this.  And then, obviously, you're not going to get a

24   remand ruling until the 14th, so if there's anything else you

25   want to tell me, you're welcome to send it by letter.  Obviously

```
1    you need to copy the other side with it.  But, you know, I'm not
2    going to give you a deadline, but you know I'm working on this,
3    so the sooner the better.  All right.  Thank you.
4        (Court adjourned)
5                                * * *
6        (End of requested transcript)
7                              -oOo-
8        I certify that the foregoing is a correct transcript from
9    the record of proceedings in the above matter.
10
11   Date:  January 21, 2004
12
13                              _____
14                              Signature of Court Reporter
                                Barbara Barnard
15
16
17
18
19
20
21
22
23
24
25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CITY OF SAN BENITO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V | § | C. A. NO. B03-080 |
| | § | |
| TEJAS GAS PIPELINE COMPANY, ET AL., | § | |
| | § | |
| Defendants | § | |

**CITY OF SAN BENITO'S RESPONSES TO DEFENDANT PENNZOIL GAS
MARKETING COMPANY'S FIRST REQUEST FOR ADMISSIONS**

TO:   Defendant, PENNZOIL GAS MARKETING COMPANY
       By and through their attorneys of record:
       Francis I. Gandy, Jr.
       148 American Bank Plaza
       Corpus Christi, Texas 78475

       COMES NOW the City of San Benito, and Pursuant to the Texas Rules of Federal Procedure,

submits the following as their responses to Defendant Pennzoil Gas Marketing Company's First

Request for Admissions. The City of San Benito reserves the right to supplement and/or withdraw

any of the following objections, admissions or denials.

                         Respectfully submitted,

                         _____
                         **ADAM PONCIO**
                         State Bar No. 16109800
                         **LAW OFFICES OF CERDA & PONCIO**
                         A Professional Corporation
                         924 McCullough Ave.
                         San Antonio, Texas 778215-1642
                         Telephone (210) 212-7979
                         Facsimile  (210) 212-5880
                         ATTORNEY FOR PLAINTIFFS

Responses to Pennzoil's Request for Admissions
Page 1

## CERTIFICATE OF SERVICE

I, the undersigned attorney of record for Plaintiff, do hereby certify that I have on this *1st* day of April, 2004, forwarded by United States Mail, a true and correct copy of the above document to the following attorneys of record pursuant to the Federal Rules of Civil Procedure:

Mr.Osbourne J. Dykes, III
1301 McKinney, Suite 5100
Houston, TX 77010

Attorney-in-Charge for Tejas Gas Pipeline Company, Tejas Gas Pipeline, L.L.C, Tejas Gas Pipeline, L.P., Tejas Gas , L.L.C., Tejas Gas Marketing, L.L.C., Gulf Energy Marketing  Company, Gulf Energy Marketing L.L.C., Coral Energy Services L.L.C., Coral Energy Resources L.P.,  Shell Gas Trading Company and Transco Petro Source Company.

Ms. Jerry K. Clements
2200 Ross Avenue, Suite 2200
Dallas, TX 75201-6776

Attorney-in-Charge for Amoco Energy Trading Corp., BP Energy Company, Arco Natural Gas Marketing Inc., Vastar Gas Marketing, Inc., Chevron U.S.A., Inc., Conoco, Inc., Natural Gas Clearinghouse, Inc., Texaco Exploration and Production, Inc., Texaco Natural Gas, Inc., Texaco Gas Marketing, Inc., Total E&P USA, Inc., as successor in interest to FINA, Inc, Union Pacific Resources Company, and Anadarko Energy Services Company.

Mr. David Van Susteren
1301 McKinney, Suite 5100
Houston, TX 77010

Attorney-in-Charge for Duke Energy Trading and Marketing, L.L.C., PanEnergy Trading and Market Services, L.L.C., and PanEnergy Trading & Marketing, L.L.C.

Mr. Francis I. Gandy, Jr.
148 American Bank Plaza
Corpus Christi, TX 78475

Attorney-in-Charge for Gulf Coast Energy, Inc.

Mr. Bradley M. Whalen
Doyle, Restrepo, Harvin & Robbins, L.L.P.
4700 Chase Tower
600 Travis Street
Houston, TX 77002
Attorney-in-Charge for Pennzoil Gas Marketing Company

---

Responses to Pennzoil's Request for Admissions
Page 2

Mr. Randy Beevis
Cinergy Marketing & Trading, LP
1000 East Main Street
Plainfield, IN 46168

Attorney-in-Charge for Cinergy Marketing & Trading, LP


**ADAM PONCIO**

## REQUESTS FOR ADMISSIONS

1.    Pennzoil has not owned a gas pipeline within the San Benito city limits since January 1, 1941.

Response: Plaintiff does not have sufficient information to either admit or deny. Plaintiff will supplement this response when discovery is completed. Pipeline ownership is but one issue in this case.

2.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had not made an inquiry as to whether Pennzoil has owned a gas pipeline within the San Benito city limits since January 1, 1941.

Response: Plaintiff objects to this request because it is vague and ambiguous in nature. The word "inquiry" is not defined. San Benito admits that it has evidence to show that Pennzoil and the rest of the Defendants, and/or their affiliates in this case, sold gas at the La Palma power plant which has been located inside the city limits of San Benito at all relevant times. The Defendants, and/or their affiliates, had to use the streets of San Benito, and other public places, with pipe lines, whether owned by the Defendant or not, to make those natural gas sales at the La Palma power plant. All such natural gas sales by the defendants were metered at the power plant. Discovery is ongoing in this case, and Plaintiff reserves the right to supplement this response when discovery is completed.

3.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no evidentiary support for its claim that Pennzoil has owned a gas pipeline within the San Benito city limits since January 1, 1941.

Response: Admitted as to whether Plaintiff had no evidentiary support for its claim that Pennzoil has owned a gas pipeline inside the city limits of San Benito since January 1, 1941, at the time referenced in Request for Admission No.3. San Benito also admits that it has evidence to show that Pennzoil and the rest of the Defendants, and/or their affiliates in this case, sold gas at the La Palma power plant which has been located inside the city limits of San Benito at all relevant times. The Defendants, and/or their affiliates, had to use the streets of San Benito, and other public places, with pipe lines, whether owned by the Defendant or not, to make those natural gas sales at the La Palma plant. All such natural gas sales by the defendants were metered at the power plant. Discovery is ongoing in this case, and Plaintiff reserves the right to supplement this response when discovery is completed.

4.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no document in its possession, custody or control which showed that Pennzoil has owned a gas pipeline within the San Benito city limits since January 1, 1941,

Response: Please see the answer to Request for Admission No. 3, which is incorporated herein by reference.

5.    Pennzoil has not owned gas pipeline fixtures within the San Benito city limits since January 1, 1941.

Response: Plaintiff does not have sufficient information to either admit or deny. Plaintiff reserves the right to supplement this request once discovery is completed. Ownership of gas pipeline fixtures is but one issue in this case.

6.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had not made an inquiry as to whether Pennzoil has owned gas pipeline fixtures within the San Benito city limits since January 1, 1941.

Response: Plaintiff objects to this request because it is vague and ambiguous in nature. The word "inquiry" is not defined. San Benito admits that it has evidence to show that Pennzoil, and the rest of the Defendants, and/or their affiliates in this case, sold gas at the La Palma power plant which has been located inside the city limits of San Benito at all relevant times. The Defendants, and/or their affiliates, had to use the streets and/or other public places of San Benito, with pipe lines, whether owned by the Defendant or not, to make those natural gas sales at the La Palma plant. All such natural gas sales by the defendants were metered at the power plant. Discovery is ongoing in this case, and Plaintiff reserves the right to supplement this response when discovery is completed.

7.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no evidentiary support for its claim that Pennzoil has owned gas pipeline fixtures within the San Benito city limits since January 1, 1941.

Response: Admitted as to whether Plaintiff had no evidentiary support for its claim that Pennzoil has owned gas pipeline fixtures inside the city limits of San Benito since January 1, 1941, at the time referenced in Request for Admission No. 7. San Benito also admits that it does have evidence to show that Pennzoil and the rest of the Defendants, and/or their affiliates in this case, sold gas at the La Palma power plant which has been located inside the city limits of San Benito at all relevant times. The Defendants, and/or their affiliates, had to use the streets of San Benito, and other public places, with pipe lines, whether owned by the Defendant or not, to make those natural gas sales at the La Palma plant. All such natural gas sales by the defendants were metered at the power plant. Discovery is ongoing in this case, and Plaintiff reserves the right to supplement this response when discovery is completed.

8.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no document in its possession, custody or control which showed that Pennzoil has owned gas pipeline fixtures within the San Benito city limits since January 1, 1941.

Response: Please see the response to Request for Admission No. 7, which is incorporated herein by reference.

9.      Pennzoil has not owned gas pipeline appurtenances within the San Benito city limits since January 1, 1941.

Response: Plaintiff does not have sufficient information to either admit or deny. Plaintiff reserves the right to supplement this request once discovery is completed. Ownership of gas pipeline appurtenances is but one issue in this case.

10.     At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had not made an inquiry as to whether Pennzoil has owned gas pipeline appurtenances within the San Benito city limits since January 1, 1941.

Response: Plaintiff objects to this request because it is vague and ambiguous in nature. The word "inquiry" is not defined. San Benito admits that it has evidence to show that Pennzoil, and the rest of the Defendants, and/or their affiliates in this case, sold gas at the La Palma power plant which has been located inside the city limits of San Benito at all relevant times. The Defendants, and/or their affiliates, had to use the streets and/or other public places of San Benito, with pipe lines, whether owned by the Defendant or not, to make those natural gas sales at the La Palma plant. All such natural gas sales by the defendants were metered at the power plant. Discovery is ongoing in this case, and Plaintiff reserves the right to supplement this response when discovery is completed.

11.     At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no evidentiary support for its claim that Pennzoil has owned gas pipeline appurtenances within the San Benito city limits since January 1, 1941.

Response: Admitted as to whether Plaintiff had no evidentiary support for its claim that Pennzoil has owned gas pipeline appurtenances inside the city limits of San Benito since January 1, 1941, at the time referenced in Request for Admission No. 11. San Benito also admits that it does have evidence to show that Pennzoil and the rest of the Defendants, and/or their affiliates in this case, sold gas at the La Palma power plant which has been located inside the city limits of San Benito at all relevant times. The Defendants, and/or their affiliates, had to use the streets of San Benito, and other public places, with pipe lines, whether owned by the Defendant or not, to make those natural gas sales at the La Palma plant. All such natural gas sales by the defendants were metered at the power plant. Discovery is ongoing in this case, and Plaintiff reserves the right to supplement this response when discovery is complete.

12.     At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no document in its possession, custody or control which showed that Pennzoil has owned gas pipeline appurtenances within the San Benito city limits since January 1, 1941.

Response: Please see the response to Request for Admission No. 11, which is incorporated herein by reference.

13.     In order for Pennzoil to be liable under San Benito Ordinance no. 478, Pennzoil must have

owned a gas pipeline, fixtures and/or appurtenances within the San Benito city limits.

Response: Denied.

14.    Pennzoil owes San Benito nothing under San Benito ordinance 478.

Response: Denied.

15.    Pennzoil has not used San Benito's streets, highways, alleys, parks or other public places since January 1, 1941.

Response: Denied.

16.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had not made an inquiry as to whether Pennzoil has used San Benito's streets, highways, alleys, parks or other public places since January 1, 1941.

Response: Denied.

17.    At the time San Benito filed its response to -notice of removal and motion to remand with supporting authorities, San Benito had no evidentiary support for its claim that Pennzoil has used San Benito's streets, highways, alleys, parks or other public places since January 1, 1941.

Response: Denied.

18.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no document in its possession, custody or control which showed that Pennzoil has used San Benito's streets, highways, alleys, parks or other public places since January 1, 1941,

Response: Denied.

19.    Pennzoil has not sold natural gas for heat, power or other purposes derived from consumers of such natural gas within the San Benito city limits since January 1, 1941.

Response: Denied. Plaintiff does admit that Pennzoil sold natural gas to the La Palma Power Plant once owned by CP&L, and such natural gas was used by the power plant to generate power and may have been used for other purposes. The power plant is and has been located inside the city limits of the City of San Benito at all relevant times. Discovery is ongoing and Plaintiff reserves the right to supplement this response once discovery is completed.

20.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had not made an inquiry as to whether Pennzoil has sold natural gas for heat, power or other purposes derived from consumers of such natural gas

within the San Benito city limits since January 1, 1941.

Response: Denied.

21.   At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no evidentiary support for its claim that Pennzoil has sold natural gas for heat, power or other purposes derived from consumers of such natural gas within the San Benito city limits since January 1, 1941.

Response: Denied.

22.   At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no document in its possession, custody or control which showed that Pennzoil has sold natural gas for heat, power or other purposes derived from consumers of such natural gas within the San Benito city limits since January 1, 1941.

Response: Denied.

23.   Pennzoil has not operated a gas pipeline, fixtures or appurtenances within the San Benito city limits since January 1, 1941.

Response: Denied.  To "operate" is synonymous with to "use."

24.   At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had not made an inquiry as to whether Pennzoil has operated a gas pipeline, fixtures or appurtenances within the San Benito city limits since January 1, 1941.

Response: Denied.  To "operate" is synonymous with to "use."

25.   At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no evidentiary support for its claim that Pennzoil has operated a gas pipeline, fixtures or appurtenances within the San Benito city limits since January 1, 1941.

Response: Denied.  To "operate" is synonymous with to "use."

26.   At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no document in its possession, custody or control which showed that Pennzoil has operated a gas pipeline, fixtures or appurtenances within the San Benito city limits since January 1, 1941.

Response: Denied.

27.   Pennzoil has not operated as a gas utility within the San Benito city limits since January 1,

1941.

Response: Plaintiff does not have sufficient information to either admit or deny. Discovery is ongoing and Plaintiff reserves the right to supplement or amend this response once discovery is completed.

28.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had not made an inquiry as to whether Pennzoil has operated as a gas utility within the San Benito city limits since January 1, 1941.

Response:  Plaintiff objects to this request because it is vague and ambiguous in nature.  The word "inquiry" is not defined.  San Benito admits that it has evidence to show that Pennzoil, and the rest of the Defendants, and/or their affiliates in this case, sold gas at the La Palma power plant which has been located inside the city limits of San Benito at all relevant times.  The Defendants, and/or their affiliates, had to use the streets and/or other public places of San Benito, with pipe lines, whether owned by the Defendants or not, to make those natural gas sales at the La Palma plant.  All such natural gas sales by the defendants were metered at the power plant.  Discovery is ongoing in this case, and Plaintiff reserves the right to supplement this response when discovery is complete

29.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no evidentiary support for its claim that Pennzoil has operated as a gas utility within the San Benito city limits since January 1, 1941.

Response: Admitted as to whether Plaintiff had no evidentiary support for its claim that Pennzoil has operated as a gas utility within the city limits of San Benito since January 1, 1941, at the time referenced in Request for Admission No. 29.  San Benito also admits that it does have evidence to show that Pennzoil and the rest of the Defendants, and/or their affiliates in this case, sold gas at the La Palma power plant which has been located inside the city limits of San Benito at all relevant times.  The Defendants, and/or their affiliates, had to use the streets of San Benito, and other public places, with pipe lines, whether owned by the Defendant or not, to make those natural gas sales at the La Palma plant.  All such natural gas sales by the defendants were metered at the power plant.  Discovery is ongoing in this case, and Plaintiff reserves the right to supplement this response when discovery is complete.

30.    At the time San Benito filed its response to notice of removal and motion to remand with supporting authorities, San Benito had no document in its possession, custody or control which showed that Pennzoil has operated as a gas utility within the San Benito city limits since January 1, 1941.

Response:  Please see Plaintiff's response to Request for Admission No. 29, which is incorporated herein by reference.

31.    As of the date of San Benito's responses to these requests for admissions, San Benito has no documents, items or things which prove that Pennzoil has ever owned or operated a gas pipeline, fixtures or appurtenances within the San Benito city limits.

Response: Admitted as to Plaintiff having no evidence of ownership by Pennzoil of a gas pipeline, fixtures or appurtenances within the San Benito city limits. Denied as to whether Pennzoil has operated a gas pipeline, fixtures or appurtenances. Pennzoil had to use gas pipelines located in streets and other public places inside the city limits of San Benito to make the gas sales that occurred and were metered at the La Palma power plant in the City of San Benito.

32.    As of the date of San Benito's responses to these requests for admissions, San Benito has no documents, items or things which prove that Pennzoil owes San Benito any money under San Benito Ordinance no. 478.

Response: Denied.

33.    As of the date of San Benito's responses to these requests for admissions, San Benito has no documents, items or things which prove that Pennzoil has used San Benito's streets, highways, alleys, parks or other public places since January 1, 1941.

Response: Denied.

34.    As of the date of its responses to these requests for admissions, San Benito has no documents, items or things which prove that Pennzoil has sold natural gas for heat, power or other purposes derived from consumers of such natural gas within the San Benito city limits since January 1, 1941.

Response: Denied. Plaintiff does admit that Pennzoil sold natural gas to the La Palma Power Plant once owned by CP&L, and such natural gas was used by the power plant to generate power and may have been used for other purposes. The power plant is and has been located inside the city limits of the City of San Benito at all relevant times. Discovery is ongoing and Plaintiff reserves the right to supplement this response once discovery is completed.

35.    As of the date of its responses to these requests for admissions, San Benito has no documents, items or things which prove that Pennzoil has operated as a gas utility within the San Benito city limits since January 1, 1941.

Response: Plaintiff does not have sufficient information to either admit or deny. Discovery is ongoing and Plaintiff reserves the right to supplement this request once discover is completed.

36.    As of the date of San Benito's responses to these requests for admissions, San Benito has no factual basis for its claim that Pennzoil has ever owned or operated a pipeline, fixtures or appurtenances within the San Benito city limits.

Response: Denied.

37.    As of the date of San Benito's responses to these requests for admissions, San Benito has no

factual basis for its claim that Pennzoil owes San Benito any money under San Benito Ordinance no. 478.

Response: Denied.

38.     As of the date of San Benito's responses to these requests for admissions, San Benito has no factual basis for its claim that Pennzoil has used San Benito's streets, highways, alleys, parks or other public places since January 1, 1941.

Response: Denied.

39.     As of the date of its responses to these requests for admissions, San Benito has no factual basis for its claim that Pennzoil has sold natural gas for heat, power or other purposes derived from consumers of such natural gas within the San Benito city limits since January 1, 1941.

Response: Denied.

40.     As of the date of its responses to these requests for admissions, San Benito has no factual basis for its claim that Pennzoil has operated a gas pipeline within the San Benito city limits since January 1, 1941.

Response: Denied.

41.     As of the date of its responses to these requests for admissions, San Benito has no factual basis for its claim that Pennzoil has operated as a gas utility within the San Benito city limits since January 1, 1941.

Response: Plaintiff does not have sufficient information to either admit or deny. Discovery is ongoing and Plaintiff reserves the right to supplement this request once discover is completed.

# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
1301 McKINNEY, SUITE 5100
HOUSTON, TEXAS 77010-3095
WWW.FULBRIGHT.COM

OSBORNE J. DYKES, III
PARTNER
JDYKES@FULBRIGHT.COM

DIRECT DIAL:    (713) 651-5545
TELEPHONE:    (713) 651-5151
FACSIMILE:    (713) 651-5246

January 15, 2004

*VIA CERTIFIED MAIL and*
*FACSIMILE (210) 212-5880*
Mr. Adam Poncio
Cerda & Poncio
924 McCullough
San Antonio, TX 78215-1642

> Certified Article Number
> 7160 3901 9848 0492 5206
> SENDERS RECORD

Re:    Cause No. B03-080; *City of San Benito v. Tejas Gas Pipeline Company, et al.*, In the United States District Court for the Southern District of Texas, Brownsville Division

Dear Adam:

I am writing on behalf of the following defendants in the above case, which we represent:

> Tejas Gas Pipeline Company
> Tejas Gas Pipeline, LLC
> Tejas Gas pipeline LP
> Tejas Gas LLC
> Tejas Gas Marketing, LLC
> Gulf Energy Marketing Company
> Gulf Energy Marketing LLC
> Coral Energy Services LLC
> Coral Energy Resources LP
> Shell Gas Trading Company
> Transco Petro Source Company (n/k/a Transco P-S Company)

It was my understanding at the hearing in Brownsville on October 27, 2003 that the plaintiff was required to specify for each defendant (1) the pipeline located in the City of San Benito which plaintiff contends such defendant owned and (2) the period (dates) of such ownership. This was to be done by year-end. Also, supporting documentation was to be furnished.

30626737.1

Mr. Adam Poncio
January 15, 2004
Page 2

     The scheduling order signed on November 4, 2003 reflects that plaintiff is to submit "initial disclosures" by December 31, 2003, and an asterisk indicates that defendants would submit initial disclosures thirty days later if no question regarding "ownership of relevant pipelines" exists. Thus, the order refers to "ownership of relevant pipelines," the specific fact on which, as I recall, Judge Hanen required disclosure by plaintiff. We expect to receive a transcript of the hearing in the next two weeks to confirm Judge Hanen's expressions from the bench about plaintiff's disclosure obligation.

     I have read Plaintiff, The City of San Benito's Rule 26 Disclosure Statement, which you served on December 31, 2003, and it does not identify any pipeline within the City of San Benito allegedly owned by any of the defendants listed above, or for that matter, by any defendant at all. (It is our information and belief that none of the defendants listed above now owns or has ever owned a pipeline in the City of San Benito.) Additionally, I note that under your paragraph for Rule 26(a)(1)(C), pertaining to damage calculations, you make no mention of any of the defendants listed above.

     Your filing suggests to me that you have determined that you do not wish to pursue a claim against any of the defendants listed above. Will you agree to a dismissal of the case with prejudice as to those defendants?

       Yours very truly,

       Osborne J. Dykes, III

OJD/jag
cc:   ***VIA CERTIFIED MAIL and***
     ***FACSIMILE (361) 985-0601***
     Mr. Paul D. Andrews
     Law Offices of Thomas J. Henry
     Moore Plaza Shopping Center
     5425 SPID Suite 180
     Corpus Christi, TX 78411

     Mr. Jeff Palmer (firm)

     Other defense counsel

**Certified Article Number**

7160 3901 9848 0492 5213

**SENDERS RECORD**

30626737.1

# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
1301 MCKINNEY, SUITE 5100
HOUSTON, TEXAS 77010-3095
WWW.FULBRIGHT.COM

OSBORNE J. DYKES, III
PARTNER
JDYKES@FULBRIGHT.COM

DIRECT DIAL:    (713) 651-5545
TELEPHONE:    (713) 651-5151
FACSIMILE:    (713) 651-5246

January 20, 2004

***VIA CERTIFIED MAIL and***
***FACSIMILE (210) 212-5880***
Mr. Adam Poncio
Cerda & Poncio
924 McCullough
San Antonio, TX 78215-1642

Re:    Cause No. B03-080; *City of San Benito v. Tejas Gas Pipeline Company, et al.*, In the United States District Court for the Southern District of Texas, Brownsville Division

Dear Adam:

I have reviewed the *Plaintiff, The City of San Benito's Supplemental Rule 26 Enclosure Statement*, which I received today. It appears to be identical to *Plaintiff, The City of San Benito's Rule 26 Disclosure Statement*, which you served on December 31, 2003, except that you have added a paragraph 3.9, pertaining to Pennzoil Gas Marketing n/k/a Devon.

Once again, you have not identified any pipeline within the City of San Benito allegedly owned by any of the defendants listed below nor have you included any damage calculation for any of these defendants:

> Tejas Gas Pipeline Company
> Tejas Gas Pipeline, LLC
> Tejas Gas pipeline LP
> Tejas Gas LLC
> Tejas Gas Marketing, LLC
> Gulf Energy Marketing Company
> Gulf Energy Marketing LLC
> Coral Energy Services LLC
> Coral Energy Resources LP
> Shell Gas Trading Company
> Transco Petro Source Company (n/k/a Transco P-S Company)

30630115.1

HOUSTON • NEW YORK • WASHINGTON DC • AUSTIN • DALLAS • LOS ANGELES • MINNEAPOLIS • SAN ANTONIO • HONG KONG • LONDON • MUNICH

Mr. Adam Poncio
January 20, 2004
Page 2

Will you agree to a dismissal of the case with prejudice as to those defendants?

Yours very truly,

Osborne J. Dykes, III

OJD/jag
cc:     *VIA CERTIFIED MAIL and*
        *FACSIMILE (361) 985-0601*
        Mr. Paul D. Andrews
        Law Offices of Thomas J. Henry
        Moore Plaza Shopping Center
        5425 SPID Suite 180
        Corpus Christi, TX  78411

        Mr. Jeff Palmer (firm)

        Other defense counsel

30630115.1

*Osborne Dykes*

# MESSAGE CONFIRMATION

01/20/04  14:58
ID=FULBRIGHT

| DATE | S,R-TIME | DISTANT STATION ID | MODE | PAGES | RESULT | |
|------|----------|--------------------|------|-------|--------|--|
| 01/20 | 01'57" | | B.C. | | COMP | 60A0 |

01/20/04    14:53    FULBRIGHT                                    NO.234   D01

# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
1301 MCKINNEY, SUITE 5100
HOUSTON, TEXAS 77010-3095
WWW.FULBRIGHT.COM

## FACSIMILE TRANSMISSION

**DATE:**   January 20, 2004           **MATTER NUMBER:**   10312296

| RECIPIENT(S): | FAX NO.: | PHONE NO.: |
|---------------|----------|------------|
| Mr. Adam Poncio<br>Cerda & Poncio | 210 212 5880 | |
| Mr. Paul Andrews<br>Law Offices of Thomas J. Henry | 361 985 0601 | |

# BROAD~IST CONFIRMATION ~.EPORT

01/20/04  14:57
ID=FULBRIGHT

PAGES     = 03

TOTAL TIME = 00:01'57"

| LOCATION ID | PAGES | RESULT | LOCATION ID | PAGES | RESULT |
|---|---|---|---|---|---|
| KEYPAD | | | | | |
| 210 212 5880 | 03 | OK | | | |
| 41031229613619850601 | 03 | OK | | | |

# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
1301 MCKINNEY, SUITE 5100
HOUSTON, TEXAS 77010-3095
WWW.FULBRIGHT.COM

OSBORNE J. DYKES, III
PARTNER
JDYKES@FULBRIGHT.COM

DIRECT DIAL:    (713) 651-5545
TELEPHONE:    (713) 651-5151
FACSIMILE:    (713) 651-5246

January 28, 2004

*VIA CERTIFIED MAIL and*
*FACSIMILE (210) 212-5880*
Mr. Adam Poncio
Cerda & Poncio
924 McCullough
San Antonio, TX 78215-1642

Certified Article Number

7160 3901 9844 0392 7311

SENDERS RECORD

Re:    Cause No. B03-080; *City of San Benito v. Tejas Gas Pipeline Company, et al.,* In
the United States District Court for the Southern District of Texas, Brownsville
Division

Dear Adam:

I am enclosing pages 12-16 of the transcript of the October 27, 2003 hearing before Judge
Hanen in this case. The court said on page 12:

> I would think that we ought to be able to establish a two-tier,
> if you will, or two-stage discovery setup where you get to
> figure out the ownership issues.

Then on page 16 Judge Hanen said:

> That's six weeks, but I know the holidays are sitting in the middle of that; not
> only Thanksgiving, but Christmas as well – to produce your information that you
> gleaned to name these defendants. And it sounds – I mean, was he right? Were
> we talking Railroad Commission documents or whatever? But let me not limit it
> to that, though. I mean, if you have City of San Benito documents or some
> correspondence between any of these defendants to the city or whatever that says,
> "Oh, by the way, we've got a pipeline running down Main Street," I mean, I want
> you to produce that too, okay?

(Emphasis added.) These statements, together with the scheduling order signed by the Court,
clearly require plaintiff to produce documents demonstrating ownership of pipelines, if there are
any, on or before December 31, 2003. I have received no such documents from you. Do you
have any such documents for any of the parties I represent in this suit:

HOUSTON • NEW YORK • WASHINGTON DC • AUSTIN • DALLAS • LOS ANGELES • MINNEAPOLIS • SAN ANTONIO • HONG KONG • LONDON • MUNICH

Mr. Adam Poncio
January 28, 2004
Page 2

> Tejas Gas Pipeline Company
> Tejas Gas Pipeline, LLC
> Tejas Gas pipeline LP
> Tejas Gas LLC
> Tejas Gas Marketing, LLC
> Gulf Energy Marketing Company
> Gulf Energy Marketing LLC
> Coral Energy Services LLC
> Coral Energy Resources LP
> Shell Gas Trading Company
> Transco Petro Source Company (n/k/a Transco P-S Company)

Please let me hear from you on this point. Also, per my earlier correspondence to you, is there any reason that the above parties should not be dismissed with prejudice?

Yours very truly,

Osborne J. Dykes, III

OJD/jag
Enclosure
cc:     **_VIA CERTIFIED MAIL and_**
        **_FACSIMILE (210) 381 0825_**
        Mr. Ramon Garcia
        Law Office of Ramon Garcia, PC
        222 West University Drive
        Edinburg, TX 78539

Certified Article Number

7160 3901 9844 0392 7328

SENDERS RECORD

        Mr. Jeff Palmer (firm)

        Other defense counsel

30635187.1

```
 1                IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3     ─────────────────────────────────  )
       CITY OF SAN BENITO                  )
 4                                         )
                                           )  CIVIL ACTION NO.
 5     VS.                                 )  CA B-03-080
                                           )
 6     TEJAS GAS PIPELINE, ET AL           )
       ─────────────────────────────────  )
 7

 8

 9
                  INITIAL PRETRIAL & SCHEDULING CONFERENCE
10                 BEFORE THE HONORABLE ANDREW S. HANEN
                             OCTOBER 27, 2003
11

12

13     APPEARANCES:

14     For the Plaintiff:          MR. ADAM PONCIO
                                    Law Office of Cerda & Poncio
15                                  924 McCullough
                                    San Antonio, Texas  78215-1642
16
       For Tejas Gas Pipeline:     OSBORNE J. DYKES, III
17                                  JEFFREY D. PALMER
                                    Fulbright & Jaworski
18                                  1301 McKinney, Suite 5100
                                    Houston, Texas  77010-3095
19
       For Cinergy:                MS. JULIE L. EZELL
20                                  Cinergy Services
                                    1000 East Main Street
21                                  Plainfield, Indiana  46168

22

23     For Pennzoil:               MR. JOHN DAVID PAGE
                                    Attorney At Law
24                                  3040 Post Oak Blvd., Suite 850
                                    Houston, Texas  77056
25
```

**CERTIFIED COPY**

1   that they actually control somehow, and I understand that.

2       On the other hand, it seems somewhat backwards, if you will,

3   to make Mr. Page -- Mr. Page's client go through a bunch of

4   hoops producing a bunch of production documents, if you will, or

5   witnesses with regard to how much gas they sell if they don't

6   have any that runs under the City of San Benito.  And I'm, in a

7   way, opening this a little bit for discussion, but I think there

8   ought to be a way that you ought to be able to satisfy yourself,

9   and you ought to be allowed the discovery you need to satisfy

10  yourself that there is no hanky-panky corporate shell game going

11  on, at the same time without making them produce a million

12  documents since 1941 to bring it up to date.  And I'm -- I mean,

13  I would think that we ought to be able to establish a two-tier,

14  if you will, or two-stage discovery setup where you get to

15  figure out the ownership issues.

16      And pending a positive answer to that, you go forward into

17  the next stage.  And with a negative answer, you'd either come

18  to the court, perhaps, and voluntarily dismiss them, or that the

19  defendants would file a motion for summary judgement and say,

20  you know, "Me no Alamo.  I've never owned a pipeline there, and

21  I shouldn't be sued and shouldn't have to pay any rent for

22  pipeline rent."

23      What kind of information do you need to establish -- now,

24  what comes to mind is immediately some kind of interrogatory or

25  some kind of request for admission with an interrogatory

1    attached to it, something that basically says, "Mr. Defendant,

2    have you now or have you in the last 60 years since 1941 owned a

3    pipeline that runs under the City of San Benito or had any

4    ownership interest in a company that owned a pipeline that had

5    any ownership interest in gas that ran under the City of San

6    Benito?"  I mean, how does it -- tell me about that.

7              MR. PONCIO:  I think we could formulate something, Your

8    Honor, if you're talking about a two-tiered level of discovery.

9    What I didn't want to do was work towards a liability trial,

10   then start all over again working towards a damage trial.

11             THE COURT:  Yeah.  I'm not really -- and I know the

12   defendants might prefer that.  I'm not leaning toward that.  I'm

13   leaning toward, though -- but I do understand the "Don't make us

14   jump through every hoop and produce every accounting record we

15   have for every ounce of gas we've ever sold," or MCF of gas or

16   however this is sold so that -- only to eventually come forward

17   with our motion for summary judgment saying, "We haven't been

18   near the City of San Benito."

19             MR. PONCIO:  I think if Your Honor, once you've made

20   your decision on the motion to remand, if you could give me a

21   two-week period to formulate some sort of proposed discovery

22   plan towards that end that you just relayed to us, I think I can

23   come up with that for you, Your Honor.

24             THE COURT:  Gentlemen, what would be wrong with that?

25   Or gentlemen and lady?

1          MR. DYKES:  Your Honor, Mr. Poncio and I have talked

2     going back to when I first learned of this lawsuit.  I think

3     that was sometime a few months after it was filed, and I think

4     this is useful to recount -- this was an attempt at discovery on

5     my part, so I think it's relevant to what we're talking about.

6          I asked him why he believed that these companies had

7     pipelines or sales or any other connection with the City of San

8     Benito.  And he'll correct me if I'm wrong, but I believe I

9     understood him to say that he had gone to the Railroad

10     Commission and had been at a warehouse with some ancient records

11     that everyone thought had been discarded, and that he had found

12     records that named each of the defendants, each of the 65

13     defendants in this case, and in each case in such a way as to

14     justify suing that defendant.  And he offered, which I

15     appreciated, to give me the records for the companies I was

16     interested in.  I did ask for those companies.  He has been, I

17     know, extremely busy in trial and other matters, but I don't

18     have them yet.

19          Now, if we can just get that information, if we can find out

20     why it is -- if he can focus us on what it is that he believes

21     about each company, this makes it so much more doable from our

22     standpoint.  If there's any question, pipeline ownership, for

23     example, ownership of a company that owns a pipeline that

24     extends back 60 years, the burden for Shell and for Kinder

25     Morgan, which now effectively is some of these companies, is

1    staggering.  If we can avoid that 60-year search without any

2    focus, that's -- that's my aim in proceeding further on

3    discovery.

4         We have -- when we talked back on August the 15th, and this

5    is reflected in the -- in the joint discovery case management

6    plan that we -- that we filed, we had agreed with Mr. Poncio

7    that he would file his initial disclosure from whatever date we

8    were looking at, and that we would then have -- after we got a

9    look at these -- at this evidence that he felt that he had, we

10   would then have 60 days to do our research on those identified

11   areas.  And if we -- I would submit, Your Honor, that that is a

12   logical plan.

13        THE COURT:  Is that problematic for you?

14        MR. PONCIO:  We don't have any problem with that.  We

15   talked before you came out, Your Honor, and said using that same

16   plan that we had set out, just setting a 30-day period from

17   whatever date you've decided on the motion to remand, then we

18   can work using that same trial plan initially.

19        THE COURT:  All right.  Here's what -- let me do this.

20   It's the 27th.  And unfortunately, I have two conferences, one

21   this week and one next week.  But let's take it as quasi-gospel

22   that I will rule on the motion to remand by the 14th of

23   November.

24        All right.  Then, Mr. Poncio, what I want the plaintiffs to

25   do -- and I'm going to give you to the end of the year to do

1    this. That's six weeks, but I know the holidays are sitting in

2    the middle of that; not only Thanksgiving, but Christmas as

3    well -- to produce your information that you gleaned to name

4    these defendants.  And it sounds -- I mean, was he right?  Were

5    we talking Railroad Commission documents or whatever?  But let

6    me not limit it to that, though.  I mean, if you have City of

7    San Benito documents or some correspondence between any of these

8    defendants to the city or whatever that says, "Oh, by the way,

9    we've got a pipeline running down Main Street," I mean, I want

10   you to produce that too, okay?

11       All right.  And then I will go out to the -- let me change

12   calendars -- okay.  Let's just say yours is due -- Mr. Poncio,

13   that's due the 31st of December, so, I mean, right at year's

14   end.  On the 27th of February, in that six -- almost two months

15   there, you know, I want the defendants to do the research that

16   goes along with that, having received these documents to find

17   out exactly where you are.

18       And I'm trying to think the best way of bringing that issue

19   to a resolution.  It may be by, Mr. Poncio, you then sending out

20   the discovery that we talked about.

21            MR. PONCIO:  Right.

22            THE COURT:  You know, give me a list of every company

23   you've ever owned a piece of, you know, however you want to

24   phrase it.  But design it enough to where you pick up not only

25   the defendants, but any subsidiary or parent corporation or

# MESSAGE CONFIRMATION

01/29/04  10:56
ID=FULBRIGHT

| DATE | S,R-TIME | DISTANT STATION ID | MODE | PAGES | RESULT | |
|------|----------|--------------------|------|-------|--------|---|
| 01/29 | 02'59" | 3618830148 | CALLING | 09 | OK | 0000 |

01/29/04     10:52     FULBRIGHT → 00304103122961361883                     NO.349     001

# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
1301 MCKINNEY, SUITE 5100
HOUSTON, TEXAS 77010-3095
WWW.FULBRIGHT.COM

## FACSIMILE TRANSMISSION

**DATE:**   January 29, 2004          **MATTER NUMBER:**     10312296

| RECIPIENT(S): | FAX NO.: | PHONE NO.: |
|---------------|----------|------------|
| Francis I. Gandy<br>Law Offices of Francis Gandy | (361) 883-0148 | (361) 883-6333 |

| 2. Article Number | COMPLETE THIS SECTION ON DELIVERY | |
|---|---|---|
| | A. Received by (Please Print Clearly) | B. Date of Delivery |
| | | 1/30/04 |
| **7160 3901 9844 0392 7311** | C. Signature X _____ | ☐ Agent ☐ Addressee |
| 3. Service Type  CERTIFIED MAIL | D. Is delivery address different from item 1? | ☐ Yes |
| 4. Restricted Delivery? *(Extra Fee)*   ☐ Yes | If YES, enter delivery address below: | ☐ No |

1. Article Addressed to:

Mr. Adam Poncio
Cerda & Poncio
924 McCullough
San Antonio, TX  78215-1642

10312296/City of San Benito                           Osborne J. Dykes, III

PS Form 3811, July 2001                    Domestic Return Receipt

2003 WL 22495756
--- S.W.3d ---
**(Cite as: 2003 WL 22495756 (Tex.))**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

Supreme Court of Texas.

**SOUTHERN UNION COMPANY, Southern
Union Gas Company**, and Rio Grande Valley Gas
Company, et al.,
v.
CITY OF EDINBURG.

No. 01-0785.

Argued Nov. 20, 2002.
Decided Oct. 31, 2003.
Rehearing Denied April 9, 2004.

City sued natural gas utility and its affiliated
suppliers, alleging that they had used various means
to evade franchise agreement and franchise taxes. The
city asserted claims for breach of contract, fraud,
tortious interference with contract, civil conspiracy,
single business enterprise, fraudulent use of distinct
corporations, and purpresture. The 92nd District
Court, Hidalgo County, Michael J. Westergren, J.,
entered judgment on jury verdict in favor of city.
Suppliers appealed. The Corpus Christi Court of
Appeals, Chavez, J., 59 S.W.3d 199, affirmed in part
and reversed in part and modified the judgment. On
petitions for review, the Supreme Court, Owen, J.,
held that: (1) the utility was not required by franchise
agreement and ordinance to pay the tax on gas that
was transported through utility's pipeline system and
sold within city by unregulated affiliated suppliers;
(2) as a matter of first impression, gas purchased
within the city from affiliated suppliers was not
subject to the 4% franchise tax based on a theory of
single business enterprise; (3) the suppliers did not
tortiously interfere with city's right to franchise tax
revenue from utility on gas sold by utility in city; and
(4) the utility did not fraudulently induce city to enact
ordinance embodying franchise agreement and
utility's obligation to pay franchise tax.

Affirmed in part, reversed in part, and rendered.

[1] Gas ⟨key⟩10

190k10

Ordinance and franchise agreement requiring natural
gas utility to pay a franchise tax of four percent of its

gross income derived from all gas sales within the
city did not require the utility to pay the tax on gas
that was transported through utility's pipeline system
and sold within city by unregulated affiliated
suppliers; the term "all gas sales within the city"
referred to the utility's gross income derived from all
gas sales by the utility within the city, and the
franchise agreement did not give an exclusive right to
the utility to sell gas in the city and did not prohibit
the utility from providing transportation services
through utility's pipeline on public property and
public rights-of-way.

[2] Gas ⟨key⟩10
190k10

No grounds for disregarding the separate corporate
entities of natural gas utility and its affiliated
suppliers and their respective, separate contractual
obligations arose from use of utility's pipelines to
transport the gas or from the common directors,
shared employees, and central accounting and payroll
systems, and, thus, although city had right to
franchise tax on utility's sales within city, it had no
right to tax sales by affiliates within city under single
business enterprise theory; the city knew about the
sales by affiliated suppliers, their gas was metered
when it entered utility's system, and no evidence
existed of a sham, dishonesty, or intent to deceive.
V.A.T.S. Bus.Corp.Act, art. 2.21.

[3] Gas ⟨key⟩10
190k10

City in action to recover franchise taxes from natural
gas utility failed to present any evidence of damages
from utility's sale of lateral pipelines within city
without city's express written consent in alleged
violation of ordinance embodying franchise
agreement.

[4] Gas ⟨key⟩10
190k10

Natural gas suppliers affiliated with utility had the
legal right to sell gas to consumers through utility's
pipelines and, therefore, did not tortiously interfere
with city's right to franchise tax revenue from utility
on gas sold by utility in city.

[5] Gas ⟨key⟩10
190k10

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2003 WL 22495756
(Cite as: 2003 WL 22495756 (Tex.))

Natural gas utility did not fraudulently induce city to enact ordinance embodying franchise agreement and utility's obligation to pay franchise tax on sales by utility in city, even though the utility later transported affiliated suppliers' gas for sales in city; no evidence existed that, at the time the franchise agreement was reached, the utility made any misrepresentations to the city or did not intend to perform the agreement.

[6] Fraud ⊕═12
184k12

A mere failure to perform a contract is not evidence of fraud.

[7] Nuisance ⊕═63
279k63

A "purpresture" is an encroachment upon public rights and easements, the appropriation to private use of that which belongs to the public.

[8] Municipal Corporations ⊕═697(1)
268k697(1)

City abandoned any claim for damages, an injunction, or other relief regarding its contention that a purpresture existed after natural gas utility sold pipelines to affiliated company; utility constructed the facilities on public land and rights-of-way under the authority given by the city and continued to use and operate the facilities to provide gas service to consumers within the city after title was transferred, and the city made no contention that it was entitled to any relief from either company as a result of the transfer of title to the facilities without the city's consent.

Nancy R. Hudson, for Amicus Curiae Texans for Reasonable Legal Fe.

Joe R. Greenhill, for Amicus Curiae Texas Civil Justice League.

Luther H. Soules, III, Jerry J. Fulton, Eduardo R. Rodriguez, Paul D. Andrews, Sara Murray, B. Mills Latham, James P. Wallace, Reagan W. Simpson, for other interested parties.

David C. Garza, for Mercado Gas Services, Inc.

J.A. (Tony) Canales, E. Lee Parsley, for Rio Grande Valley Gas Company.

Daniel W. Bishop, Jerry K. Clements, for Southern Union Company.

Christina Carlson Dodds, Cynthia Keely Timms, E. Lee Parsley, for Southern Union Gas Company.

Russell S. Post, Jennifer Bruch Hogan, Benjamin L. Hall, III, Elizabeth B. Hawkins, John R. Leach, III, Dana C. Livingston Cobb, Robert M. Roach, Jr., Sheryl A. Scott, J. Brett Busby, for City of Edinburg.

Justice OWEN delivered the opinion of the Court.

*1 The City of Edinburg entered into franchise agreements with Rio Grande Valley Gas Company, to whom we will refer as RGVG, that were embodied in ordinances of the City. The ordinance at issue in this case, Ordinance No. 1129, permitted RGVG to install and operate pipeline facilities on or under public rights-of-way and other public lands within the City or areas annexed by the City and to distribute and sell natural gas. The ordinance required RGVG to pay a franchise tax of "four (4%) percent of its gross income derived from all gas sales within the City." RGVG was subsequently acquired by and merged into Southern Union Company, to whom we will refer as Southern Union.

The principal issue in this case is whether gas purchased by consumers within the City from companies affiliated with RGVG and Southern Union is subject to the 4% franchise tax under Ordinance No. 1129 based on a theory of "single business enterprise." We hold that it is not, and we accordingly affirm the court of appeals' judgment in part, reverse in part, and render judgment that the City take nothing.

I

RGVG has supplied gas to consumers in the City of Edinburg under a series of franchise agreements since 1926. The agreement at issue was reached and became effective in 1985. As noted above, this franchise agreement was embodied in Ordinance No. 1129. Until 1993, RGVG was a subsidiary of Valero Energy Corporation. In 1993, RGVG was acquired by Southern Union and merged into that corporation. Southern Union assumed all of RGVG's rights and obligations under Ordinance No. 1129, with the approval of the City. RGVG, like Southern Union, was a "local distribution company" and a "gas utility" within the meaning of the Texas Utilities Code. [FN1] This meant that the rates at which RGVG and subsequently Southern Union sold gas were

2003 WL 22495756                                                                                      **Page 3**
**(Cite as: 2003 WL 22495756, \*1 (Tex.))**

regulated. The City authorized RGVG and Southern Union to include all payments for franchise taxes in their rates and thus pass the franchise taxes on to ratepayers.

Until 1985, RGVG bought all of its gas from Valero Transmission Company, one of its affiliates. Valero Transmission Company's sales to RGVG were also regulated and were made at rates specified in tariffs filed with and approved by the Texas Railroad Commission. Commencing in 1985, pursuant to a settlement of a Railroad Commission proceeding to which the City was a party, RGVG began buying twenty percent of its gas from another affiliated company, Reata Industrial Gas Company, in order for RGVG to lower its gas costs. Reata Industrial Gas Company was a so-called special marketing program or "SMP" that was authorized to buy spot-market gas and sell it at unregulated, market rates. RGVG's purchases from Reata Industrial Gas Company were rolled in with its other gas supplies and resold to consumers within the City. RGVG's purchases from Reata Industrial Gas Company are not at issue. But Reata subsequently began making direct sales to consumers within the City. Those and other direct sales by special marketing companies affiliated with RGVG and Southern Union are at issue.

**\*2** The emergence of SMPs like Reata Industrial Gas Company were part of changes in the natural gas industry that began occurring in the 1980s and the Railroad Commission's response to those changes. The Commission authorized new ways for consumers to obtain and suppliers and transporters to supply or transport natural gas. This Court considered the validity of some of these regulatory developments in *Railroad Commission of Texas v. Lone Star Gas Co.* [FN2] Although the evolution of the natural gas industry and regulatory responses, including deregulation for certain types of suppliers, are not directly material to the present dispute, they are the background against which the issues presented in this case arose.

Gas supplies became available to gas consumers from spot-market suppliers that were cheaper than the regulated gas offered for sale by regulated local distributions companies like RGVG. But RGVG owned or operated all the existing facilities within the City. In order for consumers to have access to cheaper gas supplies, they would have to obtain transportation from RGVG or build their own pipeline system. The latter option was feasible for only a very few of the largest gas consumers. Under

market and regulatory pressure, RGVG filed new tariffs that allowed it to transport gas for many consumers who chose to buy gas from suppliers other than RGVG. This was done with the approval of both the Railroad Commission and the City. Transportation of gas that consumers purchased from suppliers other than RGVG was thus designed to and did displace many of the sales that RGVG had formerly made. The Railroad Commission refused to limit this "by-pass" of local distribution companies like RGVG. RGVG's tariffs, approved by both the Commission and the City, required it to offer transportation on a non-discriminatory basis to certain classes of gas consumers in the City. The transportation tariffs were embodied in ordinances other than Ordinance No. 1129, and the City was entitled to receive fees or taxes for transportation under those ordinances.

Some of the largest purchasers of natural gas in the City chose to purchase gas from sources other than RGVG. One user eventually bypassed the RGVG system completely by obtaining gas from suppliers that had no relation at all to RGVG and by using pipeline facilities that were totally separate from those of RGVG or any of its affiliates. Other large consumers chose to purchase spot-market gas from Reata Industrial Gas Company, which was an affiliate of RGVG until 1993. As indicated above, the stock of RGVG was owned by Valero Energy Corporation until Southern Union acquired RGVG in 1993, but RGVG was the only Valero entity that Southern Union acquired. Valero Energy Corporation also owned the stock of Valero Natural Gas Company, which in turn owned the stock of Reata Industrial Gas Company and another company, Valero Transmission Company. In 1987, Reata Industrial Gas Company and Valero Transmission Company became the general partners of Reata Industrial Gas, L.P. ("Reata, L.P.") and Valero Transmission, L.P. All of Reata Industrial Gas Company's and Valero Transmission Company's assets, including gas sales contracts, were transferred to Reata, L.P. and Valero Transmission, L.P., respectively. Thereafter, Reata, L.P. made spot-market gas sales to consumers within the City, and this gas was transported by RGVG.

**\*3** In 1993, as part of the transaction in which Southern Union acquired RGVG from Valero Energy Corporation, it was agreed that Reata, L.P., which continued to be a Valero Energy Corporation affiliate, would market gas to industrial customers within the City for two years without competition from Southern Union, other than the regulated sales

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2003 WL 22495756
(Cite as: 2003 WL 22495756, *3 (Tex.))

Page 4

made by Southern Union as RGVG's successor. After that, Mercado Gas Services, Inc. ("Mercado"), a subsidiary of Southern Union, competed with Reata, L.P. and sold gas to some large industrial customers within the City. Southern Union transported gas for both Reata, L.P. and Mercado.

Not all of the gas transported by RGVG and Southern Union for users within the City was supplied by their affiliates. At least two industrial consumers purchased gas from suppliers that had no corporate relation to RGVG or Southern Union. At some point, the City took the position that all gas sold by any company to consumers within the City was subject to the 4% franchise tax under Ordinance No. 1129 if the gas was delivered by means of either RGVG's or Southern Union's facilities. Southern Union and the Valero entities disagreed with this interpretation of Ordinance No. 1129, and the City filed suit. The City contended that RGVG, Southern Union, and certain of their respective affiliated companies devised a scheme to avoid paying the 4% franchise tax on gas that was sold to consumers within the City by companies other than RGVG and Southern Union. The City asserted various theories on which it contended it was entitled to recover damages for the lost franchise fees.

The City asserted other claims as well. In 1987, RGVG had transferred the ownership of its gas transmission system, including about seven miles of lateral lines within the City, to an affiliated company. At the time of trial, these facilities were owned by Valero Transmission, L.P. The City contended that these transfers were made without its consent and in violation of Ordinance No. 1129. The City also contended that the operation of these laterals by Valero Transmission, L.P. constituted a purpresture in public property. [FN3]

After a lengthy trial, the jury found:
  1) RGVG committed fraud against the City in connection with entering into Ordinance No. 1129;
  2) The City did not waive or ratify such fraud and was not estopped from complaining about that fraud;
  3) RGVG, Valero Transmission Company, and Reata Industrial Gas Company were not part of a conspiracy to commit fraud against the City in connection with entering into Ordinance No. 1129;

Reata, L.P.

4) The amounts that would compensate the City for RGVG's fraud were $584,517.26 for October 1, 1985 to September 30, 1993, and $235,258.74 for October 1, 1993 to the time of trial (August 18, 1998);
5) RGVG, prior to October 1, 1993, and Southern Union, on and after October 1, 1993, failed to comply with Ordinance No. 1129 with respect to payments due under the ordinance;
6) RGVG's and Southern Union's failure to comply was not excused by the City's fraud, waiver, or ratification, and the City was not estopped from complaining of the failure to comply;
*4 7) The amounts that would compensate the City for the failure to comply were $584,517.26 for October 1, 1985 to September 30, 1993, and $235,258.74 for October 1, 1993 to the time of trial (August 18, 1998);
8) RGVG sold, transferred or assigned rights, privileges or duties required by Ordinance No. 1129 to be performed by RGVG without the express written consent of the City first being obtained considering Ordinance No. 1129 in its entirety;
8a) RGVG's sale, transfer or assignment of rights, privileges or duties required by Ordinance No. 1129 to be performed by RGVG was not excused by the City's fraud, waiver, estoppel, or ratification;
9) Damages for such failure to comply were $4,000,000;
10) The City was entitled to attorneys' fees totaling $3,518,085 for trial and any appeals;
11) Valero Energy Corporation was responsible for the conduct of RGVG from October 1, 1985 to September 30, 1993;
12) RGVG, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Company, and Reata Industrial Gas Company operated as a single business enterprise from October 1, 1985 to September 30, 1993;
13) Valero Transmission Company, Valero Transmission, L.P., Reata Industrial Gas Company, Reata, L.P., Valero Natural Gas Company, and Mercado intentionally interfered with Ordinance No. 1129;
14) None of those companies interfered because it had a good faith belief that it had a right to do so;
15) With regard to damages for such interference, the jury found:

$30,000

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2003 WL 22495756                                                                              **Page 5**
**(Cite as: 2003 WL 22495756, *4 (Tex.))**

| | |
|---|---|
| Reata Industrial Gas Company | $50,000 |
| Mercado | $80,000 |
| Valero Transmission Company | $1,333,333.33 |
| Valero Transmission, L.P. | $1,333,333.33 |
| Valero Natural Gas Company | $1,333,333.33 |

16) The gas facilities of Valero Transmission, L.P. constituted a purpresture in public property in the City's property;

17) Exemplary damages of $300,000 should be assessed against RGVG; and

18) Valero Transmission Company, Valero Transmission, L.P., Reata Industrial Gas Company, Reata, L.P., Valero Natural Gas Company, and Mercado did not act with actual malice.

The trial court rendered judgment awarding the City:
1) actual damages of $3,301,183.92 for breach of contract and tortious interference, prejudgment interest of $1,069,110.72, and post-judgment interest from RGVG, Southern Union, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Company, and Reata Industrial Gas Company, jointly and severally;
2) actual damages of $253,258.74, prejudgment interest of $76,442.98, and post-judgment interest from Southern Union for breach of contract;
3) attorneys' fees totaling $3,518,085 for trial and any appeals from RGVG, Southern Union, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Company, and Reata Industrial Gas Company, jointly and severally;
4) $300,000 in exemplary damages from RGVG, together with post-judgment interest;
*5 5) $1,333,333.33, prejudgment interest of $433,242, and post-judgment interest from Valero Transmission, L.P. for tortious interference;
6) $30,000, prejudgment interest of $7,619.18, and post-judgment interest from Reata, L.P. for tortious interference; and
7) $80,000, prejudgment interest of $20,317.81, and post-judgment interest from Mercado for tortious interference.

The trial court declared that certain pipelines and facilities located in the City constituted a purpresture in public property in the City's rights-of-way and an encroachment on the City's property without its permission. The trial court also declared that Valero

Energy Corporation used RGVG as its alter ego and was vicariously liable for RGVG's conduct from October 1, 1985 to September 30, 1993, and that Southern Union was liable for any liabilities of RGVG from October 1, 1985 to the date of judgment (December 1, 1998). However, the trial court disregarded the jury's finding of $4,000,000 in damages for RGVG's transfer of rights or privileges under Ordinance No. 1129 without the City's consent.

All parties appealed. The court of appeals reversed the trial court's judgment in part, modified it, and affirmed the award of all attorneys' fees. [FN4] The court concluded that the "single business enterprise" theory was a valid means under Texas law "of disregarding the corporate form," and that this theory was not confined to providing a means of collecting a judgment from more than one defendant. [FN5] The court of appeals also concluded that the finding by the jury that five of the defendants (RGVG, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Company, and Reata Industrial Gas Company) operated as a "single business enterprise" applied to all causes of action asserted by the City. [FN6] With regard to the breach of contract claim, the court of appeals held that "the contractual obligations of the franchise agreement extend throughout the Valero family, and the Valero appellants were responsible for collecting and paying franchise fees on all Valero gas sales inside the city, whether the gas was nominally sold by RGVG or by Reata." [FN7] The court of appeals upheld the measure of damages awarded for breach of the franchise agreement by RGVG, concluding that there was evidence to support it. [FN8]

The court of appeals held, however, that Southern Union had no corporate affiliation with the Valero corporations and therefore that "the same analysis does not apply when the transporter is outside the corporate family." [FN9] The court of appeals held that the obligation to pay franchise fees on sales by Reata ended when Southern Union became the franchisee. [FN10] The court of appeals accordingly reversed the damage award against Mercado and the damages assessed directly against Southern Union. [FN11]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2003 WL 22495756
(Cite as: 2003 WL 22495756, *5 (Tex.))

Page 6

With regard to the transfer of lateral pipelines by RGVG, the City contended that the trial court erred in disregarding the jury's verdict awarding $4,000,000. The court of appeals disagreed, holding that the City's pleadings did not support submission of the liability question on this issue. [FN12]

*6 With regard to tortious interference, the court of appeals concluded that to the extent the jury made findings regarding RGVG's transfer of the lateral lines to other entities, the issue should not have been submitted because the pleadings did not support such a submission. [FN13] However, the charge to the jury on interference contained two distinct theories, only one of which involved the transfer of the lateral lines. The other theory was based solely on loss of franchise tax revenue because of sales made by entities other than RVGV and Southern Union. The trial court awarded the full amount of damages found by the jury for tortious interference. Nevertheless, the court of appeals' opinion states that "[b]ecause the trial court disregarded the jury's answer regarding damages arising from the tortious interference question, we hold that the trial court's judgment was correct in this regard." [FN14] The opinion then says in a footnote, "[t]he only damages assessed against appellant Mercado Gas Services, Inc. were for tortious interference with contract. Because we remove the city's recovery on this claim, we render judgment that the city take nothing as to Mercado." [FN15] The court of appeals was not as clear as it could have been about its holding with regard to the interference findings. It expressly "remove[d]" the finding of damages against Mercado, [FN16] but not the trial court's awards against Valero Transmission Company, Valero Transmission, L.P., Reata, L.P., Valero Natural Gas Company, or Reata Industrial Gas Company. However, in the closing paragraph of its opinion, the court of appeals set forth the judgment that should be rendered, and no amounts for tortious interference were included. [FN17] The City contends in this Court that the court of appeals erred in reversing the awards for tortious interference. Based on the court of appeals' judgment, we conclude, as have the parties, that the court of appeals reversed the trial court as to all awards under the tortious interference claims.

The court of appeals also held that the City failed to plead a cause of action for fraudulent inducement. [FN18] The court of appeals therefore held that the City was not entitled to recover under such a theory, and it reformed the trial court's judgment to exclude the award of $300,000 in exemplary damages.

[FN19]

The court of appeals rejected arguments that the City was barred by waiver, estoppel, or ratification from asserting its claims. [FN20] It also rejected arguments that the attorneys' fees awarded were not supported by competent evidence and should have been segregated between claims for which attorneys' fees are recoverable and claims for which fees are not recoverable. [FN21] The court of appeals further held that there could be no purpresture, which it defined as "an encroachment without consent on public rights, property, or easements, or the appropriation for private use of that which belongs to the public," because under the single business enterprise findings, Valero Transmission Company and RGVG were a single entity, and Valero Transmission, L.P., the owner of the laterals, was the successor in interest to Valero Transmission Company. [FN22]

*7 The court of appeals also addressed the City's contentions with regard to a most-favored nations provision in Ordinance No. 1129. On rehearing, the court of appeals held that the most-favored nations provision applied to all of Southern Union's franchise agreements, not just to the area in which RGVG had franchises that had been limited to the Rio Grande Valley. [FN23] The court of appeals also held that Southern Union was not jointly and severally liable for trial and appellate attorneys' fees, [FN24] but then concluded on further rehearing that Southern Union was liable for all of RGVG's liabilities. [FN25]

All parties filed petitions for review in this Court, which we granted. [FN26] While the case was pending in this Court, the issue regarding the most-favored nations provision in Ordinance No. 1129 was settled, and that issue is no longer before us.

II

[1] The first issue we address is the proper construction of Ordinance No. 1129. The Ordinance says in pertinent part:
SECTION 1.
Subject to the terms and conditions mentioned in this Ordinance, the right, privilege and franchise is hereby granted to Rio Grande Valley Gas Company, a Delaware corporation and to its successors, lessees and assigns, to acquire, install, construct, operate and maintain a system of mains, pipes, and laterals and the necessary plants, attachments and appurtenances for the purpose of supplying and distributing natural gas

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2003 WL 22495756                                                                          **Page 7**
**(Cite as: 2003 WL 22495756, \*7 (Tex.))**

(including equivalent substitutes) for fuel, power, heat, light, and for other purposes in, through, upon, under, and along the streets, avenues, alleys, highways, parks and other public places ...; and to distribute, supply and convey said natural gas through a system of mains, pipes, and laterals, for the purpose of distributing, supplying, and selling natural gas for fuel, power, heat, light and for any other purpose, to other cities, towns, communities and areas outside the City Limits of Edinburg and to the inhabitants thereof, for the full term of this franchise.

\* \* \*

*SECTION 3.*
The Grantee, its successors, lessees or assigns, shall at all times be subject to any Ordinances now in existence, or which may hereafter be passed, not inconsistent herewith. No fee or other charge of any kind shall be imposed upon the Grantee, or upon any consumer of gas for the breaking or opening of any streets or other public places or for the laying of mains, service pipes or other connections therein except as provided for hereunder.

\* \* \*

*SECTION 5.*
Grantee, and its successors and assigns, shall have the right to adopt and enforce Rules of Service for service hereunder not inconsistent with law or this Ordinance. Grantee shall supply gas and provide service at the rates and under the terms and conditions specified by such rules and as provided herein.
a. The Grantee shall not charge or receive any higher rate for natural gas furnished by it to any domestic customer within the City Limits than the rate fixed by the regulatory authority having jurisdiction or permitted by applicable laws.

\* \* \*

**\*8** c. Grantee shall charge and receive for natural gas furnished by it to any commercial and industrial customer within the City Limits such rates as it may from time to time establish, but there shall be no discrimination in rates between industrial customers using equal daily quantities of gas under similar conditions.

\* \* \*

*SECTION 11.*
a. The Grantee, by accepting or acting under this grant, shall pay to the City of Edinburg, as a

franchise tax and as compensation for the rights and privileges enjoyed hereunder, during the life of this grant the amount indicated in paragraph b. immediately below [a most favored nations clause], or four (4%) percent of its gross income derived from all gas sales within the City of Edinburg, Texas, whichever is greater. Such payment shall be based on receipts for two (2) 6-month periods one beginning July 1 and ending December 31 and the other beginning January 1 and ending June 30.... This tax shall be in lieu of all other franchise, license or occupation taxes, levies, exactions, rentals or charges which may be levied or attempted to be levied by the said City of Edinburg, Texas.

The City contends that RGVG and subsequently its successor Southern Union were obligated to pay a 4% franchise tax on all gas sold within the City that went through RGVG's or Southern Union's pipeline system, regardless of what entity, affiliated or not, actually sold gas to consumers within the City. The City argues that the phrase "four (4%) percent of its gross income *derived from* all gas sales within the City" [FN27] includes income derived from transportation that was provided by RGVG or Southern Union in connection with gas sales within the City. The court of appeals was unpersuaded by this argument, [FN28] as are we.

First, the City does not limit its claim to gross income that RGVG or Southern Union "derived from" transporting gas sold by other suppliers. The City claims that it is entitled to 4% of the entire amount paid by gas consumers for gas, which includes payments to suppliers other than RGVG and Southern Union for the gas itself as well as payments to RGVG or Southern Union for transportation. At most, however, the City's "derived from" argument would entitle it to 4% of the transportation revenues that RGVG and Southern Union received.

Second, the language on which the City relies does not support its interpretation. If the reference to "all gas sales within the City" truly meant "*all* " gas sales within the City, regardless of who the seller was, how was the Grantee to derive income from "all" sales if it had no participation whatsoever, even as a transporter, in some sales within the City? The reference to "all gas sales within the City," read in context, means "its [the Grantee's] gross income derived from all gas sales [by the Grantee] within the City."

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Other provisions of the franchise agreement reflect that in exchange for the bundle of rights granted to the Grantee, it was contemplated that there would be a single assessment based on *sales* of gas *by the Grantee*. The Ordinance contemplates that *sales* will be made by the Grantee directly to customers in the City based on rates fixed by "the regulatory authority having jurisdiction or permitted by applicable law." As a regulated local distribution company and a gas utility within the meaning of the Texas Utilities Code, [FN29] RGVG and subsequently Southern Union could only make sales of gas at the rates and under the terms and conditions specified in their filed, approved tariffs. The sales made by Reata Industrial Gas Company, Reata, L.P., and Mercado, on the other hand, were unregulated.

**\*9** The provisions of the franchise agreement reflect the parties' intent that the Grantee's "gross income derived from all gas sales within the City" meant gross income from the Grantee's sales within the City, not sales by other parties. This conclusion is consistent with the fact that this franchise agreement did not give the Grantee the exclusive right to sell gas within the City. Indeed, under Texas law, the grant could not have been an exclusive one. [FN30] It is unreasonable to construe the franchise agreement to mean that the Grantee would have to pay franchise taxes on sales made by another company who had the lawful right to sell gas within the City.

The franchise agreement embodied in Ordinance No. 1129 does not expressly prohibit the Grantee from providing transportation services for other gas suppliers or for customers who buy gas from those other suppliers. Apparently, RGVG provided transportation services to customers in the City based on the rights granted to it in Ordinance No. 1129 from January 1986 until January 1988. The franchise tax that it paid to the City, however, continued to be calculated on "its gross income derived from all gas sales within the City." This resulted in less revenue to the City, and in January 1988, the City enacted Ordinance No. 1266, which approved tariff rate schedules that expressly permitted RGVG to transport gas for large-volume industrial consumers within the City and assessed fees or taxes for that transportation. Two other ordinances, Ordinance Nos. 1371 and 1465, were also enacted by the City to set a fee or tax on transportation that RGVG provided for consumers within the City. Yet, the City now contends that it is entitled to a franchise tax under Ordinance No. 1129 for transported gas rather than, or perhaps in addition to, fees or taxes assessed under these other

ordinances. As the court of appeals observed, the City did not make any claim that RGVG or Southern Union failed to pay franchise taxes under the transportation ordinances. The City's only claim in this suit was under Ordinance No. 1129.

Perhaps recognizing the weakness in its interpretation of Ordinance No. 1129, the City contends in the alternative that sales made by affiliates of RGVG or Southern Union to consumers within the City should be subject to the franchise tax set forth in Ordinance No. 1129 under a theory of single business enterprise. We turn to that contention.

III

[2] The City asserts that the Valero companies, which included RGVG until it was purchased by Southern Union, were operated as a single business enterprise. Therefore, the City contends, any sales of gas made by any Valero- related entity within the City should be subject to the 4% franchise tax. The City also argues that the way in which the Valero companies were operated was a sham to defraud the City and that Southern Union joined in the sham after it acquired RGVG and continued to transport gas for Reata, L.P., an affiliate of Valero Energy Corporation. Southern Union later perpetrated a sham of its own, the City argues, when its affiliate, Mercado, sold gas to consumers within the City and Southern Union transported that gas. The "real seller," the City contends, was Southern Union, not Mercado.

**\*10** The jury found that RGVG, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Company, and Reata Industrial Gas Company operated as a single business enterprise from October 1985 to September 1993, when Southern Union acquired RGVG. The jury was not asked to find and thus did not make any findings regarding a single business enterprise as to Southern Union or the operation of any Valero entity after September 1993.

The claim that Southern Union is liable under a single business enterprise or "sham" theory is easily resolved, since there were no findings in the trial court to support such a claim. The City's contention that the court of appeals erred in reversing the trial court's judgment in this regard has no merit.

With regard to events occurring before Southern Union acquired RGVG in 1993, the Valero entities

[FN31] challenge the City's single business enterprise theory on several bases. Among those challenges is the contention that this Court has never recognized such a theory and that there is no need for an additional theory for either piercing a corporate veil or imposing joint and several liability. The Valero entities, joined by Southern Union, also argue that the use of the single business enterprise theory in this case goes beyond piercing a corporate veil and imposing joint and several liability because a single business enterprise theory was used to transform the separate contracts of affiliated companies into contractual undertakings by all affiliated companies as if they were a single entity. The Valero companies and Southern Union urge this Court to clarify the law in Texas regarding the validity and parameters of the single business enterprise theory.

The Valero entities also contend that article 2.21 of the Texas Business Corporation Act [FN32] governs liability under any theory of single business enterprise in this case and that the court of appeals improperly ignored article 2.21. The City counters that the theory of single business enterprise is well recognized by the courts of appeals in this state; that in any event, the charge to the jury essentially tracked article 2.21; and that there is evidence to support the jury's findings regarding single business enterprise.

This Court has never considered the "single business enterprise" concept in any detail. The only decision in which we have had occasion to comment at all on such a theory was in *George Grubbs Enterprises, Inc v. Bien.* [FN33] In that case, the sole issue we addressed was whether it was proper to instruct the jury that in assessing punitive damages against a corporation, it could consider the "wealth or profitability" of a corporate entity related to the defendant even though that related corporate entity was not a party to the case, if the jury concluded that the defendant and its affiliate were "operated as and constitute a single business enterprise." [FN34] In that case, the jury was instructed that a " 'single business enterprise' exists when two or more corporations associate together and, rather than operate as separate entities, integrate their resources to achieve a common business purpose." [FN35] In relating the procedural history, we said:

> *11 Prior to submission of the case to the jury, the defendants objected to this instruction on the grounds that it erroneously omitted the factors necessary to determine whether Grubbs Enterprises and Auto Park constituted a single business enterprise. *See, e.g. Paramount*

*Petroleum v. Taylor Rental Ctr.,* 712 S.W.2d 534 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.) (listing factors). [FN36]

We then said: "Assuming without deciding that it would *ever* be proper for the jury to consider the wealth of a related corporate entity which had not been joined as a defendant, we find that the instruction was inadequate for the reasons stated in the defendants' objection to the charge." [FN37] We then explained that exemplary damages "rest on justifications similar to those for criminal punishment," that if corporate structures were to be disregarded, there must be "a fact-specific analysis of each case," and that disregarding the corporate structure "demands jury instructions that advise the jury concerning all the factors bearing on their decision." [FN38] We held that "[b]ecause this 'single business enterprise' instruction seeks to disregard the corporate structure, the failure to submit all relevant factors to guide the jury's consideration was error." [FN39] We said nothing in this opinion to indicate that a "single business enterprise" theory was different from other theories already recognized to disregard corporate structure and hold one corporation liable for the debt or tort of another. We certainly said nothing in *George Grubbs* to indicate that a "single business enterprise" theory could be used to view the contracts of distinct corporations as the contracts of a single, amalgamated entity.

We need not decide today whether a theory of "single business enterprise" is a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure and the theories of joint venture, joint enterprise, or partnership for imposing joint and several liability. That is because whatever label might be given to the City's attempt to treat the Valero entities as a single entity, article 2.21 of the Texas Business Corporation Act [FN40] controls, and the questions submitted to the jury were intended to embody the requirements of article 2.21.

Since 1993, article 2.21 has provided that, with certain exceptions that do not apply in this case, section A of article 2.21 is the exclusive means for imposing liability on a corporation for the obligations of another corporation in which it holds shares. [FN41] The current version of article 2.21 says:

> The liability of a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for an obligation that is limited by Section A of this article is exclusive and preempts any other liability imposed on a holder,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for that obligation under common law or otherwise.... [ [FN42]]

**\*12** Section A of article 2.21 sets forth the basis on which a corporation may have an obligation with respect to its affiliate's contractual obligations:

A. A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate thereof or of the corporation, shall be under no obligation to the corporation or to its obligees with respect to:

* * *

(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder, owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate; or

(3) any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality, including without limitation: (a) the failure to comply with any requirement of this Act or of the articles of incorporation or bylaws of the corporation; or (b) the failure to observe any requirement prescribed by this Act or by the articles of incorporation or bylaws for acts to be taken by the corporation, its board of directors, or its shareholders.[ [FN43]]

In connection with the single business enterprise question that was submitted to the jury in this case, the jury was instructed:

You are instructed that a single business enterprise exists when two or more corporations associate together and rather than operate as separate business entities, integrate their resources to achieve a common business purpose. In order to answer this question "Yes," you must find that such single business enterprise was used for the purpose of perpetrating and did perpetrate an actual fraud on the City of Edinburg primarily for the direct personal benefit of the single business enterprise. "Actual fraud" as used above means conduct involving dishonesty of purpose or intent to deceive.

This instruction does not track article 2.21 precisely, but even under this instruction, there is no evidence to support a finding that RGVG or any of the Valero entities perpetrated an actual fraud on the City. The court of appeals incorrectly concluded: "To prove that there has been a sham to perpetrate a fraud, *tort* claimants must show only constructive fraud." [FN44] First, the City used the single business enterprise finding to underpin its *breach of contract* claim. There was no *tort* claim to which the single business enterprise finding could have applied, other than the fraud in the inducement claim, which we consider below. Second, the charge to the jury required a finding of actual fraud, not constructive fraud.

**\*13** There is no evidence that RGVG or any of the Valero entities engaged in "conduct involving dishonesty of purpose" or that they acted with "intent to deceive" the City within the meaning of the jury charge. Indeed, the fact that RGVG transported gas sold by its affiliates to consumers within the City was well known to the City. The City even approved tariffs that set the terms and conditions for such transportation. Affiliates of RGVG had the legal right to sell gas to consumers in the City, and RGVG had the legal right to transport that gas. Ordinance No. 1129 was never intended to give, nor could it have given, RGVG the exclusive right to sell gas to consumers in the City.

The court of appeals based its conclusion that there was "constructive fraud" on the testimony of an expert witness who opined that whether gas was sold, as distinguished from transported, and the identity of the seller should be determined not by the written contractual agreements that governed sales and transportation, but by where the gas was metered. The expert opined that because gas was measured when it was delivered to a customer within the city, the "sale" took place at the customer's point of receipt within the City, and that since RGVG delivered the gas, it must have been the seller. In this expert's opinion, the gas purchase contracts consumers had with suppliers such as Reata, L.P. and the separate contracts that these consumers entered into with RGVG for transportation were a "sham." The court of appeals concluded that this expert testimony could override the express contractual provisions that evidenced distinct sales and transportation transactions. [FN45]

The court of appeals' conclusion is insupportable, both legally and factually. The quantity of gas

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2003 WL 22495756                                                                                                    **Page 11**
(Cite as: 2003 WL 22495756, *13 (Tex.))

transported and sold to a consumer can only be accurately measured by metering the volume of gas received by the consumer. The gas entering RGVG's pipeline system was also metered upstream of that delivery point, and allocations were made between that point and the various delivery points. Some of the gas in RGVG's system was purchased, transported, then resold by RGVG to consumers within the City. Other gas in RGVG's system had been purchased by other suppliers, including Reata, L.P. That gas was transported by RGVG, then resold by the other suppliers to consumers in the City. There is no allegation and no evidence that any of the allocations among RGVG, Reata, L.P., and other suppliers of the amounts sold or the amounts transported were inaccurate in any way. There is no evidence whatsoever of a "sham."

The court of appeals correctly recognized that when Southern Union provided transportation to Reata, L.P., just as RGVG had done, the expert's conclusion that the sales and transportation contracts were a mere sham could not withstand scrutiny. The court of appeals recognized that regardless of how or where the gas was metered, the sales were made by Reata, L.P., not Southern Union. [FN46] But the dichotomy the court of appeals saw between transportation by RGVG for Reata, L.P. and transportation by Southern Union for Reata, L.P. is illogical. The only distinction the court of appeals could draw between the two was that Southern Union was a transporter "outside the corporate family." [FN47] This distinction is immaterial. It does not matter whether the company that supplies the gas to consumers within the City is affiliated with RGVG or Southern Union, as long as the supplier is a separate corporate entity, and there is no basis for disregarding the separate corporate identities.

*14 In an analogous situation in *Railroad Commission of Texas v. Lone Star Gas Co.*, we held that the separate existence of corporations was not disregarded "when affiliated purchasers use the same pipeline to transport gas." [FN48] In that case, the Railroad Commission had promulgated rules governing pipeline companies such as RGVG and Southern Union and their affiliated special marketing programs (SMPs) such as Reata, L.P. and Mercado. Under the Commission's rules and regulations, separate corporate entities were created as SMPs to buy cheaper spot-market gas and sell it to the affiliated pipelines' customers. [FN49] The rules that were challenged in *Lone Star* treated pipeline companies and their affiliated SMPs as one entity for

purposes of preventing discriminatory production and taking of natural gas when the pipeline and the SMP used the same pipeline system, unless the SMP qualified as a first purchaser or applied for a hardship exception. [FN50] We held that operating in this manner, as required by the Commission's rules, did not disregard the separate corporate structures of the pipeline company and its SMP. [FN51] Similarly, the fact that RGVG and later Southern Union transported gas supplied by an affiliated company in the same manner and in the same pipeline system along with gas that RGVG and Southern Union sold to some of the same customers does not provide grounds for disregarding the separate corporate entities and their respective, separate contractual obligations.

The City argues that the Valero entities had common directors, shared employees, and had central accounting and payroll systems. We have held that such facts do not justify disregarding the corporate structures of affiliated companies. [FN52] But more importantly, proof of such facts would not establish liability under article 2.21 [FN53] or the charge given to the jury in this case.

There was no basis in this record for concluding that the distinct corporate identities of the Valero entities should be disregarded or that sales of gas by RGVG's affiliates to consumers within the City could be considered sales by RGVG under Ordinance No. 1129.

                                    IV

[3] The jury found that RGVG sold, transferred or assigned "rights, privileges or duties required by Edinburg Ordinance No. 1129 to be performed by Rio Grande Valley Gas Company without the express written consent of the City of Edinburg first being obtained considering Ordinance 1129 in its entirety." The jury awarded $4,000,000 in damages for this claim. The jury was instructed in that regard:

Consider the following elements of damages, if any, and none other:
    The difference, if any, between the value to the City of Edinburg of the rights, privileges or duties sold, transferred or assigned without the express written consent of the City of Edinburg being first obtained and the amount for which the City of Edinburg could have purchased such rights, privileges or duties. Do not include in your answer any amount that you find the City of Edinburg could have avoided by the exercise of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Page 12

reasonable care.

**\*15** The trial court disregarded the jury's findings and refused to award any damages for this claim. The court of appeals affirmed, concluding that the City had not included this claim in its pleadings. [FN54] The City contends that it did adequately plead this claim and that the court of appeals reversed on unpreserved and unassigned error.

In the interest of brevity, we will not parse through the pleading and preservation contentions or the myriad other contentions made by the parties with regard to this claim. That is because the trial court was correct in holding that there was no evidence to support any award of damages. The claim is based on RGVG's sale of its gas transmission system to Valero Energy Corporation in 1987. This included four laterals located within the City. Through other transactions, Valero Transmission, L.P. became the owner of the four laterals, which consisted of about seven miles of pipelines within the City. The City did not consent in writing to these transfers. Assuming, without deciding, that RGVG's transfer without the City's consent was in violation of Ordinance No. 1129, the City offered no evidence of any damages it suffered. One of the City's expert witnesses testified that RGVG's entire transmission system had a value of about $2,000,000 in 1987. The four laterals at issue were only a small fraction of this system. The expert did not offer any valuation of the four laterals and expressly testified that he did not calculate the value of the laterals. No other evidence was offered that even remotely indicated how the City was damaged. RGVG continued to discharge its responsibilities under Ordinance No. 1129 after title to the facilities was transferred to an affiliate. The trial court correctly disregarded the jury's findings on this claim, and the court of appeals did not err in affirming this aspect of the trial court's judgment.

## V

The City contends that the court of appeals erred in holding that the City could not prevail on its tortious interference claim. The jury found that Valero Transmission Company, Valero Transmission, L.P., Reata Industrial Gas Company, Reata, L.P., Valero Natural Gas Company, and Mercado intentionally interfered with Ordinance No. 1129. The jury was instructed: "Interference is intentional if committed with the belief that interference is substantially certain to result in or with the desire to interfere with the contract." The jury also found that these companies

interfered without a good faith belief that they had a right to do so. In this regard, the jury was instructed:

> A company is justified to interfere with Ordinance 1129 if: (1) such party possesses interests in the market for gas in Edinburg equal or superior to the rights of the parties to the contract; (2) such company has a good faith claim to a colorable legal right to interfere with the contract, even though that claim ultimately proves to be mistaken; or (3) such company has a good faith doubt as to the rights of the parties under the contract.

**\*16** The instructions to the jury regarding damages for interference were complex. As to Reata, L.P., Reata Industrial Gas Company, and Mercado, the jury was instructed to base damages on lost franchise fees under Ordinance No. 1129. [FN55] As to Valero Transmission Company, Valero Transmission, L.P., and Valero Natural Gas Company, the jury was instructed to determine damages based on the transfer of rights, privileges or duties without the City's written consent. [FN56] This latter instruction pertained to the transfer of the four laterals within the City by RGVG to Valero Energy Corporation as part of a transfer of RGVG's gas transmission system.

The court of appeals concluded that "the jury charge asked the jury to assess damages based on the value of the lateral pipelines," but that "the only damages asserted in the pleadings were lost franchise fees." [FN57] The court of appeals then held that the City's pleadings did not give the defendants fair notice of the tortious interference claims. [FN58] As with its claim regarding the transfer of the laterals, the City contends that it adequately plead tortious interference. But again, in the interest of brevity, we will not address those or many of the other issues raised by the parties with respect to tortious interference because there is no merit to the substance of the tortious interference claims.

[4] With regard to the portion of the claim based on the transfer of laterals within the City by RGVG to Valero Energy Corporation, there was no evidence of any damages suffered by the City, as discussed above. With regard to the claim that sales of gas were made by affiliates of RGVG, and that the City therefore lost franchise tax revenue under Ordinance No. 1129, there was no tortious interference as a matter of law.

The companies affiliated with RGVG that sold gas to consumers in the City had the legal right to make those sales. The City had no right to expect that RGVG would be the exclusive supplier of gas to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

consumers within the City. As noted above, the franchise agreement embodied in Ordinance No. 1129 did not give RGVG the exclusive right to sell gas within the city limits. Nor could it lawfully have done so. [FN59] The City approved tariffs and enacted ordinances that implemented some of the very sales that the City now contends constituted tortious interference. The City's tortious interference claim has no merit.

## VI

[5] The court of appeals held that the City failed to plead fraudulent inducement and therefore that the trial court erred in awarding punitive damages. The City takes issue with that holding. As with other claims, we will not undertake to sort through the pleadings issues because, on the merits, the City's fraud claim fails.

The jury found that RGVG committed "fraud against the City of Edinburg in connection with entering into Edinburg Ordinance No. 1129." The jury was instructed:
> You are instructed that "fraud" occurs when-
> a. a party makes a material misrepresentation;
> *17 b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion;
> c. the misrepresentation is made with the intention that it should be acted on by the other party; and
> d. the other party acts in reliance upon the misrepresentation and thereby suffers injury.
> You are instructed that a "material misrepresentation" occurs if a promise of future performance is made without a present intent to perform as promised.

[6] Ordinance No. 1129 was approved by the City in September 1985. It was not until two years later, in October 1987, that affiliates of RGVG first made sales to consumers within the City. There was no evidence that at the time the franchise agreement was reached, RGVG made any misrepresentations to the City. Nor is there any evidence that at the inception of this agreement, RGVG did not intend to perform it. As we held in *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, the "mere failure to perform a contract is not evidence of fraud." [FN60] Even were there evidence that RGVG did not fully perform material obligations under Ordinance 1129, that would not establish fraudulent inducement.

The court of appeals did not err in reversing the trial court's judgment with respect to fraud in the inducement.

## VII

[7] Finally, the City contends that the court of appeals erred in reversing the trial court's determination that portions of certain of the laterals transferred by RGVG to Valero Energy Corporation (and that were owned by Valero Transmission, L.P. at the time of trial) were a purpresture and an encroachment on public property. We have defined a purpresture "as an encroachment upon public rights and easements, the appropriation to private use of that which belongs to the public." [FN61]

The court of appeals reasoned that since the Valero entities were operated as a single business enterprise, Valero Transmission, L.P. "had the same rights to own pipelines as RGVG." [FN62] This analysis is incorrect for at least two reasons. First, RGVG was acquired by Southern Union in 1993. Valero Transmission, L.P.'s ownership of the laterals could not have been referable to RGVG after that date, even under the court of appeals' single business enterprise theory. Second, as we have held above, there was no basis for disregarding the distinct corporate identities of RGVG, Valero Energy Corporation, or Valero Transmission, L.P.

[8] However, the court of appeals' judgment was nevertheless correct because the trial court's judgment declaring a purpresture served no purpose. Even assuming that there was a purpresture, which we do not decide, the City had abandoned any claim for damages, an injunction, or other relief regarding its contention that a purpresture existed. The facilities were constructed by RGVG under the authority given to it by the City in Ordinance No. 1129. RGVG has apparently continued to use and operate the facilities to provide gas service to consumers within the City after title was transferred to Valero Transmission, L.P. The City makes no contention that it is entitled to any relief from RGVG or Valero Transmission, L.P. as a result of the transfer of title to these facilities without the City's consent. Accordingly, we affirm the court of appeals' judgment in this regard, although we do so on grounds that differ from those asserted by the court of appeals.

\* \* \*

*18 Because the foregoing issues are dispositive, we

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2003 WL 22495756
(Cite as: 2003 WL 22495756, *18 (Tex.))

**Page 14**

do not reach a number of other issues raised, including questions regarding the proper measure of damages and proof and segregation of attorneys' fees. We affirm the court of appeals' judgment in part, reverse that judgment in part, and render judgment that the City take nothing.

Justice O'NEILL did not participate in the decision.

FN1. TEX. UTIL. CODE §§ 101.003(7), 121.001(a).

FN2. 844 S.W.2d 679 (Tex.1992).

FN3. The jury in this case was instructed that "a 'purpresture' is an encroachment without consent or permission upon public rights, property or easements or the appropriation to private use of that which belongs to the public."

FN4. 59 S.W.3d 199.

FN5. *Id.* at 210.

FN6. *Id.* at 212.

FN7. *Id.* at 213.

FN8. *Id.* at 216-17.

FN9. *Id.* at 214.

FN10. *Id.*

FN11. *Id.* at 225.

FN12. *Id.* at 215.

FN13. *Id.* at 215-16.

FN14. *Id.* at 216.

FN15. *Id.* at 216 n. 5.

FN16. *Id.*

FN17. *Id.* at 225.

FN18. *Id.* at 217-18.

FN19. *Id.* at 218.

FN20. *Id.* at 218-19.

FN21. *Id.* at 221-24.

FN22. *Id.* at 224-25.

FN23. 59 S.W.3d 225, 228.

FN24. *Id.* at 229.

FN25. *Id.* at 230.

FN26. Valero Energy Corporation was acquired by PG & E Gas Transmission Corporation after the dispute in this case arose, and after RGVG had been acquired by Southern Union. Then, while this case was pending in the court of appeals, El Paso Gas Transmission Company and other El Paso entities acquired or succeeded the PG & E entities. To minimize confusion to the greatest extent possible, we will refer to the former Valero entities using the names under which they were formerly known rather than their names after the PG & E and El Paso acquisitions or mergers.

FN27. Emphasis added.

FN28. 59 S.W.3d at 214 ("The only gross income [Southern Union] derived from sales of spot-market gas inside the city was its transportation revenue. While evidence was presented at trial establishing that the city had passed a separate ordinance setting rates and fees for 'transportation' of gas, the city did not seek damages in this litigation for lost transportation fees.").

FN29. TEX. UTIL. CODE §§ 101.003(7), 121.001(a).

FN30. *See* TEX. CONST. art. I, § 26 ("Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed, nor shall the law of primogeniture or entailments ever be in force in this State."); *see also Edwards County v. Jennings,* 89 Tex. 618, 35 S.W. 1053, 1054 (1896); *City of Brenham v. Brenham Water Co.,* 67 Tex. 542, 4 S.W. 143, 156 (1887); *Altgelt v. City of San Antonio,* 81 Tex. 436, 17 S.W. 75, 76 (1890); *Gomez v. City Transp. Co. of Dallas,* 262 S.W.2d 417, 422 (Tex.Civ.App.-Dallas 1953, writ ref'd n.r.e.) ; *State v. Cent. Power & Light Co.,* 147 S.W.2d 330, 334 (Tex.Civ.App.-Beaumont 1941), *aff'd,* 139 Tex. 51, 161 S.W.2d 766

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2003 WL 22495756                                                                Page 15
(Cite as: 2003 WL 22495756, *18 (Tex.))

(1942); *Templeton v. City of Wellington,*
207 S.W. 186, 187-88 (Tex.Civ.App.-
Amarillo 1918, no writ); *Ennis Waterworks
v. City of Ennis,* 136 S.W. 513, 516-17
(Tex.Civ.App.1911), *aff'd,* 105 Tex. 63, 144
S.W. 930 (1912).

FN31. As indicated in note 26 above, we
will refer to the Valero entities as they were
formerly known, not as they are or have
been known since the PG & E and El Paso
acquisitions or mergers.

FN32. TEX. BUS. CORP. ACT art. 2.21.

FN33. 900 S.W.2d 337 (Tex.1995).

FN34. *Id.* at 338.

FN35. *Id.*

FN36. *Id.* at 338-39.

FN37. *Id.* at 339 (emphasis in original).

FN38. *Id.*

FN39. *Id.*

FN40. TEX. BUS. CORP. ACT art. 2.21.

FN41. Act of May 7, 1993, 73rd Leg., R.S.,
ch. 215, § 2.05, 1993 Tex. Gen. Laws 418,
446.

FN42. TEX. BUS. CORP. ACT art. 2.21, §
B.

FN43. TEX. BUS. CORP. ACT art. 2.21, §
A.

FN44. 59 S.W.3d at 209 (emphasis added).

FN45. *Id.* at 214.

FN46. *Id.*

FN47. *Id.*

FN48. 844 S.W.2d 679, 690 (Tex.1992).

FN49. *Id.* at 684.

FN50. *Id.*

FN51. *Id.* at 690.

FN52. *See, e.g., BMC Software Belgium,
N.V. v. Marchand,* 83 S.W.3d 789, 799
(Tex.2002).

FN53. TEX. BUS. CORP. ACT art. 2.21.

FN54. 59 S.W.3d at 215-16.

FN55. The instruction said:
The loss, if any, of the contract's benefit due
to the interference as measured by:
The difference, if any, between the value of
the franchise fees payable under Edinburg
Ordinance No. 1129 as agreed to by Rio
Grande Valley Gas Company and Southern
Union Company as successor to Rio Grande
Valley Gas Company with the City of
Edinburg and the value of the franchise fees
actually paid under Edinburg Ordinance No.
1129 as it was performed by Rio Grande
Valley Gas Company and Southern Union
Company as successor to Rio Grande Valley
Gas Company. Do not include in your
answer any amount that you find the City of
Edinburg could have avoided by the
exercise of reasonable care.

FN56. The instruction said:
The loss, if any, of the contract's benefit due
to the interference as measured by:
The difference, if any, between the value to
the City of Edinburg of the rights, privileges
or duties sold, transferred or assigned
without the express written consent of the
City of Edinburg being first obtained and
the amount for which the City of Edinburg
could have purchased such rights, privileges
or duties. Do not include in your answer any
amount that you find the City of Edinburg
could have avoided by the exercise of
reasonable care.

FN57. 59 S.W.3d at 215-16.

FN58. *Id.* at 216.

FN59. *See* TEX. CONST. ART. I, § 26
("Perpetuities and monopolies are contrary
to the genius of a free government, and shall
never be allowed, nor shall the law of
primogeniture or entailments ever be in
force in this State.").

FN60. 960 S.W.2d 41, 48 (Tex.1998).

2003 WL 22495756
(Cite as: 2003 WL 22495756, *18 (Tex.))

FN61. *Hill Farm, Inc. v. Hill County,* 436 S.W.2d 320, 321 (Tex.1969); *see also* KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 86 (5th ed.1984).

FN62. 59 S.W.3d at 225.

2003 WL 22495756, 2003 WL 22495756 (Tex.)

Briefs and Other Related Documents (Back to top)

. 2002 WL 32133221T1 (Appellate Brief) Reply in Support of Brief on the Merits Filed by Southern Union Company, Southern Union Gas Company and Rio Grande Valley Gas Company (May. 31, 2002)

. 2002 WL 32133220T1 (Appellate Brief) Response to City of Edinburg's Brief on the Merits, Filed by Southern Union Company, Southern Union Gas Company, Rio Grande Valley Gas Company and Mercado Gas Services, Inc. (May. 15, 2002)

. 2002 WL 32133222T1 (Appellate Brief) Amicus Curiae Brief of Texans for Reasonable Legal Fees (May. 15, 2002)

. 2002 WL 32349523T1 (Appellate Filing) Reply in Support of Petition for Review Filed by Southern Union Company, Southern Union Gas Company and Rio Grande Valley Gas Company (Jan. 11, 2002)

. 2002 WL 32349525T1 (Appellate Filing) PG&E Petitioners' Reply to the City of Edinburg's "Response to Petition for Review Filed by PG&E Gas Transmission, et al." (Jan. 11, 2002)

. 2002 WL 32349524T1 (Appellate Filing) PG&E Respondents' Response to the City of Edinburg's Petition for Review (Jan. 02, 2002)

. 2001 WL 34378023T1 (Appellate Filing) The City of Edinburg's Response to Petition for Review Filed by Southern Union, et al. (Dec. 27, 2001)

. 2001 WL 34378022T1 (Appellate Filing) Petition for Review for the City of Edinburg (Nov. 05, 2001)

. 2001 WL 34378020T1 (Appellate Filing) Petition for Review Filed by Southern Union Company, Southern Union Gas Company and Rio Grande Valley Gas Company (Oct. 17, 2001)

. 2001 WL 34378021T1 (Appellate Filing) PG&E Petitioners' Petition for Review (Oct. 17, 2001)

. 2001 WL 34115254T1 (Appellate Brief) Brief on the Merits, Filed by Southern Union Company, Southern Union Gas Company and Rio Grande Valley Gas Company (Mar. 25, 2001)

. 2001 WL 34115255T1 (Appellate Brief) PG&E Petitioners' Brief on the Merits (2001)

. 2001 WL 34115256T1 (Appellate Brief) PG&E Petitioners' Reply to the City of Edinburg's Brief on the Merits in Response to Pg&e Gas Transmission, et al. (2001)

. 2001 WL 34115257T1 (Appellate Brief) PG&E Respondents' Response to Petitioner Edinburg's Brief on the Merits (2001)

. 2001 WL 34115258T1 (Appellate Brief) Brief on the Merits for Petitioner, the City of Edinburg (2001)

. 2001 WL 34115259T1 (Appellate Brief) The City of Edinburg Reply Brief on the Merits in Response to PG&E's Brief on the Merits (2001)

. 2001 WL 34115260T1 (Appellate Brief) The City of Edinburg's Reply Brief on the Merits in Response to Southern Union's Brief on the Merits (2001)

. 2001 WL 34115261T1 (Appellate Brief) City of Edinburg's Brief on the Merits in Response to PG&E Gas Transmission, et al. (2001)

. 2001 WL 34115262T1 (Appellate Brief) City of Edinburg's Brief on the Merits in Response to Southern Union, et al. (2001)

. 2001 WL 34377751T1 (Appellate Brief) Brief of Amicus Curiae, Texas Civil Justice League, in Support of the Petition for Review (2001)

. 2001 WL 34378024T1 (Appellate Filing) Response to Petition for Review Filed by PG&E Gas Transmission, et al. (2001)

. 2001 WL 34378025T1 (Appellate Filing) Response to City of Edinburg's Petition for Review Filed by Southern Union Company, Southern Union Gas Company, Rio Grande Valley Gas Company and Mercado Gas Services, Inc. (2001)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works