IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 3 0 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| CITY OF SAN BENITO, | § | |
| | § | |
| v. | § | |
| | § | C.A. NO. B03-080 |
| | § | |
| TEJAS GAS PIPELINE COMPANY, | § | |
| et al. | § | |

PENNZOIL GAS MARKETING COMPANY'S FURTHER MOTION TO DISMISS
AND RESPONSE TO THE PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

TO THE HONORABLE UNITED STATES DISTRICT JUDGE ANDREW HANEN:

I. Pennzoil's Further Motion to Dismiss

1.      The plaintiff's failure to comply with the Court's June 16, 2004 order;

Pennzoil's motion to dismiss is granted under the terms of the Court's order.  On June 16,

2004 the Court ordered the plaintiff to do the following:  a) provide proof of pipeline

ownership or stipulate that it has no such proof, b) file a concise and unambiguous amended

complaint if the plaintiff intends to rely on any theory of liability other than pipeline

ownership, and c) on or before July 14, 2004 produce to each defendant "plaintiff's evidence

as to any theory of liability." The plaintiff conceded that it has no evidence that Pennzoil has

ever owned a pipeline within the City of San Benito.  The plaintiff did not produce any

documents until July 26–almost two weeks after the Court's deadline.  The documents it has

now produced fail to meet the Court's requirements. The plaintiff has produced only 8 pages

of documents which have anything to do with Pennzoil.[1]  Among other things, those few

pages do not contain any evidence of the following matters which are critical to the

plaintiff's claims:

    a.    <u>Transmission of gas through city property</u>: The plaintiff has produced no evidence that any of the gas at issue passed through or under property which is within the corporate limits of the city.

    b.    <u>Delivery of gas within city limits</u>: The plaintiff has not produced any evidence that the plant where the gas was delivered fell within city limits at the time of alleged gas sales by Pennzoil.

    c.    <u>Location of pipelines</u>: The plaintiff has not produced any evidence as to the location of the pipelines through which the plaintiff alleges Pennzoil transported or delivered gas.  There is no evidence that such pipelines fall within the city limits.

    d.    <u>Identity of pipelines</u>: The plaintiff has not produced any evidence as to the identity of the pipeline(s) through which it contends Pennzoil transported or delivered gas for any of the alleged gas sales.

    e.    <u>Transactions which are allegedly subject to the ordinance</u>: The plaintiff has produced no evidence about which of the alleged gas sales are subject to the ordinance at issue.

    f.    <u>Interference with the plaintiff's right of ownership</u>: The plaintiff has produced no evidence that any conduct or property of any of the defendants deprived the plaintiff of the use and enjoyment of its property.  The plaintiff has produced no evidence that the defendants' alleged use of its property kept the plaintiff from using such property for some other purpose.

    g.    <u>Public hazard</u>: The plaintiff has produced no evidence that any conduct of the defendants caused the plaintiff to incur expense to guard against any threat to public safety, or that any conduct of the defendants ever posed such a threat.

---

[1]The plaintiff's production which pertains to Pennzoil is attached as Exhibit A.

h.     <u>Accounting</u>: The plaintiff has produced no evidence of the following:

    i.     That any rent is owed, or

    ii.     That any rent which may have been owed has not been paid.

At the very least the plaintiff was required to produce its evidence that the alleged gas sales were subject to the ordinance at issue, that the sales were actually made, that the gas was delivered and paid for, calculation of the rent amount due, when the rent amount came due, that the recipient of the sale proceeds owed the rent, and that the recipient of the sales proceeds never paid. The plaintiff has not produced any such evidence.

i.     <u>Gas utility</u>: The plaintiff has produced no evidence that Pennzoil is or ever has been a gas utility. The ordinance at issue on its face applies only to gas utilities.

j.     <u>Pipeline ownership</u>: As explained at paragraph 7 below, each of the plaintiff's claims is dependent upon pipeline ownership because the ordinance at issue provides for payment of rent, which requires a fixed presence on city property. The plaintiff has conceded that it has no evidence that Pennzoil ever owned a pipeline within the city limits.

2.     On February 11, 2004, Pennzoil Gas Marketing Company ("Pennzoil") filed a motion to dismiss the plaintiff's claims against it on the ground that the plaintiff had repeatedly violated the Court's orders regarding discovery by failing to produce any evidence of pipeline ownership by Pennzoil.[2] The other defendants also moved for dismissal on similar grounds at about the same time. On March 18, 2004, the Court granted some of the motions to dismiss. Pennzoil's amended motion to dismiss remains pending before the Court.

---

[2]Pennzoil amended its motion on March 19, 2004. See Exhibit B, Pennzoil's Amended Motion to Dismiss.

3.     On April 1, 2004, the plaintiff filed a motion for reconsideration of the Court's March 18, 2004 orders dismissing the plaintiff's claims against some of the defendants. The Court conditionally granted this motion in its June 16, 2004 Order (the "Order"). See Exhibit C. However, the Court conditioned reinstatement of the plaintiff's claims upon the plaintiff's timely compliance with five conditions. If the plaintiff failed to comply by the deadlines set out in the June 16 Order with any of these five conditions, the Court's Order provided that the plaintiff's motion for reconsideration will be denied and the pending motions to dismiss will be granted. See Exhibit C, p. 15-16.

4.     The plaintiff failed to comply timely with the following condition set out in the Order:

> Provide to each defendant within 20 business days of this order plaintiff's evidence as to any theory of liability raised either in the original complaint (i.e., the Seventh Amended Petition) or the supplemental complaint referred to in paragraph 3.

Exhibit C, p. 15, ¶ 4. The twentieth business day by which the plaintiff was required to produce its evidence against the defendants, including Pennzoil, was July 14, 2004. The plaintiff failed to meet this deadline. The plaintiff did not provide any information to Pennzoil regarding its alleged liability until July 26, at which time the plaintiff sent Pennzoil about 700 pages of documents. Of the 700 or so pages, only 8 dealt with Pennzoil.

5.     The plaintiff failed to comply with the Court's condition that the plaintiff must file an amended complaint concisely and unambiguously setting out any theory of liability other than pipeline ownership. The plaintiff has conceded that it has no evidence that

4

Pennzoil ever owned a pipeline within the San Benito city limits. Exhibit D. Thus under the Court's June 16 order, the plaintiff was required to replead as to Pennzoil and to clearly, concisely and unambiguously state claims not based on pipeline ownership. All of the plaintiff's claims in its eighth amended petition appear to be based on the theory that Pennzoil is liable for failure to pay rent pursuant to City of San Benito ordinance 478. However, the plaintiff has not unambiguously excluded any claim against Pennzoil. Though the plaintiff has no evidence of pipeline ownership, it has not excluded any claim against Pennzoil which is based on pipeline ownership. Ordinance 478 provides that the plaintiff may collect rent from gas utilities for the use or occupation of city streets and real property.[3] On its face, ordinance no. 478 limits the plaintiff's ability to charge rents to the use of property "within the City of San Benito." Exhibit E, § II. As explained in paragraph 6 below, the plaintiff has produced no evidence that Pennzoil has ever owned or occupied any property within the city.

6.      The plaintiff has produced no evidence that Pennzoil appropriated property for its own use or occupation. Ordinance no. 478 identifies the charges at issue as rents. Id. A municipality's charges for the use of city streets and other property is, unquestionably, a charge of rent. City of St. Louis v. Western Union Tel. Co., 148 U.S. 92, 98 (1893) (ordinance requiring that telegraph and telephone companies must pay a fixed sum per annum "for the privilege of using the streets, alleys, and public places thereof..." was rent

---

[3]Pennzoil is not now and never has been a gas utility. Thus the ordinance is inapplicable to Pennzoil.

rather than a tax); Fleming v. Houston Lighting & Power Co., 143 S.W.2d 923 (Tex. 1940);

Tex. Atty. Gen. Op. H-1265, November 30, 1978 (concluding that charges for the use of city

streets is a rent rather than a tax). A rent is a charge levied for appropriation of property for

one's sole use or occupation. City of St. Louis, 148 U.S. at 97-98. Despite the Court's order

that the plaintiff produce the evidence supporting its claims, the plaintiff has produced no

evidence that Pennzoil ever had a fixed existence within the incorporated limits of the city

or that Pennzoil ever appropriated such property for its use or occupation.

      7.    The plaintiff has produced no evidence in support of its purpresture, trespass,

quantum meruit, wrongful appropriation, negligence and tortious interference claims.

a.    Purpresture is encroachment upon public property without consent, or the appropriation of public property for private use. Southern Union Co. v. City of Edinburg, 2003 WL 22495756 *17 (Tex. 2003); Jamail v. Stoneledge Condominium Owners Assoc., 970 S.W. 673, 676 (Tex. App.--Austin 1998, no writ). The plaintiff has produced no evidence that Pennzoil encroached upon public property, that the plaintiff did not consent to encroachment if it occurred, or that the alleged encroachment was for private use.

b.    Trespass to real property is the entry upon another's land without consent. Russell v. American Real Estate Corp., 89 S.W.3d 204, 208 (Tex. App.--Corpus Christi 2002, no pet.). A trespass claim requires proof of interference with the owner's right of possession which, in this case, means proof that Pennzoil occupied the plaintiff's property. Id. The plaintiff has conceded it has no such evidence.

c.    Quantum meruit is an equitable theory of recovery based on an implied agreement to pay for the benefits received. Heldenfels Brothers, Inc. v. City of Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992). To prevail under a claim of quantum merit, the plaintiff must show that: (1) valuable services and/or materials were provided, (2) to the party sought to be charged, (3) which were accepted by the party sought to be charged, and (4) such circumstances reasonably notified the recipient that plaintiff expected to be paid in return for

the services and/or materials rendered. Id. The plaintiff has produced no evidence of services or materials provided to Pennzoil, no evidence that Pennzoil accepted such services or materials, and no evidence of any circumstance wherein Pennzoil was reasonably notified that the plaintiff expected payment for such services or materials.

d.    <u>Wrongful appropriation</u> is a claim that requires, at a minimum, the showing that Pennzoil misappropriated the plaintiff's property, i.e., by occupying it. The plaintiff's claim is based on the assertion that Pennzoil used the plaintiff's pipelines with the city limits. The plaintiff has produced no evidence of such use.

e.    <u>Negligence</u> consists of a duty, a breach of that duty, and damages proximately caused by the breach. <u>Praesel v. Johnson</u>, 967 S.W.2d 391, 394 (Tex. 1998). The plaintiff's negligence claim requires proof of occupancy, because it is grounded on the argument that Pennzoil negligently violated ordinance no. 478. Pennzoil cannot have violated that ordinance unless it occupied the plaintiff's property. The plaintiff has produced no evidence that Pennzoil occupied the plaintiff's property.

f.    <u>Tortious interference</u> with prospective business relationships requires the plaintiff to show: (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference. <u>Allied Capital Corp. v. Cravens</u>, 67 S.W.3d 486, 491 (Tex. App.–Corpus Christi 2002, no pet.). The plaintiff alleges that Pennzoil's "existence and activities within the City's property" interfered with the plaintiff's ability to rent such property to others. Pennzoil has never owned or occupied property within the city's corporate limits, thus it could not have interfered with the plaintiff's rental of property to another. The plaintiff has produced no evidence of any specific business relationships that were prevented by any "independently tortious or unlawful" act by Pennzoil. The plaintiff has produced no evidence that Pennzoil acted in any manner, at any time, with a conscious desire to, or with knowledge that its conduct would, prevent the plaintiff from pursuing business relationships with others.

8.    <u>The plaintiff's claims should be dismissed</u>. The Court ordered the plaintiff to

7

timely produce its evidence of pipeline ownership or to timely produce its evidence in support of claims not based on pipeline ownership. The plaintiff has violated that order, and its claims should be dismissed. The City's eighth amended complaint does not concisely and unambiguously describe a basis for liability other than pipeline ownership. To the contrary, each of the City's claims is grounded on such ownership. The plaintiff concedes that it has no evidence that Pennzoil owned a pipeline within the San Benito city limits, but the plaintiff failed to timely state a claim based on a theory of liability not dependant on pipeline ownership. For these reasons, Pennzoil further moves that the Court grant its motion to dismiss, according to the Court's June 16, 2004 Order.

## II. Pennzoil's Response to the
## Plaintiff's Motion for Protective Order

9.     <u>The plaintiff has not complied with the Fed. R. Civ. P. 26(a)</u>. The plaintiff has failed to disclose the information and documents required by Fed. R. Civ. P. 26(a)(1)(A) through 26(a)(1)(C) relating to its claims against Pennzoil and its alleged damages. Moreover, the plaintiff has failed to respond to Pennzoil's written discovery (requests for production and an additional interrogatory) served on June 11 and due July 14, 2004. Instead, the plaintiff has asked the Court to rule that it need not respond until:

    a.     The Court has ruled that the plaintiff has complied with the Court's June 16 order, and

    b.     Pennzoil has responded to discovery which the plaintiff served in February 2004.

10.     As to the plaintiff's first point, the Court did not suspend discovery in its June

8

16 order.  To the contrary, the Court ordered the plaintiff to provide the defendants with the plaintiff's evidence in support of its claims on or before July 14.  Far from an admonition to stay discovery, the Court has ordered disclosure.  Yet the plaintiff has failed to comply with the Court's order by not producing evidence sufficient to support its claims against Pennzoil.

11.    As to the plaintiff's second point, the plaintiff ignores Pennzoil's motion to quash the plaintiff's discovery (which was filed on March 8, 2004) and the fact that the plaintiff has not complied with its own disclosure obligations.   Sixteen months after the plaintiff sent Pennzoil the plaintiff's seventh amended petition, Pennzoil still does not know the basis for the plaintiff's claims though it has repeatedly asked for this information and the Court has ordered the plaintiff to produce it.  In violation of the Federal Rules of Civil Procedure, the plaintiff has not produced to Pennzoil the basis of its damage calculations (Rule 26(a)(1)(C)), the documents it relies upon for its claim against Pennzoil (Rule 26(a)(1)(B)), or persons likely to have discoverable information that San Benito may rely upon (Rule 26(a)(1)(A)).  Pennzoil should not have to bear the expense of responding to the plaintiff's discovery until the plaintiff has complied with its disclosure obligations under Rule 26(a)(1)and the Court's June 16 order.

12.    The plaintiff continues its pattern of delay.  The Court has noted the "unambiguous record of delay in this case."  Exhibit C, p. 9.  The plaintiff's motion for protective order is its latest effort to avoid disclosure, its obligations under the rules and this Court's order, and to provide the support for its claims.  The plaintiff has not provided any cognizable basis for its refusal to respond.  Pennzoil respectfully requests that the Court order

the plaintiff to answer Pennzoil's discovery and produce the documents which Pennzoil requested.

    13.   <u>Prayer</u>. For these reasons, among others, Pennzoil moves that the Court:

        (i)    dismiss the plaintiff's claims against Pennzoil Gas Marketing Company with prejudice to re-filing; and

        (ii)   that Pennzoil be granted such other and further relief, including without limitation an award of attorneys' fees and costs, to which it is justly entitled.

or, in the alternative,

        (i)    deny the plaintiff's motion for protection;

        (ii)   order that the plaintiff must answer Pennzoil's interrogatory no. 6 and produce the documents which Pennzoil has requested; and

        (iii)  that Pennzoil be granted such other and further relief, including without limitation an award of attorneys' fees and costs, to which it is justly entitled.

Respectfully submitted,

J. D. Page
State Bar No. 15406700
3040 Post Oak Blvd., Suite 850
Houston, Texas 77056
(713) 840-9200 Telephone
(713) 840-9217 Facsimile

By: _____

Bradley M. Whalen
State Bar No. 21238800
Doyle, Restrepo, Harvin
    & Robbins, L.L.P.
4700 Chase Tower
600 Travis Street
Houston, Texas 77002

10

(713) 228-5100 Telephone
(713) 228-6138 Facsimile

Attorneys for Pennzoil Gas Marketing Company

## CERTIFICATE OF CONFERENCE

On February 6, 2004 I asked Adam Poncio, counsel for the plaintiff, whether the plaintiff is opposed to Pennzoil's motion to dismiss.  Mr. Poncio said that the plaintiff is opposed to Pennzoil's motion.

_____
Bradley M. Whalen

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served in compliance with Fed. R. Civ. P. 5 on July 29, 2004, addressed as follows:

Adam Poncio
Law Office of Cerda & Poncio
924 McCullough
San Antonio, Texas 78215
Facsimile: (210) 212-5880

Osborne J. Dykes, III
1301 McKinney, Suite 5100
Houston, Texas 77010
Facsimile: (713) 651-5246

Julie Ezell
Cinergy Marketing & Trading, L.P.
1000 East Main Street
Plainfield, Indiana
Facsimile: (317) 838-6001

Randy Beevis
Cinergy Marketing & Trading, L.P.
1100 Louisiana, Suite 4900

11

Houston, Texas 77002
Facsimile: (713) 393-6903

Francis I. Gandy
Attorney at Law
148 American Bank Plaza
Corpus Christi, Texas 78475
Facsimile: (361) 883-0148

Robert Galligan
Jones, Galligan, Key & Lozano, LLP
2300 West Pike, Suite 300
Weslaco, Texas 78599-1247
Facsimile: (956) 968-6089

C. Scott Jones
Jerry K. Clements
Locke, Liddell & Sapp, LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
Facsimile: (214) 740-8800

David G. Oliveira
Roerig, Oliveira & Fisher LLP
866 West Price Road, Suite 9
Brownsville, Texas 78520
Facsimile: (956) 542-0016

Bradley M. Whalen

# EXHIBIT A

TRAL POWER AND LIGHT COMPANY
- PURCHASE REPORT
THE MONTH OF SEPTEMBER 1992

| SUPPLIER NAME | Fuel Type | PURCHASE TYPE | Expiration Date | PLANT NAME | MMBTU | COST | $/MMBTU | TONS | TOTAL $/TON | MMBTU /TON | BTU/LB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Caloways | COAL | FIRM | 12-31-1999 | Coleto Creek | 3,113,999 | $7,159,015 | $2.299 | 148,192 | $48.970 | 21.301 | 10,650.37 |
| Cyprus Impre Corporation | COAL | SPOT | 12-31-1992 | Coleto Creek | 512,980 | $832,227 | $1.622 | 20,714 | $40.177 | 24.764 | 12,381.96 |
| Mountain Coal Company | COAL | SPOT | 12-31-1992 | Coleto Creek | 1,020,134 | $1,763,492 | $1.731 | 43,280 | $40.785 | 23.581 | 11,790.73 |
| Pacific Basin Resources | COAL | SPOT | 12-31-1992 | Coleto Creek | 14,814 | $25,989 | $1.777 | 709 | $36.628 | 20.612 | 10,306.06 |
| Prior Period Adjustments | COAL | N/A | N/A | Coleto Creek | 0 | $1,786 | $0.000 | 0 | $0.000 | 0.000 | 0.00 |
| Exxon | COAL | FIRM | 06-30-2006 | Oklaunion | 302,441 | $508,701 | $1.682 | 17,685 | $28.765 | 17.102 | 8,550.78 |
| Mobil Coal Production, Inc. | COAL | SPOT | MONTHLY | Oklaunion | 32,948 | $55,284 | $1.6678 | 1,922 | $28.784 | 17.143 | 8,571.28 |
| Sun Coal Co. | COAL | SPOT | 09-30-92 | Oklaunion | 0 | $0 | $0.000 | 0 | $0.000 | 0.000 | 0.00 |
| | | | | TOTAL COAL: | 4,997,098 | $10,346,474 | $2.070 | 230,482 | $44.891 | 21.681 | 10,840.53 |
| ostal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | B. M. Davis | 75,683 | $110,437 | $1.459 | | | | |
| Corpus Christi Gas Marketing | NG | SPOT | 01-Apr-96 | B. M. Davis | 1,103,177 | $2,282,047 | $2.069 | | | | |
| RON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | B. M. Davis | 431,012 | $1,016,662 | $2.384 | | | | |
| Exxon Gas System, Inc. | NG | SPOT | Monthly | B. M. Davis | 479,999 | $927,722 | $1.933 | | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | B. M. Davis | 19,261 | $35,966 | $1.867 | | | | |
| Mobil Natural Gas Inc. | NG | SPOT | Monthly | B. M. Davis | 124,006 | $242,951 | $1.959 | | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | B. M. Davis | 30,851 | $57,610 | $1.867 | | | | |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | B. M. Davis | 62,003 | $122,741 | $1.980 | | | | |
| Oryx Gas Marketing | NG | SPOT | Monthly | B. M. Davis | 37,202 | $73,265 | $1.969 | | | | |
| Pan-Tec Gas Gathering Co. | NG | SPOT | Monthly | B. M. Davis | 1,779 | $3,398 | $1.910 | | | | |
| Pennzoil Gas Marketing Co. | NG | SPOT | Monthly | B. M. Davis | 62,402 | $122,894 | $1.969 | | | | |
| Shell Gas Trading Co. | NG | SPOT | Monthly | B. M. Davis | 123,106 | $242,441 | $1.969 | | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | B. M. Davis | 188,405 | $367,669 | $1.941 | | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | B. M. Davis | 15,501 | $44,906 | $2.897 | | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | B. M. Davis | 24,939 | $49,372 | $1.980 | | | | |
| | | | | TOTAL PLANT: | 2,780,326 | $5,702,283 | $2.051 | | | | |
| GC Marketing | NG | SPOT | Monthly | E. S. Joslin | 289,048 | $592,546 | $2.050 | | | | |
| Tenngasco Marketing Corp. | NG | SPOT | 31-Dec-95 | E. S. Joslin | 170,331 | $344,296 | $2.021 | | | | |
| Tenngasco Marketing Corp. | NG | FIRM | 31-Dec-95 | E. S. Joslin | 209,154 | $445,707 | $2.131 | | | | |
| | | | | TOTAL PLANT: | 668,533 | $1,382,554 | $2.068 | | | | |
| Balcones Pipeline | NG | FIRM | 24-Nov-94 | J. L. Bates | 16,542 | $34,736 | $2.100 | | | | |
| Balcones Pipeline | NG | SPOT | Monthly | J. L. Bates | 35,428 | $67,664 | $1.910 | | | | |
| ostal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | J. L. Bates | 37,050 | $54,063 | $1.459 | | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | J. L. Bates | 9,429 | $17,606 | $1.867 | | | | |
| Gulf Energy Marketing | NG | SPOT | 31-May-96 | J. L. Bates | 296,840 | $585,728 | $1.980 | | | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | J. L. Bates | 155,400 | $323,166 | $2.080 | | | | |
| Mobil Natural Gas Inc. | NG | SPOT | Monthly | J. L. Bates | 60,706 | $118,934 | $1.959 | | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | J. L. Bates | 15,103 | $28,203 | $1.867 | | | | |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | J. L. Bates | 30,353 | $60,066 | $1.980 | | | | |
| Oryx Gas Marketing | NG | SPOT | Monthly | J. L. Bates | 18,212 | $35,866 | $1.969 | | | | |
| Pennzoil Gas Marketing Co. | NG | SPOT | Monthly | J. L. Bates | 30,548 | $60,162 | $1.969 | | | | |
| Prior Period Adjustments | NG | N/A | N/A | J. L. Bates | 0 | $2,063 | $0.000 | | | | |
| Shell Gas Trading Co. | NG | SPOT | Monthly | J. L. Bates | 60,285 | $118,685 | $1.969 | | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | J. L. Bates | 92,721 | $179,969 | $1.941 | | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | J. L. Bates | 7,586 | $21,963 | $2.897 | | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | J. L. Bates | 12,209 | $24,180 | $1.980 | | | | |
| Waters Engineering | NG | FIRM | 30-Sep-96 | J. L. Bates | 13,204 | $33,010 | $2.500 | | | | |
| | | | | TOTAL PLANT: | 893,596 | $1,766,154 | $1.976 | | | | |
| ostal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | La Palma | 39,779 | $58,046 | $1.459 | | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | La Palma | 10,124 | $18,905 | $1.867 | | | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | La Palma | 150,600 | $313,202 | $2.080 | | | | |
| Gulf Energy Marketing | NG | SPOT | 31-May-96 | La Palma | 289,807 | $567,631 | $1.960 | | | | |
| Mobil Natural Gas Inc. | NG | SPOT | Monthly | La Palma | 65,178 | $127,696 | $1.959 | | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | La Palma | 16,216 | $30,280 | $1.867 | | | | |
| Oryx Gas Marketing | NG | SPOT | Monthly | La Palma | 19,553 | $38,506 | $1.969 | | | | |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | La Palma | 32,589 | $64,513 | $1.980 | | | | |
| Pennzoil Gas Marketing Co. | NG | SPOT | Monthly | La Palma | 32,799 | $64,584 | $1.969 | | | | |
| Prior Period Adjustments | NG | N/A | N/A | La Palma | 0 | $1,935 | $0.000 | | | | |
| Shell Gas Trading Co. | NG | SPOT | Monthly | La Palma | 64,704 | $127,428 | $1.969 | | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | La Palma | 99,552 | $193,246 | $1.941 | | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | La Palma | 8,147 | $23,603 | $2.897 | | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | La Palma | 13,108 | $25,950 | $1.980 | | | | |
| | | | | TOTAL PLANT: | 841,956 | $1,655,538 | $1.966 | | | | |
| ostal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | La Palma #7 | 5,614 | $8,191 | $1.459 | | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | La Palma #7 | 1,429 | $2,666 | $1.867 | | | | |
| Mobil Natural Gas Inc. | NG | SPOT | Monthly | La Palma #7 | 9,198 | $18,020 | $1.959 | | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | La Palma #7 | 2,288 | $4,273 | $1.867 | | | | |
| Oryx Gas Marketing | NG | SPOT | Monthly | La Palma #7 | 2,759 | $5,434 | $1.970 | | | | |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | La Palma #7 | 4,599 | $9,104 | $1.980 | | | | |
| Pennzoil Gas Marketing Co. | NG | SPOT | Monthly | La Palma #7 | 4,629 | $9,115 | $1.969 | | | | |
| Shell Gas Trading Co. | NG | SPOT | Monthly | La Palma #7 | 9,131 | $17,963 | $1.969 | | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | La Palma #7 | 14,049 | $27,271 | $1.941 | | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | La Palma #7 | 1,150 | $3,331 | $2.898 | | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | La Palma #7 | 1,850 | $3,662 | $1.979 | | | | |
| | | | | TOTAL PLANT: | 56,696 | $109,054 | $1.923 | | | | |
| Delhi Pipeline | NG | FIRM | 01-Sep-94 | Laredo | 499,513 | $1,373,661 | $2.750 | | | | |
| TXO | NG | SPOT | Monthly | Laredo | 269,667 | $555,514 | $2.060 | | | | |
| | | | | TOTAL PLANT: | 769,180 | $1,929,175 | $2.508 | | | | |

CENTRAL POWER AND LIGHT COMPANY
FUEL PURCHASE REPORT
FOR THE MONTH OF OCTOBER 1992

| SUPPLIER NAME | Fuel Type | PURCHASE TYPE | Expiration Date | PLANT NAME | MMBTU | COST | $/MMBTU | TONS | TOTAL $/TON | BTU/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| Colowyo | COAL | FIRM | 12-31-1999 | Coleto Creek | 2,929,583 | $6,807,228 | $2.324 | 138,797 | $49.044 | 10,553.4 |
| Mountain Coal Company | COAL | SPOT | 12-31-1992 | Coleto Creek | 1,000,390 | $1,739,240 | $1.739 | 43,017 | $40.431 | 11,627.8 |
| Pacific Basin Resources | COAL | SPOT | 12-31-1992 | Coleto Creek | 257,964 | $421,074 | $1.632 | 10,647 | $39.549 | 12,114.4 |
| Prior Period Adjustments: | COAL | N/A | N/A | | 0 | $10,477 | $0.000 | 0 | $0.000 | 0.0 |
| Exxon | COAL | FIRM | 06-30-2005 | Oklaunion | 305,016 | $429,120 | $1.407 | 18,101 | $23.707 | 8,425.4 |
| Mobil Coal Production, Inc. | COAL | SPOT | MONTHLY | Oklaunion | 136,459 | $136,434 | $1.000 | 8,046 | $16,957 | 8,479.9 |
| | | | | TOTAL COAL: | 4,629,392 | $9,543,573 | $2.062 | 218,608 | $43,656 | 10,588.1 |
| | | | | | | | | | | |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-96 | Nueces Bay | 247,276 | $697,383 | $2.820 | | | |
| Corpus Christi Leasehels | NG | FIRM | Various | Nueces Bay | 6,516 | $10,823 | $1.661 | | | |
| CPL-HMW Joint Venture | NG | FIRM | | Nueces Bay | 0 | $127,121 | $0.000 | | | |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | Nueces Bay | 56,403 | $172,324 | $3.055 | | | |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | Nueces Bay | 358,892 | $953,493 | $2.657 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | Nueces Bay | 0 | $731 | $0.000 | | | |
| | | | | TOTAL PLANT: | 669,087 | $1,961,875 | $2.932 | | | |
| | | | | | | | | | | |
| ARCO Natural Gas Marketing | NG | SPOT | Monthly | B. M. Davis | 198,445 | $534,587 | $2.694 | | | |
| Coastal Border Gas Sales, Inc. | NG | FIRM | 01-Sep-93 | B. M. Davis | 124,657 | $239,775 | $1.920 | | | |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-96 | B. M. Davis | 790,500 | $2,229,442 | $2.820 | | | |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | B. M. Davis | 464,660 | $1,471,096 | $3.166 | | | |
| Exxon Gas System, Inc. | NG | SPOT | Monthly | B. M. Davis | 9,920 | $27,082 | $2.730 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | B. M. Davis | 2,451 | $6,402 | $2.612 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | B. M. Davis | 89,659 | $234,213 | $2.612 | | | |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | B. M. Davis | 102,666 | $270,670 | $2.633 | | | |
| Pan-Tex Gas Gathering Co. | NG | SPOT | Monthly | B. M. Davis | 1,487 | $3,926 | $2.640 | | | |
| Pennzoil Gas Marketing Co. | NG | SPOT | Monthly | B. M. Davis | 110,230 | $294,668 | $2.673 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | B. M. Davis | (13) | $9,726 | $0.000 | | | |
| Southern Gas Pipeline Co. | NG | SPOT | Monthly | B. M. Davis | 82,311 | $220,895 | $2.684 | | | |
| Texaco Exploration and Production | NG | SPOT | Monthly | B. M. Davis | 185,815 | $498,671 | $2.684 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | B. M. Davis | 95,121 | $252,365 | $2.653 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | B. M. Davis | 102,666 | $290,271 | $2.821 | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | B. M. Davis | 62,686 | $182,277 | $2.899 | | | |
| | | | | TOTAL PLANT: | 2,424,114 | $6,766,295 | $2.791 | | | |
| | | | | | | | | | | |
| ARCO Natural Gas Marketing | NG | SPOT | Monthly | J. L. Bates | 28,265 | $76,143 | $2.694 | | | |
| Balcones Pipeline | NG | FIRM | 24-Nov-94 | J. L. Bates | 16,481 | $34,610 | $2.100 | | | |
| Balcones Pipeline | NG | SPOT | Monthly | J. L. Bates | 26,971 | $71,203 | $2.640 | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | J. L. Bates | 17,784 | $34,152 | $1.920 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | J. L. Bates | 349 | $912 | $2.613 | | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-95 | J. L. Bates | 93,313 | $253,317 | $2.715 | | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-95 | J. L. Bates | 197,937 | $530,471 | $2.680 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | J. L. Bates | 12,771 | $33,360 | $2.612 | | | |
| Oryx Gas Marketing | NG | SPOT | Monthly | J. L. Bates | 14,655 | $38,581 | $2.633 | | | |
| Pennzoil Gas Marketing Co. | NG | SPOT | Monthly | J. L. Bates | 15,701 | $41,975 | $2.673 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | J. L. Bates | 504 | $6,439 | $12,775 | | | |
| Southern Gas Pipeline Co. | NG | SPOT | Monthly | J. L. Bates | 11,724 | $31,463 | $2.684 | | | |
| Texaco Exploration and Production | NG | SPOT | Monthly | J. L. Bates | 28,467 | $71,026 | $2.684 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | J. L. Bates | 13,549 | $35,545 | $2.653 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | J. L. Bates | 14,655 | $41,344 | $2.621 | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | J. L. Bates | 8,957 | $25,962 | $2.899 | | | |
| Waters Engineering | NG | FIRM | 30-Sep-96 | J. L. Bates | 10,868 | $27,170 | $2.500 | | | |
| | | | | TOTAL PLANT: | 510,951 | $1,354,076 | $2.650 | | | |
| | | | | | | | | | | |
| ARCO Natural Gas Marketing | NG | SPOT | Monthly | La Palma | 65,843 | $177,372 | $2.694 | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | La Palma | 41,427 | $79,556 | $1.920 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | La Palma | 813 | $2,124 | $2.613 | | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-95 | La Palma | 111,287 | $302,111 | $2.715 | | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-95 | La Palma | 236,083 | $632,649 | $2.680 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | La Palma | 29,749 | $77,710 | $2.612 | | | |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | La Palma | 34,138 | $89,873 | $2.633 | | | |
| Pennzoil Gas Marketing Co. | NG | SPOT | Monthly | La Palma | 36,574 | $97,779 | $2.673 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | La Palma | 0 | $5,549 | $0.000 | | | |
| Southern Gas Pipeline Co. | NG | SPOT | Monthly | La Palma | 27,310 | $73,291 | $2.684 | | | |
| Texaco Exploration and Production | NG | SPOT | Monthly | La Palma | 61,653 | $165,456 | $2.684 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | La Palma | 31,561 | $83,733 | $2.653 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | La Palma | 34,138 | $98,310 | $2.621 | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | La Palma | 20,665 | $60,478 | $2.899 | | | |
| | | | | TOTAL PLANT: | 731,421 | $1,943,990 | $2.656 | | | |
| | | | | | | | | | | |
| ARCO Natural Gas Marketing | NG | SPOT | Monthly | La Palma #7 | 423 | $1,138 | $2.691 | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | La Palma #7 | 266 | $511 | $1.920 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | La Palma #7 | 5 | $14 | $2.728 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | La Palma #7 | 191 | $499 | $2.611 | | | |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | La Palma #7 | 219 | $577 | $2.634 | | | |
| Pennzoil Gas Marketing Co. | NG | SPOT | Monthly | La Palma #7 | 235 | $628 | $2.670 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | La Palma #7 | 0 | $1,112 | $0.000 | | | |
| Southern Gas Pipeline Co. | NG | SPOT | Monthly | La Palma #7 | 175 | $470 | $2.688 | | | |
| Texaco Exploration and Production | NG | SPOT | Monthly | La Palma #7 | 396 | $1,062 | $2.684 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | La Palma #7 | 203 | $537 | $2.647 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | La Palma #7 | 219 | $618 | $2.823 | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | La Palma #7 | 134 | $388 | $2.897 | | | |
| | | | | TOTAL PLANT: | 2,466 | $7,554 | $3.063 | | | |
| | | | | | | | | | | |
| Delhi Pipeline | NG | FIRM | 01-Sep-94 | Laredo | 274,732 | $755,513 | $2.750 | | | |
| TXO | NG | SPOT | Monthly | Laredo | 427,322 | $1,175,136 | $2.750 | | | |
| | | | | TOTAL PLANT: | 702,054 | $1,930,649 | $2.750 | | | |

CENTRAL POWER AND LIGHT COMPANY
FUEL PURCHASE REPORT
FOR THE MONTH OF FEBRUARY 1993

| SUPPLIER NAME | Fuel Type | PURCHASE TYPE | Expiration Date | PLANT NAME | MMBTU | COST | $/MMBTU | TONS | TOTAL $/TON | BTU/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| Coiowyo | COAL | FIRM | 12-31-1999 | Coleto Creek | 2,270,299 | $5,208,214 | $2.293 | 108,901 | $48,701 | 10,618.7 |
| Cyprus Empire Coal Corp | COAL | SPOT | 12-31-1992 | Coleto Creek | 438,113 | $737,245 | $1.683 | 20,997 | $35.112 | 10,432.8 |
| Prior Period Adjustments: | COAL | N/A | N/A | Coleto Creek | | ($511,087) | $0.000 | $0 | $0.000 | 0.0 |
| | | | | TOTAL PLANT: | 2,708,412 | 5,933,372 | $2.190 | 127,898 | $46,364 | 10,588.2 |
| Amax Eagle Butte | COAL | SPOT | Monthly | Oklaunion | 15,559 | $27,153 | $1.745 | 928 | $29,260 | 8,363.1 |
| Exxon | COAL | FIRM | 05-30-2006 | Oklaunion | 292,688 | $514,272 | $1.757 | 17,495 | $29,395 | 8,354.9 |
| Prior Period Adjustments: | COAL | N/A | N/A | Oklaunion | | 1932 | $0.000 | $0 | $0.000 | 0.0 |
| | | | | TOTAL PLANT: | 308,247 | 542,357 | $1.759 | 18,423 | $29.439 | 8,365.8 |
| | | | | TOTAL COAL | 3,016,659 | 6,474,729 | $2.146 | 146,321 | $44,250 | 10,308.4 |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | Nueces Bay | 3,889 | $4,762 | $1.224 | | | |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-96 | Nueces Bay | 271,632 | $466,905 | $1.719 | | | |
| Corpus Christi Leaseholds | NG | FIRM | Various | Nueces Bay | 7,619 | $14,028 | $1.841 | | | |
| CPL-HMW Joint Venture | NG | | | Nueces Bay | | $152,339 | $0.000 | | | |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | Nueces Bay | 89,165 | $166,702 | $1.870 | | | |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | Nueces Bay | 268,933 | $432,762 | $1.609 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | Nueces Bay | 64 | $96 | $1.497 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | Nueces Bay | 2,569 | $3,827 | $1.490 | | | |
| Onyx Gas Marketing | NG | FIRM | 01-Aug-95 | Nueces Bay | 5,549 | $9,297 | $1.675 | | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | Nueces Bay | 2,907 | $4,480 | $1.541 | | | |
| Reynolds Metals Company | NG | SPOT | Monthly | Nueces Bay | 1,147 | $1,586 | $1.384 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | Nueces Bay | 1,470 | $2,490 | $1.694 | | | |
| Transok | NG | SPOT | Monthly | Nueces Bay | 3,030 | $4,823 | $1.592 | | | |
| Transok (AMAX) | NG | SPOT | Monthly | Nueces Bay | 2,996 | $4,708 | $1.572 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | Nueces Bay | 3,107 | $5,342 | $1.719 | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | Nueces Bay | 579 | $932 | $1.610 | | | |
| Prior Period Adjustments: | NG | N/A | | Nueces Bay | | 1,215 | | | | |
| | | | | TOTAL PLANT : | 664,656 | $1,276,315 | $1.920 | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | La Palma | 53,725 | $65,786 | $1.224 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | La Palma | 888 | $1,323 | $1.490 | | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | La Palma | 179,890 | $314,840 | $1.750 | | | |
| Gulf Energy Marketing | NG | SPOT | 31-May-96 | La Palma | 80,561 | $127,689 | $1.585 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | La Palma | 35,487 | $52,868 | $1.490 | | | |
| Onyx Gas Marketing | NG | FIRM | 01-Aug-95 | La Palma | 76,654 | $128,434 | $1.676 | | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | La Palma | 40,165 | $61,887 | $1.541 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | La Palma | 20,306 | $34,397 | $1.694 | | | |
| Transok | NG | SPOT | Monthly | La Palma | 41,853 | $66,623 | $1.592 | | | |
| Transok (AMAX) | NG | SPOT | Monthly | La Palma | 41,393 | $65,046 | $1.571 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | La Palma | 42,928 | $73,798 | $1.719 | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | La Palma | 8,002 | $12,878 | $1.609 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | La Palma | | $11,037 | $0.000 | | | |
| | | | | TOTAL PLANT : | 621,850 | $1,016,607 | $1.635 | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | B. M. Davis | 88,263 | $108,078 | $1.225 | | | |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-96 | B. M. Davis | 989,124 | $1,700,200 | $1.719 | | | |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | B. M. Davis | 415,545 | $828,057 | $1.993 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | B. M. Davis | 1,460 | $2,174 | $1.489 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | B. M. Davis | 58,300 | $86,856 | $1.490 | | | |
| Onyx Pipeline Company | NG | FIRM | 01-Dec-96 | B. M. Davis | 348,863 | $613,999 | $1.760 | | | |
| Onyx Gas Marketing | NG | FIRM | 01-Aug-95 | B. M. Davis | 125,932 | $211,002 | $1.676 | | | |
| Pan-Tex Gas Gathering Co. | NG | SPOT | Monthly | B. M. Davis | 1,460 | $2,246 | $1.540 | | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | B. M. Davis | 65,988 | $101,674 | $1.541 | | | |
| Reynolds Metals Company | NG | SPOT | Monthly | B. M. Davis | 4,178 | $5,782 | $1.384 | | | |
| Tennessee Marketing Corp. | NG | FIRM | 31-Dec-95 | B. M. Davis | 69,591 | $124,011 | $1.782 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | B. M. Davis | 33,362 | $56,510 | $1.694 | | | |
| Transok | NG | SPOT | Monthly | B. M. Davis | 68,759 | $109,454 | $1.592 | | | |
| Transok (AMAX) | NG | SPOT | Monthly | B. M. Davis | 68,004 | $106,863 | $1.571 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | B. M. Davis | 70,523 | $121,241 | $1.719 | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | B. M. Davis | 15,147 | $21,157 | $1.609 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | B. M. Davis | 0 | $17,128 | $0.000 | | | |
| | | | | TOTAL PLANT : | 2,422,499 | 4,216,435 | $1.741 | | | |
| | | | | E. S. Joslin | | ($6,715) | $0.000 | | | |
| CPL-HMW Joint Venture | NG | | | | | | | | | |
| Balcones Pipeline | NG | FIRM | 24-Nov-94 | J. L. Bates | 14,500 | $30,450 | $2.100 | | | |
| Balcones Pipeline | NG | SPOT | Monthly | J. L. Bates | 28,975 | $44,160 | $1.540 | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | J. L. Bates | 25,545 | $31,280 | $1.225 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | J. L. Bates | 422 | $629 | $1.491 | | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | J. L. Bates | 14,108 | $24,691 | $1.750 | | | |
| Gulf Energy Marketing | NG | SPOT | 31-May-96 | J. L. Bates | 6,318 | $10,014 | $1.585 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | J. L. Bates | 16,873 | $25,138 | $1.490 | | | |
| Onyx Pipeline Company | NG | FIRM | 01-Dec-96 | J. L. Bates | 330,867 | $586,166 | $1.760 | | | |
| Onyx Gas Marketing | NG | FIRM | 01-Aug-95 | J. L. Bates | 36,445 | $61,069 | $1.676 | | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | J. L. Bates | 19,098 | $29,427 | $1.541 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | J. L. Bates | 9,655 | $16,355 | $1.694 | | | |
| Transok | NG | SPOT | Monthly | J. L. Bates | 19,901 | $31,678 | $1.592 | | | |
| Transok (AMAX) | NG | SPOT | Monthly | J. L. Bates | 19,682 | $30,929 | $1.571 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | J. L. Bates | 20,411 | $35,090 | $1.719 | | | |
| Val Gas, L.P. | NG | SPOT | Monthly | J. L. Bates | 3,805 | $6,123 | $1.609 | | | |
| Waters Engineering | NG | FIRM | 30-Sep-96 | J. L. Bates | 10,080 | $25,150 | $2.500 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | J. L. Bates | | $6,928 | | | | |
| | | | | TOTAL PLANT : | 565,368 | $1,007,278 | $1.721 | | | |
| Delhi Pipeline | NG | FIRM | 01-Sep-94 | Laredo | 225,100 | $677,551 | $3.010 | | | |
| TXO | NG | SPOT | Monthly | Laredo | 400,536 | $678,165 | $1.693 | | | |
| | | | | TOTAL PLANT : | 625,636 | $1,355,716 | $2.167 | | | |

CENTRAL POWER AND LIGHT COMPANY
FUEL PURCHASE REPORT
FOR THE MONTH OF FEBRUARY 1993

| SUPPLIER NAME | Fuel Type | PURCHASE TYPE | Expiration Date | PLANT NAME | MMBTU | COST | $/MMBTU |
|---|---|---|---|---|---|---|---|
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-98 | Victoria | 130,328 | $224,020 | $1.719 |
| Corpus Christi Leaseholds | NG | FIRM | Various | Victoria | 7,496 | $13,801 | $1.841 |
| CPL-HMW Joint Venture | NG | | | Victoria | | $172,838 | $0.000 |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | Victoria | 87,730 | $164,020 | $1.870 |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | Victoria | 264,606 | $425,819 | $1.609 |
| Reynolds Metals Company | NG | SPOT | Monthly | Victoria | 550 | $782 | $1.385 |
| Prior Period Adjustments: | NG | N/A | N/A | | | ($55) | |
| | | | | TOTAL PLANT : | 490,710 | $1,001,205 | $2.040 |
| | | | | | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | La Palma #7 | 292 | $358 | $1.224 |
| Gulf Coast Energy | NG | SPOT | Monthly | La Palma #7 | 5 | $7 | $1.438 |
| Onyx Pipeline Company | NG | SPOT | Monthly | La Palma #7 | 193 | $287 | $1.489 |
| Onyx Gas Marketing | NG | FIRM | 01-Aug-95 | La Palma #7 | 417 | $698 | $1.674 |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | La Palma #7 | 218 | $336 | $1.543 |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | La Palma #7 | 110 | $187 | $1.699 |
| Transok | NG | SPOT | Monthly | La Palma #7 | 227 | $362 | $1.595 |
| Transok (AMAX) | NG | SPOT | Monthly | La Palma #7 | 225 | $353 | $1.571 |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | La Palma #7 | 233 | $401 | $1.721 |
| Val Gas, L.P. | NG | SPOT | Monthly | La Palma #7 | 43 | $70 | $1.627 |
| Prior Period Adjustments: | NG | N/A | N/A | La Palma #7 | | $1,329 | $0.000 |
| | | | | TOTAL PLANT : | 1,963 | $4,389 | $2.236 |
| | | | | | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | Lon C. Hill | 0 | $0 | $0.000 |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-98 | Lon C. Hill | 25,337 | $43,550 | $1.719 |
| Corpus Christi Leaseholds | NG | FIRM | Various | Lon C. Hill | 6,539 | $12,039 | $1.841 |
| CPL-HMW Joint Venture | NG | | | Lon C. Hill | | $134,046 | $0.000 |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | Lon C. Hill | 76,525 | $143,072 | $1.870 |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | Lon C. Hill | 230,811 | $371,434 | $1.609 |
| Reynolds Metals Company | NG | SPOT | Monthly | Lon C. Hill | 107 | $148 | $1.384 |
| Tenngasco Marketing Corp. | NG | FIRM | 31-Dec-95 | Lon C. Hill | 259,675 | $462,741 | $1.782 |
| Prior Period Adjustments: | NG | N/A | N/A | Lon C. Hill | | $3,142 | |
| | | | | TOTAL PLANT : | $596,994 | $1,170,172 | $1.954 |
| | | | | | | | |
| | | | | TOTAL NATURAL GAS : | 6,011,676 | $11,041,407 | $1.837 |

NOTES :

CENTRAL POWER AND LIGHT COMPANY
FUEL PURCHASE REPORT
FOR THE MONTH OF APRIL 1993

| SUPPLIER NAME | Fuel Type | PURCHASE TYPE | Expiration Date | PLANT NAME | MMBTU | COST | $/MMBTU | TONS | $/TON | BTU/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| Colowyo | COAL | FIRM | 12-31-1999 | Coleto Creek | 1,596,193 | $3,752,685 | $2.396 | 75,184 | $49.913 | 10,415.7 |
| Cyprus Empire Coal Corp | COAL | SPOT | 01-Jan-1990 | Coleto Creek | 727,136 | $1,322,515 | $1.728 | 10,823 | $36.267 | 10,495.1 |
| Pacific Basin Resources | COAL | SPOT | 12-31-1992 | Coleto Creek | 193 | $306 | $1.585 | 8 | $38.250 | 12,062.5 |
| Amax Eagle Butte | COAL | SPOT | Monthly | Oklaunion | 141,329 | $142,475 | $1.008 | 8,412 | $16.937 | 8,400.4 |
| Exxon | COAL | FIRM | 06-30-2006 | Oklaunion | 16,514 | $29,249 | $1.771 | 992 | $29.485 | 8,323.6 |
| Prior Period Adjustments: | COAL | N/A | N/A | N/A |  | $3,235 |  |  |  |  |
|  |  |  |  | TOTAL COAL | 7,951,405 | $4,318,463 | $2.213 | 95,419 | $45,259 | 10,225.5 |
|  |  |  |  |  |  |  |  |  |  |  |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | Nueces Bay | 37,990 | $60,359 | $1.589 |  |  |  |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-95 | Nueces Bay | 8,371 | $19,572 | $2.332 |  |  |  |
| Corpus Christi Leaseholds | NG | FIRM | Various | Nueces Bay | 5,544 | $10,207 | $1.841 |  |  |  |
| CPL-HMW Joint Venture | NG |  |  | Nueces Bay |  | $150,797 | $0.000 |  |  |  |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | Nueces Bay | 244,498 | $621,557 | $2.542 |  |  |  |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | Nueces Bay | 60,034 | $135,077 | $2.250 |  |  |  |
| Mobil Natural Gas | NG | SPOT | Monthly | Nueces Bay | 93,439 | $200,862 | $2.150 |  |  |  |
| Onyx Pipeline Company | NG | SPOT | Monthly | Nueces Bay | 36,966 | $78,191 | $2.115 |  |  |  |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | Nueces Bay | 31,148 | $70,238 | $2.255 |  |  |  |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | Nueces Bay | 60,201 | $128,387 | $2.133 |  |  |  |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | Nueces Bay | 87,210 | $181,030 | $2.076 |  |  |  |
| Transok | NG | SPOT | Monthly | Nueces Bay | 48,588 | $108,597 | $2.194 |  |  |  |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | Nueces Bay | 26,474 | $63,546 | $2.400 |  |  |  |
| Valero Ind. | NG | SPOT | Monthly | Nueces Bay | 21,590 | $48,148 | $2.230 |  |  |  |
| Prior Period Adjustments: | NG | N/A | N/A | Nueces Bay |  | $1,902 |  |  |  |  |
|  |  |  |  | TOTAL PLANT | 762,049 | $1,876,418 | $2.462 |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | La Palma | 2,659 | $4,224 | $1.589 |  |  |  |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | La Palma | 6,882 | $15,948 | $2.324 |  |  |  |
| Mobil Natural Gas | NG | SPOT | Monthly | La Palma | 6,540 | $14,058 | $2.150 |  |  |  |
| Onyx Pipeline Company | NG | SPOT | Monthly | La Palma | 2,587 | $5,473 | $2.115 |  |  |  |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | La Palma | 2,180 | $4,918 | $2.255 |  |  |  |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | La Palma | 4,213 | $8,986 | $2.133 |  |  |  |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | La Palma | 6,104 | $12,670 | $2.076 |  |  |  |
| Transok | NG | SPOT | Monthly | La Palma | 3,401 | $7,461 | $2.194 |  |  |  |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | La Palma | 1,853 | $4,448 | $2.400 |  |  |  |
| Valero Ind. | NG | SPOT | Monthly | La Palma | 1,511 | $3,370 | $2.230 |  |  |  |
| Prior Period Adjustments: | NG | N/A | N/A | La Palma | 0 | $3,383 | $0.000 |  |  |  |
|  |  |  |  | TOTAL PLANT | 37,910 | $84,937 | $2.240 |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | B. M. Davis | 71,120 | $112,993 | $1.589 |  |  |  |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-95 | B. M. Davis | 995,085 | $2,320,640 | $2.332 |  |  |  |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | B. M. Davis | 243,793 | $641,071 | $2.630 |  |  |  |
| Mobil Natural Gas | NG | SPOT | Monthly | B. M. Davis | 174,923 | $376,024 | $2.150 |  |  |  |
| Onyx Pipeline Company | NG | SPOT | Monthly | B. M. Davis | 69,202 | $146,379 | $2.115 |  |  |  |
| Onyx Pipeline Company | NG | FIRM | 01-Dec-96 | B. M. Davis | 665,420 | $1,583,737 | $2.350 |  |  |  |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | B. M. Davis | 58,308 | $131,489 | $2.255 |  |  |  |
| Pan-Tex Gas Gathering Co. | NG | SPOT | Monthly | B. M. Davis | 1,157 | $2,499 | $2.160 |  |  |  |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | B. M. Davis | 112,699 | $240,348 | $2.133 |  |  |  |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | B. M. Davis | 163,280 | $338,898 | $2.076 |  |  |  |
| Transok | NG | SPOT | Monthly | B. M. Davis | 90,959 | $199,555 | $2.194 |  |  |  |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | B. M. Davis | 49,562 | $118,985 | $2.400 |  |  |  |
| Valero Ind. | NG | SPOT | Monthly | B. M. Davis | 40,419 | $90,133 | $2.230 |  |  |  |
| Prior Period Adjustments: | NG | N/A | N/A | B. M. Davis |  | $7,170 | $0.000 |  |  |  |
|  |  |  |  | TOTAL PLANT | 2,735,907 | $6,290,100 | $2.299 |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
| Corpus Christi Leaseholds | NG | FIRM | Various | E. S. Joslin | 4,866 | $8,959 | $1.841 |  |  |  |
| CPL-HMW Joint Venture | NG |  |  | E. S. Joslin |  | $132,770 | $0.000 |  |  |  |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | E. S. Joslin | 214,619 | $545,604 | $2.542 |  |  |  |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | E. S. Joslin | 32,696 | $116,577 | $2.250 |  |  |  |
| Tenngasco Marketing Corp. | NG | FIRM | 31-Dec-95 | E. S. Joslin | 155,409 | $373,292 | $2.402 |  |  |  |
| Tenngasco Marketing Corp. | NG | SPOT | 31-Dec-95 | E. S. Joslin | 425,813 | $936,789 | $2.200 |  |  |  |
|  |  |  |  | TOTAL PLANT | 853,405 | $2,115,984 | $2.479 |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
| Balcones Pipeline | NG | FIRM | 24-Nov-94 | J. L. Bates | 16,884 | $35,456 | $2.100 |  |  |  |
| Balcones Pipeline | NG | SPOT | Monthly | J. L. Bates | 30,261 | $65,384 | $2.160 |  |  |  |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | J. L. Bates | 46,255 | $73,491 | $1.589 |  |  |  |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | J. L. Bates | 245,631 | $570,871 | $2.324 |  |  |  |
| Mobil Natural Gas | NG | SPOT | Monthly | J. L. Bates | 113,789 | $244,566 | $2.150 |  |  |  |
| Onyx Pipeline Company | NG | SPOT | Monthly | J. L. Bates | 45,009 | $95,204 | $2.115 |  |  |  |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | J. L. Bates | 37,923 | $85,521 | $2.255 |  |  |  |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | J. L. Bates | 73,299 | $156,322 | $2.133 |  |  |  |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | J. L. Bates | 106,185 | $220,419 | $2.076 |  |  |  |
| Transok | NG | SPOT | Monthly | J. L. Bates | 59,160 | $129,790 | $2.194 |  |  |  |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | J. L. Bates | 32,235 | $77,375 | $2.400 |  |  |  |
| Valero Ind. | NG | SPOT | Monthly | J. L. Bates | 26,288 | $58,622 | $2.230 |  |  |  |
| Waters Engineering | NG | FIRM | 30-Sep-96 | J. L. Bates | 28,586 | $71,465 | $2.500 |  |  |  |
| Prior Period Adjustments: | NG | N/A | N/A | J. L. Bates |  | $5,043 |  |  |  |  |
|  |  |  |  | TOTAL PLANT | 861,466 | $1,869,508 | $2.193 |  |  |  |

CENTRAL POWER AND LIGHT COMPANY
FUEL PURCHASE REPORT
FOR THE MONTH OF APRIL 1993

| SUPPLIER NAME | Fuel Type | PURCHASE TYPE | Expiration Date | PLANT NAME | MMBTU | COST | $/MMBTU |
|---|---|---|---|---|---|---|---|
| Delhi Pipeline | NG | FIRM | 01-Sep-94 | Laredo | 382,670 | $1,151,837 | $3.010 |
| Delhi Gas Mkg | NG | SPOT | Monthly | Laredo | 267,057 | $627,584 | $2.350 |
|  |  |  |  | TOTAL PLANT : | 649,727 | $1,779,421 | $2.739 |
|  |  |  |  |  |  |  |  |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-96 | Victoria | 455,221 | $1,061,713 | $2.332 |
| Corpus Christi Leaseholds | NG | FIRM | Various | Victoria | 28 | $52 | $1.844 |
| CPL-HMW Joint Venture | NG |  |  | Victoria |  | $1,145 | $0.000 |
| Delhi Gas Marketing | NG | SPOT |  | Victoria | 196,191 | $441,430 | $2.250 |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | Victoria | 1,251 | $3,181 | $2.543 |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | Victoria | 307 | $691 | $2.252 |
|  |  |  |  | TOTAL PLANT : | 652,998 | $1,508,211 | $2.310 |
|  |  |  |  |  |  |  |  |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | La Palma #7 | 406 | $648 | $1.590 |
| Mobil Natural Gas | NG | SPOT | Monthly | La Palma #7 | 999 | $2,149 | $2.151 |
| Onyx Pipeline Company | NG | SPOT | Monthly | La Palma #7 | 395 | $836 | $2.117 |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | La Palma #7 | 333 | $751 | $2.256 |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | La Palma #7 | 644 | $1,373 | $2.132 |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | La Palma #7 | 933 | $1,936 | $2.075 |
| Transok | NG | SPOT | Monthly | La Palma #7 | 520 | $1,140 | $2.193 |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | La Palma #7 | 283 | $680 | $2.402 |
| Valero Ind. | NG | SPOT | Monthly | La Palma #7 | 231 | $515 | $2.229 |
| Prior Period Adjustments: | NG | N/A | N/A | La Palma #7 |  | $81 | $0.000 |
|  |  |  |  | TOTAL PLANT : | 4,744 | $10,108 | $2.131 |
|  |  |  |  |  |  |  |  |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | Lon C. Hill | 20,889 | $33,157 | $1.589 |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-96 | Lon C. Hill | 557,067 | $1,299,249 | $2.332 |
| Corpus Christi Leaseholds | NG | FIRM | Various | Lon C. Hill | 7,841 | $14,438 | $1.841 |
| CPL-HMW Joint Venture | NG |  |  | Lon C. Hill |  | $214,366 | $0.000 |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | Lon C. Hill | 345,841 | $879,197 | $2.542 |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | Lon C. Hill | 84,919 | $191,067 | $2.250 |
| Mobil Natural Gas | NG | SPOT | Monthly | Lon C. Hill | 51,330 | $110,342 | $2.150 |
| Onyx Pipeline Company | NG | SPOT | Monthly | Lon C. Hill | 20,307 | $42,954 | $2.115 |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | Lon C. Hill | 17,110 | $38,585 | $2.255 |
| Pennzoil Gas | NG | SPOT | Monthly | Lon C. Hill | 33,071 | $70,528 | $2.133 |
| Tenngasco Marketing Corp. | NG | FIRM | 31-Dec-95 | Lon C. Hill | 144,591 | $347,306 | $2.402 |
| Tenngasco Marketing Corp. | NG | SPOT | 31-Dec-95 | Lon C. Hill | 396,172 | $871,578 | $2.200 |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | Lon C. Hill | 47,908 | $99,447 | $2.078 |
| Transok | NG | SPOT | Monthly | Lon C. Hill | 26,692 | $58,558 | $2.194 |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | Lon C. Hill | 14,543 | $34,910 | $2.400 |
| Valero Ind. | NG | SPOT | Monthly | Lon C. Hill | 11,860 | $26,449 | $2.230 |
| Prior Period Adjustments: | NG | N/A | N/A | Lon C. Hill |  | $797 | $0.000 |
|  |  |  |  | TOTAL PLANT : | 1,780,121 | $4,332,930 | $2.434 |
|  |  |  |  |  |  |  |  |
|  |  |  |  | TOTAL NATURAL GAS : | 8,338,347 | $19,867,617 | $2.385 |

NOTES :

CENTRAL POWER AND LIGHT COMPANY
FUEL PURCHASE REPORT
FOR THE MONTH OF MAY 1993

| SUPPLIER NAME | Fuel Type | PURCHASE TYPE | Expiration Date | PLANT NAME | MMBTU | COST | $/MMBTU | TONS | TOTAL $/TON | BTU/LB |
|---|---|---|---|---|---|---|---|---|---|---|
| Colowyo | COAL | FIRM | 12-31-1999 | Coleto Creek | 2,221,372 | $5,171,528 | $2.328 | 107,291 | $48,201 | 10,352.1 |
| Cyprus Empire Coal Corp | COAL | SPOT | 12-31-1992 | Coleto Creek | 446,203 | $737,913 | $1.654 | 20,978 | $35,176 | 10,635.0 |
| Amax Belle Ayr & Eagle Butte | COAL | SPOT | Monthly | Coleto Creek | 128,893 | $129,177 | $1.002 | 7,816 | $16,981 | 8,451.6 |
| Exxon | COAL | FIRM | 06-30-2006 | Oklaunion | 294,149 | $522,847 | $1.777 | 17,748 | $29,459 | 8,286.6 |
| Prior Period Adjustments: | COAL | N/A | N/A | N/A | | $70 | $0.000 | 0 | $0.000 | 0.0 |
| | | | | TOTAL COAL : | 3,090,617 | $6,561,536 | $2.123 | 153,634 | $42,709 | 10,058.4 |
| | | | | | | | | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | Nueces Bay | 57,940 | $101,572 | $1.753 | | | |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-96 | Nueces Bay | 808,357 | $1,650,599 | $2.728 | | | |
| Corpus Christi Leaseholds | NG | FIRM | Various | Nueces Bay | 7,559 | $13,915 | $1.841 | | | |
| CPL-HMW Joint Venture | NG | | 0 | Nueces Bay | | $209,488 | $0.000 | | | |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | Nueces Bay | 375,590 | $1,113,181 | $2.964 | | | |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | Nueces Bay | 48,744 | $128,685 | $2.640 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | Nueces Bay | 6,482 | $16,618 | $2.572 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | Nueces Bay | 55,924 | $143,745 | $2.570 | | | |
| Onyx Gas Marketing | NG | FIRM | 01-Aug-95 | Nueces Bay | 47,366 | $123,738 | $2.612 | | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | Nueces Bay | 67,124 | $228,476 | $2.622 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | Nueces Bay | 240,788 | $620,619 | $2.577 | | | |
| Transok (AMAX) | NG | SPOT | Monthly | Nueces Bay | 13,752 | $34,801 | $2.531 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | Nueces Bay | 11,842 | $39,878 | $3.367 | | | |
| Valero Ind. | NG | SPOT | Monthly | Nueces Bay | 25,276 | $68,245 | $2.700 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | N/A | | ($266) | | | | |
| | | | | TOTAL PLANT : | 1,566,696 | $4,502,269 | $2.838 | | | |
| | | | | | | | | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | La Palma | 42,050 | $73,716 | $1.753 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | La Palma | 4,690 | $12,060 | $2.572 | | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | La Palma | 178,736 | $472,716 | $2.675 | | | |
| Gulf Energy Marketing | NG | SPOT | 31-May-96 | La Palma | 143,378 | $343,053 | $2.393 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | La Palma | 40,587 | $104,323 | $2.570 | | | |
| Onyx Gas Marketing | NG | FIRM | 01-Aug-95 | La Palma | 34,377 | $89,802 | $2.612 | | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | La Palma | 63,230 | $165,818 | $2.622 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | La Palma | 174,752 | $450,414 | $2.577 | | | |
| Transok (AMAX) | NG | SPOT | Monthly | La Palma | 9,980 | $25,257 | $2.531 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | La Palma | 8,584 | $28,940 | $3.367 | | | |
| Valero Ind. | NG | SPOT | Monthly | La Palma | 18,344 | $49,529 | $2.700 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | La Palma | (6) | ($1,919) | $0.000 | | | |
| | | | | TOTAL PLANT : | 716,712 | $1,813,709 | $2.531 | | | |
| | | | | | | | | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | B. M. Davis | 82,521 | $144,666 | $1.753 | | | |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-96 | B. M. Davis | 146,318 | $399,157 | $2.728 | | | |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | B. M. Davis | 1,737 | $26,446 | $15.227 | | | |
| Exxon | NG | SPOT | Monthly | B. M. Davis | 279,087 | $790,591 | $2.850 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | B. M. Davis | 9,205 | $23,668 | $2.571 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | B. M. Davis | 270,361 | $624,341 | $2.309 | | | |
| Onyx Pipeline Company | NG | FIRM | 01-Dec-96 | B. M. Davis | 497,449 | $1,353,091 | $2.720 | | | |
| Onyx Gas Marketing | NG | FIRM | 01-Aug-95 | B. M. Davis | 67,464 | $176,233 | $2.612 | | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | B. M. Davis | 124,087 | $325,414 | $2.622 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | B. M. Davis | 342,946 | $883,925 | $2.577 | | | |
| Transok (AMAX) | NG | SPOT | Monthly | B. M. Davis | 19,567 | $49,568 | $2.531 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | B. M. Davis | 16,666 | $56,794 | $3.367 | | | |
| Valero Ind. | NG | SPOT | Monthly | B. M. Davis | 35,999 | $97,196 | $2.700 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | B. M. Davis | (11) | ($3,403) | $0.000 | | | |
| | | | | TOTAL PLANT : | 1,893,636 | $4,896,646 | $2.586 | | | |
| | | | | | | | | | | |
| Corpus Christi Leaseholds | NG | FIRM | Various | E. S. Joslin | 5,561 | $10,274 | $1.841 | | | |
| CPL-HMW Joint Venture | NG | | | E. S. Joslin | | $156,407 | $0.000 | | | |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | E. S. Joslin | 277,338 | $822,023 | $2.964 | | | |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | E. S. Joslin | 35,996 | $95,029 | $2.640 | | | |
| Tenngasco Marketing Corp | NG | FIRM | 31-Dec-95 | E. S. Joslin | 167,604 | $467,502 | $2.786 | | | |
| Tenngasco Marketing Corp | NG | SPOT | 31-Dec-95 | E. S. Joslin | 245,780 | $584,910 | $2.380 | | | |
| | | | | TOTAL PLANT : | 732,477 | $2,136,145 | $2.916 | | | |
| | | | | | | | | | | |
| Balcones Pipeline | NG | FIRM | 24-Nov-94 | J. L. Bates | 15,813 | $33,207 | $2.100 | | | |
| Balcones Pipeline | NG | SPOT | Monthly | J. L. Bates | 30,246 | $78,640 | $2.600 | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | J. L. Bates | 2,526 | $4,427 | $1.753 | | | |
| Gulf Coast Energy | NG | SPOT | Monthly | J. L. Bates | 282 | $724 | $2.560 | | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | J. L. Bates | 102,284 | $273,524 | $2.675 | | | |
| Gulf Energy Marketing | NG | SPOT | 31-May-96 | J. L. Bates | 82,961 | $198,496 | $2.393 | | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | J. L. Bates | 73,199 | $161,939 | $2.212 | | | |
| Onyx Pipeline Company | NG | FIRM | 01-Dec-96 | J. L. Bates | 184,551 | $501,970 | $2.720 | | | |
| Onyx Gas Marketing | NG | FIRM | 01-Aug-95 | J. L. Bates | 2,085 | $5,393 | $2.612 | | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | J. L. Bates | 3,798 | $9,959 | $2.622 | | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | J. L. Bates | 10,496 | $27,052 | $2.577 | | | |
| Transok (AMAX) | NG | SPOT | Monthly | J. L. Bates | 599 | $1,517 | $2.532 | | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | J. L. Bates | 516 | $1,738 | $3.368 | | | |
| Valero Ind. | NG | SPOT | Monthly | J. L. Bates | 1,102 | $2,975 | $2.699 | | | |
| Waters Engineering | NG | FIRM | 30-Sep-96 | J. L. Bates | 31,157 | $77,893 | $2.500 | | | |
| Prior Period Adjustments: | NG | N/A | N/A | | (3) | ($181) | $0.000 | | | |
| | | | | TOTAL PLANT : | $541,572 | $1,379,305 | $2.547 | | | |

CENTRAL POWER AND LIGHT COMPANY  6|93
FUEL PURCHASE REPORT
FOR THE MONTH OF MAY 1993

| SUPPLIER NAME | Fuel Type | PURCHASE TYPE | Expiration Date | PLANT NAME | MMBTU | COST | $/MMBTU | TONS | TOTAL $/TON |
|---|---|---|---|---|---|---|---|---|---|
| Colowyo | COAL | FIRM | 12-31-1999 | Coleto Creek | 2,221,372 | $5,171,528 | $2.328 | 107,291 | $48.201 |
| Cyprus Empire Coal Corp | COAL | SPOT | 12-31-1992 | Coleto Creek | 446,203 | $737,913 | $1.654 | 20,978 | $35.176 |
| Amax Belle Ayr & Eagle Butte | COAL | SPOT | Monthly | Oklaunion | 128,893 | $129,177 | $1.002 | 7,616 | $16.961 |
| Exxon | COAL | SPOT | 06-30-2006 | Oklaunion | 294,149 | $522,847 | $1.777 | 17,748 | $29.459 |
| Prior Period Adjustments: | COAL | N/A | N/A | N/A | | $70 | $0.000 | 0 | $0.000 |
| | | | | TOTAL COAL : | 3,090,617 | $6,561,536 | $2.123 | 153,634 | $42.709 |
| | | | | | | | | | |
| Coastal Border Gas Sales, Inc | NG | SPOT | 01-Sep-93 | Nueces Bay | 57,940 | $101,572 | $1.753 | | |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-96 | Nueces Bay | 608,357 | $1,659,599 | $2.728 | | |
| Corpus Christi Leaseholds | NG | FIRM | Various | Nueces Bay | 7,559 | $13,915 | $1.841 | | |
| CPL-HMW Joint Venture | NG | | | Nueces Bay | 0 | $209,488 | $0.000 | | |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | Nueces Bay | 375,560 | $1,113,161 | $2.964 | | |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | Nueces Bay | 48,744 | $128,685 | $2.640 | | |
| Gulf Coast Energy | NG | SPOT | Monthly | Nueces Bay | 6,462 | $16,618 | $2.572 | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | Nueces Bay | 55,924 | $143,745 | $2.570 | | |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | Nueces Bay | 47,368 | $123,736 | $2.612 | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | Nueces Bay | 87,124 | $228,476 | $2.622 | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | Nueces Bay | 240,788 | $620,619 | $2.577 | | |
| Transok (AMAX) | NG | SPOT | Monthly | Nueces Bay | 13,752 | $34,801 | $2.531 | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | Nueces Bay | 11,842 | $39,876 | $3.367 | | |
| Valero Ind. | NG | SPOT | Monthly | Nueces Bay | 25,276 | $68,245 | $2.700 | | |
| Prior Period Adjustments: | NG | N/A | N/A | Nueces Bay | | ($268 | | | |
| | | | | TOTAL PLANT : | 1,586,696 | $4,502,269 | $2.838 | | |
| | | | | | | | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | La Palma | 42,050 | $73,716 | $1.753 | | |
| Gulf Coast Energy | NG | SPOT | Monthly | La Palma | 4,690 | $12,060 | $2.572 | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | La Palma | 176,736 | $472,716 | $2.675 | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | La Palma | 143,378 | $343,053 | $2.393 | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | La Palma | 40,587 | $104,323 | $2.570 | | |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | La Palma | 34,377 | $89,802 | $2.612 | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | La Palma | 63,230 | $165,818 | $2.622 | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | La Palma | 174,752 | $450,414 | $2.577 | | |
| Transok (AMAX) | NG | SPOT | Monthly | La Palma | 9,980 | $25,257 | $2.531 | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | La Palma | 8,594 | $28,940 | $3.367 | | |
| Valero Ind. | NG | SPOT | Monthly | La Palma | 18,344 | $49,529 | $2.700 | | |
| Prior Period Adjustments: | NG | N/A | N/A | La Palma | (6 | ($1,919 | $0.000 | | |
| | | | | TOTAL PLANT : | 716,712 | $1,813,709 | $2.531 | | |
| | | | | | | | | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | B. M. Davis | 82,521 | $144,666 | $1.753 | | |
| Corpus Christi Gas Marketing | NG | FIRM | 01-Apr-96 | B. M. Davis | 146,318 | $399,157 | $2.728 | | |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | B. M. Davis | 1,737 | $26,448 | $15.227 | | |
| Exxon | NG | SPOT | Monthly | B. M. Davis | 279,087 | $739,581 | $2.650 | | |
| Gulf Coast Energy | NG | SPOT | Monthly | B. M. Davis | 9,325 | $23,668 | $2.571 | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | B. M. Davis | 270,381 | $624,341 | $2.309 | | |
| Onyx Pipeline Company | NG | FIRM | 01-Dec-96 | B. M. Davis | 497,449 | $1,353,061 | $2.720 | | |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | B. M. Davis | 67,464 | $176,233 | $2.612 | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | B. M. Davis | 124,087 | $325,414 | $2.622 | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | B. M. Davis | 342,946 | $883,925 | $2.577 | | |
| Transok (AMAX) | NG | SPOT | Monthly | B. M. Davis | 19,587 | $49,566 | $2.531 | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | B. M. Davis | 16,866 | $56,794 | $3.367 | | |
| Valero Ind. | NG | SPOT | Monthly | B. M. Davis | 35,999 | $97,198 | $2.700 | | |
| Prior Period Adjustments: | NG | N/A | N/A | B. M. Davis | (11 | ($3,403 | $0.000 | | |
| | | | | TOTAL PLANT : | 1,893,536 | $4,896,648 | $2.586 | | |
| | | | | | | | | | |
| Corpus Christi Leaseholds | NG | FIRM | Various | E. S. Joslin | 5,581 | $10,274 | $1.841 | | |
| CPL-HMW Joint Venture | NG | | | E. S. Joslin | | $156,407 | $0.000 | | |
| ENRON-Natural Gas Mktg & Strg | NG | FIRM | 31-Dec-94 | E. S. Joslin | 277,336 | $822,023 | $2.964 | | |
| ENRON-Panhandle Gas Co. | NG | SPOT | Monthly | E. S. Joslin | 35,996 | $95,029 | $2.640 | | |
| Tenngasco Marketing Corp. | NG | FIRM | 31-Dec-95 | E. S. Joslin | 167,804 | $467,502 | $2.786 | | |
| Tenngasco Marketing Corp. | NG | SPOT | 31-Dec-95 | E. S. Joslin | 245,760 | $584,910 | $2.380 | | |
| | | | | TOTAL PLANT : | 732,477 | $2,136,145 | $2.916 | | |
| | | | | | | | | | |
| Balcones Pipeline | NG | FIRM | 24-Nov-94 | J. L. Bates | 15,813 | $33,207 | $2.100 | | |
| Balcones Pipeline | NG | SPOT | Monthly | J. L. Bates | 30,246 | $78,640 | $2.600 | | |
| Coastal Border Gas Sales, Inc. | NG | SPOT | 01-Sep-93 | J. L. Bates | 2,526 | $4,427 | $1.753 | | |
| Gulf Coast Energy | NG | SPOT | Monthly | J. L. Bates | 282 | $724 | $2.569 | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | J. L. Bates | 102,264 | $273,524 | $2.675 | | |
| Gulf Energy Marketing | NG | FIRM | 31-May-96 | J. L. Bates | 82,961 | $198,496 | $2.393 | | |
| Onyx Pipeline Company | NG | SPOT | Monthly | J. L. Bates | 73,199 | $161,939 | $2.212 | | |
| Onyx Pipeline Company | NG | FIRM | 01-Dec-96 | J. L. Bates | 184,551 | $501,979 | $2.720 | | |
| Oryx Gas Marketing | NG | FIRM | 01-Aug-95 | J. L. Bates | 2,065 | $5,393 | $2.612 | | |
| Pennzoil Gas Marketing | NG | SPOT | Monthly | J. L. Bates | 3,798 | $9,959 | $2.622 | | |
| Texaco Gas Marketing Inc. | NG | SPOT | Monthly | J. L. Bates | 10,496 | $27,052 | $2.577 | | |
| Transok (AMAX) | NG | SPOT | Monthly | J. L. Bates | 599 | $1,517 | $2.532 | | |
| Transok (Mobil) | NG | FIRM | 31-Mar-96 | J. L. Bates | 516 | $1,738 | $3.368 | | |
| Valero Ind. | NG | SPOT | Monthly | J. L. Bates | 1,102 | $2,975 | $2.699 | | |
| Waters Engineering | NG | FIRM | 30-Sep-96 | J. L. Bates | 31,157 | $77,893 | $2.500 | | |
| Prior Period Adjustments: | NG | N/A | N/A | J. L. Bates | (3 | ($161 | | | |
| | | | | TOTAL PLANT : | 541,572 | $1,379,305 | $2.547 | | |

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CITY OF SAN BENITO,                §
                                   §
v.                                 §
                                   §        C.A. NO. B03-080
                                   §
TEJAS GAS PIPELINE COMPANY,        §
ET AL.                             §

## PENNZOIL'S AMENDED MOTION TO DISMISS

TO THE HONORABLE UNITED STATES DISTRICT COURT:

1.    <u>Pennzoil's certificate of conference is attached.</u>  Pennzoil has included its certificate of conference in this amended motion to dismiss.  Pennzoil's counsel had conferred with the plaintiff's counsel in writing and by telephone before Pennzoil filed its original motion to dismiss.  Pennzoil believed it had included a certificate of conference in its original motion, but inadvertently failed to include the certificate.  The plaintiff is opposed to the relief which Pennzoil seeks.  Pennzoil's amended motion is unchanged, except for this initial paragraph and the certificate of conference.

2.    <u>Relief sought.</u>  Pennzoil Gas Marketing Company ("Pennzoil") moves the Court pursuant to Fed. R. Civ. P. 41(b) to dismiss the City of San Benito's claims with prejudice because San Benito has failed to comply with the Court's order to show that Pennzoil (or any other defendant) owned a pipeline or owned a company that owned a pipeline in San Benito.

3.    <u>The Court ordered San Benito to produce evidence that Pennzoil has owned</u>

a pipeline within San Benito's corporate limits.  On October 27, 2003 the Court described

a two stage discovery plan in which San Benito would address the defendants' pipeline

ownership before liability issues were addressed.  (See Transcript of the October 27, 2003

hearing, p. 11, l. 22-p. 12, l. 15 attached as Exhibit A).  If a defendant owned a pipeline

within San Benito, the case would proceed to the next step as to that defendant.  The Court

noted that the threshold issue is pipeline ownership.  (Tr. p. 17, ll. 21-23).  San Benito has

provided no information that Pennzoil (or any other defendant) ever owned a pipeline in San

Benito.

4.     San Benito's Initial Disclosures ignored pipeline ownership and the Court's

order.  When San Benito served its Initial Disclosures on December 31, 2003 (and its two

supplemental disclosures (attached as Exhibits B1-B3), it wholly ignored the issue of pipeline

ownership and chose instead to address only the amounts of putative gas sales in San Benito.

At the October 27, 2003 hearing, San Benito argued that liability was based on direct or

indirect pipeline ownership (Tr. p. 11, ll. 9-17).  In its Initial Disclosures, San Benito does

not mention or address pipeline ownership in any way.   The defendants were required to

make their disclosures thirty days after San Benito's disclosures concerning pipeline

ownership if there was "no question regarding ownership of relevant pipelines."  See the

Court's Scheduling Order.  Since San Benito did not make any disclosures regarding pipeline

ownership, the defendants have had no obligation to make their initial disclosures.  Several

of the defendants have instead submitted statements in lieu of initial disclosures which

2

specifically note San Benito's threshold obligation and failure to address ownership of pipelines. Pennzoil submits that the case should go no further. Several of the defendants have asked San Benito to dismiss its case in light of its failure to address pipeline ownership, but San Benito has not responded to the request.

     5.    <u>Dismissal with prejudice of San Benito's claims.</u>  Since San Benito did not offer any support for its claim that the defendants owned pipelines in San Benito, the Court may and should dismiss San Benito's claims with prejudice. The Court may dismiss San Benito's claims with prejudice for failure to comply with the Court's instructions or to protect the integrity of its orders. <u>Fendler v. Westgate-California Corp.</u>, 527 F.2d 1168, 1169 (9th Cir. 1975) (per curiam); <u>see also</u> <u>Smith v. Texas Department of Criminal Justice</u>, 79 Fed. Appx. 61, 2003 WL 22426945 (5th Cir. 2003) (not published in the Federal Reporter). Fed. R. Civ. P. 41(b) provides:

> For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication on the merits.

San Benito has not complied with the orders the Court gave at the October 27, 2003 Hearing, or with the Scheduling Order. The Court may and should dismiss San Benito's claims against Pennzoil, and under the circumstances, Pennzoil moves the Court to enter an order of dismissal with prejudice.

<div align="center">3</div>

6.    For these reasons, among others, and based upon the pleadings,  Pennzoil

moves that the Court grant this motion in all things, and:

    (i)    dismiss the City of San Benito's claims against Pennzoil with prejudice to re-filing; and

    (ii)    that Pennzoil Gas Marketing Company be granted such other and further relief, including without limitation an award of attorneys' fees and costs, to which it is justly entitled.

Respectfully submitted,

By: _____

J. N. Page
State Bar No. 15406700
3040 Post Oak Blvd., Suite 850
Houston, Texas  77056
(713) 840-9200 Telephone
(713) 840-9217 Facsimile

Bradley M. Whalen
State Bar No. 21238800
Doyle, Restrepo, Harvin
    & Robbins, L.L.P.
4700 Chase Tower
600 Travis Street
Houston, Texas 77002
(713) 228-5100 Telephone
(713) 228-6138 Facsimile

4

Rene O. Oliveira
State Bar No.15254700
Roerig, Oliveira & Fisher, L.L.P.
Cameron County Office
855 West Price Road, Suite 9
Brownsville, Texas 78520
(956) 542-5666 Telephone
(956) 542-0016 Facsimile

Attorneys for Pennzoil Gas Marketing Company

## CERTIFICATE OF SERVICE

This pleading was served in compliance with Rule 5 of the Federal Rules of Civil Procedure on March 19, 2004.

Adam Poncio
Law Office of Cerda & Poncio
924 McCullough
San Antonio, Texas 78215
Facsimile: (210) 212-5880

Osborne J. Dykes, III
1301 McKinney, Suite 5100
Houston, Texas 77010
Facsimile: (713) 651-5246

Julie Ezell
Cinergy Marketing & Trading, L.P.
1000 East Main Street
Plainfield, Indiana

Randy Beevis
Cinergy Marketing & Trading, L.P.
1100 Louisiana, Suite 4900
Houston, Texas 77002
Facsimile: (713) 393-6903

Francis I. Gandy
Attorney at Law
148 American Bank Plaza
Corpus Christi, Texas 78475
Facsimile: (361) 883-0148

Robert Galligan
Jones, Galligan, Key & Lozano, LLP
2300 West Pike, Suite 300
Weslaco, Texas 78599-1247

J. D. Page

## CERTIFICATE OF CONFERENCE

On February 6, 2004 I asked Adam Poncio, counsel for the plaintiff, whether the plaintiff is opposed to Pennzoil's motion to dismiss. Mr. Poncio said that the plaintiff is opposed to Pennzoil's motion. Pennzoil's counsel had previously spoken to Mr. Poncio's assistant by telephone, and had written to Mr. Poncio asking that the plaintiff agree to dismiss its claims against Pennzoil. The plaintiff would not agree to the relief Pennzoil seeks in its motion to dismiss.

Bradley M. Whalen

6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CITY OF SAN BENITO, | § | |
| | § | |
| v. | § | |
| | § | C.A. NO. B03-080 |
| | § | |
| TEJAS GAS PIPELINE COMPANY, | § | |
| ET AL. | § | |

## ORDER OF DISMISSAL WITH PREJUDICE

On this day the Court considered Pennzoil Gas Marketing Company's motion to dismiss pursuant to Fed. R. Civ. P. 41(b) or in the alternative to compel production of documents and information concerning Pennzoil Gas Marketing Company's ownership of a pipeline within the City of San Benito's corporate limits. The Court finds that the City of San Benito has failed to comply with the Court's order that the City of San Benito produce information concerning pipeline ownership to the defendant Pennzoil Gas Marketing Company. The Court dismisses the City of San Benito's claims against Pennzoil Gas Marketing Company with prejudice to refiling. This order operates as a final adjudication on the merits that the City of San Benito takes nothing by way of its claims against Pennzoil Gas Marketing Company. Pennzoil Gas Marketing Company shall recover its costs from the City of San Benito, and Pennzoil Gas Marketing shall move for recovery of its costs within

ten days of entry of this order.

SIGNED on _____

_____

UNITED STATES DISTRICT JUDGE

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF TEXAS
 2                         BROWNSVILLE DIVISION

 3      ─────────────────────────────  )
        CITY OF SAN BENITO             )
 4                                     )
                                       )  CIVIL ACTION NO.
 5      VS.                            )  CA B-03-080
                                       )
 6      TEJAS GAS PIPELINE, ET AL      )
        ─────────────────────────────  )
 7

 8

 9

              INITIAL PRETRIAL & SCHEDULING CONFERENCE
10             BEFORE THE HONORABLE ANDREW S. HANEN
                         OCTOBER 27, 2003
11

12

13      APPEARANCES:

14      For the Plaintiff:        MR. ADAM PONCIO
                                  Law Office of Cerda & Poncio
15                                924 McCullough
                                  San Antonio, Texas  78215-1642
16
        For Tejas Gas Pipeline:   OSBORNE J. DYKES, III
17                                JEFFREY D. PALMER
                                  Fulbright & Jaworski
18                                1301 McKinney, Suite 5100
                                  Houston, Texas  77010-3095
19
        For Cinergy:              MS. JULIE L. EZELL
20                                Cinergy Services
                                  1000 East Main Street
21                                Plainfield, Indiana  46168

22

23      For Pennzoil:             MR. JOHN DAVID PAGE
                                  Attorney At Law
24                                3000 Post Oak Blvd., Suite 850
                                  Houston, Texas  77056
25
```

**CERTIFIED COPY**



2

```
1    APPEARANCES (Continued)

2    For Gulf Coast Energy:      MR. CHARLES SWEETMAN
                                 Sweetman, Skaggs, Lawler & Franz
3                                855 E. Harrison Street
                                 Brownsville, Texas  78520
4

5    Transcribed by:            BARBARA BARNARD
                                 Official Court Reporter
6                                600 E. Harrison, Box 301
                                 Brownsville, Texas  78520
7                                (956)548-2591

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Thank you, counsel.  Be seated, please.

2      All right.  We're here this afternoon on City of San Benito

3  versus Tejas Gas, et al, B-03-80.

4      And, Mr. Poncio, you're here representing the city?

5          MR. PONCIO:  Yes, Your Honor.

6          THE COURT:  And, Mr. Dykes, you're here representing how

7  many of the defendants.

8          MR. DYKES:  I have to count to tell you that.

9          THE COURT:  Well, what defendants are you not

10 representing?

11         MR. DYKES:  Well --

12         THE COURT:  Maybe that will be easier, or is there just

13 a number of those too?

14         MR. DYKES:  There are a total of 65 defendants, and I

15 represent eight to ten of them.  And I can name them precisely

16 if you'd like.

17         THE COURT:  Okay.  Why don't you do that for the record.

18         MR. PONCIO:  We're representing Tejas Gas Pipeline

19 Company, Tejas Gas Pipeline, L.L.C., Tejas Gas Pipeline L.P.,

20 Tejas Gas, L.L.C., Tejas Gas Marketing, L.L.C., Coral Energy

21 Services, L.L.C., Coral Energy Resources, L.P., Gulf Energy

22 Marketing Company, Gulf Energy Marketing, L.L.C., and Shell Gas

23 Trading Company.

24         THE COURT:  Okay.  All right.  And with you is

25 Mr. Palmer?

1          THE COURT:  I had a blank here for who the Pennzoil

2    lawyer was.

3       Let me back up now to the lawyers and who they represent.

4    Are these all the defendants that have been served, or are we

5    going to see some more defendants appear in this?

6          MR. PONCIO:  Your Honor, actually none of the defendants

7    were served.  What we did was we filed a petition where we named

8    them all, sent them a letter saying, "We're naming you.  We'd

9    like to try to negotiate on this issue."  And that's when Tejas

10   came in.  Pennzoil filed an answer.  Tejas came in, filed a

11   notice for removal after Cinergy had already filed an answer,

12   but they did not join in the consent to removal, et cetera, et

13   cetera, et cetera.

14         THE COURT:  What are we going to do with the rest of the

15   defendants?  Let's assume for my purposes that I'm not

16   prejudging your motion to remand, but what are we going to do

17   with the rest of these defendants?  Are we going to bring them

18   in the lawsuit or --

19         MR. PONCIO:  No.  With regard to the rest of the

20   defendants, Your Honor, what I would like to do is, to the

21   extent you consider them in this case, non-suit as to those

22   defendants so that we can take whatever action we need to with

23   regard to those defendants separately.

24         THE COURT:  Okay.  My only hesitation in that,

25   Mr. Poncio, is I don't want to create unnecessary -- you know, I

1    don't want another 30 lawsuits if we just have -- if we can

2    resolve everything in one.

3            MR. PONCIO:  Well, I'll tell you that with regard to the

4    practice in other cases in which I'm now involved, I think in,

5    for example, the City of Victoria case, which they conferred

6    with me on last week, I think only two or three actual

7    defendants filed removals in that case because they filed

8    individual lawsuits against those defendants.

9            THE COURT:  Okay.

10           MR. PONCIO:  So for practical purposes, you probably

11    wouldn't have the other 45 to 50 defendants.  It might actually

12    be simpler on this court.

13           THE COURT:  Okay.  Now, the City of Victoria cases, are

14    they -- you referenced in your pretrial stuff three different

15    Victoria cases.  Are they ongoing and alive and well?

16           MR. PONCIO:  Those are ongoing in that particular venue,

17    Your Honor.  I'm not specifically joined in those yet.  I

18    anticipate that I will be to some extent.  In fact, Mr. Dykes is

19    involved --

20           THE COURT:  Okay.

21           MR. PONCIO:  -- in those as well.

22           THE COURT:  Are those ongoing lawsuits, Mr. Dykes?

23           MR. DYKES:  That is correct, Your Honor.

24           THE COURT:  All right.  Now, the case that was here that

25    this got removed from or got severed from and then removed, is

1    it over, the Cameron County case?

2              MR. PONCIO:  Yes, Your Honor.  That was actually a class

3    action.  It didn't actually involve this particular case.  In

4    fact, the class action itself didn't involve the street rental

5    ordinance whatsoever.  The reason the City of San Benito severed

6    itself out of that case is that they found that they did have a

7    street rental ordinance.

8              THE COURT:  All right.

9              MR. PONCIO:  So different issues.

10             THE COURT:  Okay.  Y'all be seated.  Well, one of the

11   reasons I wanted to meet with y'all is obviously I want to get a

12   scheduling order in place.  As I started to say a minute ago, we

13   apologize for the fact that Judge Black had to recuse himself;

14   but actually, we have pretty strict federal recusal rules.

15   And -- I mean, they're not optional.  I mean, even if you guys

16   would have given your consent, he couldn't have heard it, and so

17   that's why he had to do that.

18       Let me -- somebody in state court has a venue motion?  Is

19   there a lurking venue motion?  I'm not talking about the remand

20   and whether we're supposed to be here, but --

21             MR. DYKES:  Your Honor, if the state court rules for us,

22   venue -- motion for transfer of venue must be asserted initially

23   if it's ever going to be asserted.  And we didn't file an answer

24   in state court, but we also wanted to preserve our venue

25   position.

1        THE COURT:  In case you got remanded back.

2        MR. DYKES:  In case we got remanded.  And we would like

3    also to reserve the right to move for a transfer of venue in

4    this court.  I'm not representing that we would do it, but that

5    might be a matter to be put on a scheduling order, to file a

6    motion for change of venue if one is ever going to be filed.

7        THE COURT:  Okay.  Yeah.  Well, I'll probably allow you

8    to do that, Mr. Dykes.  You're going to have to do some heavy

9    duty convincing of me that a case involving the City of San

10   Benito shouldn't be heard in this county; but, you know, you're

11   pretty creative.  You may come up with a way that convinces me.

12       All right.  So I'm taking it from what you said, though,

13   that it's not something that I necessarily need to deal with in

14   order to move forward today?

15       MR. DYKES:  We do not believe it's necessary to deal

16   with the venue motion before the removal-remand issue.

17       THE COURT:  Okay.  Okay.  Let me talk first about

18   scheduling, and then -- because I want to give y'all time to

19   talk to me about the remand.  Now, the defendants have proposed

20   more or less a bifurcated procedure, which I know the plaintiff

21   has not acquiesced in; in fact, do not want to go on that

22   procedure.

23       Mr. Dykes, why do you -- and I'm asking Mr. Dykes these

24   questions.  Any of y'all are welcome to chime in from the

25   defense side.  Why do you prefer a bifurcated proceeding?

1          MR. PAGE:  Your Honor, J.D. Page on behalf of Pennzoil.

2    We prefer the bifurcated proceeding because we've seen

3    absolutely nothing that would suggest that my client, at least,

4    has any business being sued in this.  Based upon what we

5    understand the lawsuit is about, we don't belong here.

6        We've asked Mr. Poncio for any documents that would

7    substantiate the claim that has been made.  It looks otherwise

8    like it's just sort of a shotgun approach to anybody and

9    everybody that might ever, ever possibly have business that

10   somehow touched the City of San Benito.  We've never gotten any

11   documents.

12       Until we get the threshold documents, something that makes

13   it look like there's maybe a liability issue as to us, we don't

14   think we ought to have to spend the enormous amount of time that

15   would be necessary for the damages issue.

16          THE COURT:  Let me ask what may be a naive question.

17   But, I mean, wouldn't you know if you owned a pipeline under the

18   City of San Benito or not?

19          MR. PAGE:  Yes, Your Honor, and we've said we don't own

20   a pipeline under the City of San Benito.  We've never owned one.

21   And that's exactly where we started.  And I think Mr. Poncio has

22   a claim which we do not believe is in any way supported by the

23   case law or by statute that we should be liable anyway,

24   Mr. Poncio.  And I look to Mr. Poncio, notwithstanding the fact

25   that I'm arguing or answering your question, Your Honor, because

1    I don't mean to misstate it.  But I think Mr. Poncio, having

2    nodded, has confirmed for me my understanding of his position.

3    Even though we don't own a pipeline, he contends that we should

4    be liable.

5        It is precisely because we don't own a pipeline that we

6    think that at the threshold, we should not be involved in any

7    lawsuit wherever it is brought.  And that's why, backing up to

8    the issue of bifurcation, we thought we should have a very

9    straightforward resolution in this court of whether there should

10   be any liability whatsoever before we spend, again, all the time

11   that would be necessary on the damages issues.

12       THE COURT:  Anyone else from the defense side want to

13   address that?

14       MR. DYKES:  I might just emphasize Mr. Page's point;

15   that the damages research, if it's necessary to undertake that,

16   would be an enormous labor.  Mr. Poncio has sued all the

17   defendants in this case for a period going back over 60 years,

18   back to 1941 when this ordinance was enacted.  And these

19   companies, many of them are that old, and they've had mergers

20   and acquisitions; they've had dispositions of pipeline assets.

21   If it were necessary to research all or any significant part of

22   that 60-year period, the labor involved would be -- could be, it

23   depends from company to company, but it could very well be quite

24   staggering.

25       THE COURT:  Okay.  Mr. Poncio, what's -- why doesn't

1     their position make sense?

2         MR. PONCIO:  Your Honor, the difficulty in this

3     particular case -- well, first of all, with regard to severing

4     or bifurcating, the damage documents are going to be the same

5     documents that establish liability.  For example, you're going

6     to have actual sales documents that show sales within the city.

7     The difficulty is the way gas companies and gas marketing

8     companies conduct themselves.

9       They create layer upon layer of shell companies in order to

10    avoid liability, as we've shown in other cases we've been

11    involved in, where they may say, "We don't technically own the

12    pipeline in the company, but one of our other companies do," and

13    they perform these types of transactions in order to avoid this

14    type of liability.  And our intent is to show a form of fraud

15    and manipulation of these shell companies in order to avoid

16    direct liability, but we intend to show liability based on those

17    transactions and occurrences.

18        THE COURT:  Well, here's what -- here's what strikes me.

19    I understand your point.  You can sit down.

20        MR. PONCIO:  Thank you.

21        THE COURT:  There ought to be a neutral point to this or

22    at least a common denominator in here.  There ought to be some

23    showing that at least we know or have to find out whether

24    Pennzoil owns a pipeline under there or owns a company that owns

25    a pipeline or some, you know, second cousin third time removed

1   that they actually control somehow, and I understand that.

2       On the other hand, it seems somewhat backwards, if you will,

3   to make Mr. Page -- Mr. Page's client go through a bunch of

4   hoops producing a bunch of production documents, if you will, or

5   witnesses with regard to how much gas they sell if they don't

6   have any that runs under the City of San Benito.  And I'm, in a

7   way, opening this a little bit for discussion, but I think there

8   ought to be a way that you ought to be able to satisfy yourself,

9   and you ought to be allowed the discovery you need to satisfy

10  yourself that there is no hanky-panky corporate shell game going

11  on, at the same time without making them produce a million

12  documents since 1941 to bring it up to date.  And I'm -- I mean,

13  I would think that we ought to be able to establish a two-tier,

14  if you will, or two-stage discovery setup where you get to

15  figure out the ownership issues.

16      And pending a positive answer to that, you go forward into

17  the next stage.  And with a negative answer, you'd either come

18  to the court, perhaps, and voluntarily dismiss them, or that the

19  defendants would file a motion for summary judgement and say,

20  you know, "Me no Alamo.  I've never owned a pipeline there, and

21  I shouldn't be sued and shouldn't have to pay any rent for

22  pipeline rent."

23      What kind of information do you need to establish -- now,

24  what comes to mind is immediately some kind of interrogatory or

25  some kind of request for admission with an interrogatory

1   attached to it, something that basically says, "Mr. Defendant,

2   have you now or have you in the last 60 years since 1941 owned a

3   pipeline that runs under the City of San Benito or had any

4   ownership interest in a company that owned a pipeline that had

5   any ownership interest in gas that ran under the City of San

6   Benito?"  I mean, how does it -- tell me about that.

7          MR. PONCIO:  I think we could formulate something, Your

8   Honor, if you're talking about a two-tiered level of discovery.

9   What I didn't want to do was work towards a liability trial,

10  then start all over again working towards a damage trial.

11         THE COURT:  Yeah.  I'm not really -- and I know the

12  defendants might prefer that.  I'm not leaning toward that.  I'm

13  leaning toward, though -- but I do understand the "Don't make us

14  jump through every hoop and produce every accounting record we

15  have for every ounce of gas we've ever sold," or MCF of gas or

16  however this is sold so that -- only to eventually come forward

17  with our motion for summary judgment saying, "We haven't been

18  near the City of San Benito."

19         MR. PONCIO:  I think if Your Honor, once you've made

20  your decision on the motion to remand, if you could give me a

21  two-week period to formulate some sort of proposed discovery

22  plan towards that end that you just relayed to us, I think I can

23  come up with that for you, Your Honor.

24         THE COURT:  Gentlemen, what would be wrong with that?

25  Or gentlemen and lady?

1          MR. DYKES:  Your Honor, Mr. Poncio and I have talked

2     going back to when I first learned of this lawsuit.  I think

3     that was sometime a few months after it was filed, and I think

4     this is useful to recount -- this was an attempt at discovery on

5     my part, so I think it's relevant to what we're talking about.

6          I asked him why he believed that these companies had

7     pipelines or sales or any other connection with the City of San

8     Benito.  And he'll correct me if I'm wrong, but I believe I

9     understood him to say that he had gone to the Railroad

10    Commission and had been at a warehouse with some ancient records

11    that everyone thought had been discarded, and that he had found

12    records that named each of the defendants, each of the 65

13    defendants in this case, and in each case in such a way as to

14    justify suing that defendant.  And he offered, which I

15    appreciated, to give me the records for the companies I was

16    interested in.  I did ask for those companies.  He has been, I

17    know, extremely busy in trial and other matters, but I don't

18    have them yet.

19         Now, if we can just get that information, if we can find out

20    why it is -- if he can focus us on what it is that he believes

21    about each company, this makes it so much more doable from our

22    standpoint.  If there's any question, pipeline ownership, for

23    example, ownership of a company that owns a pipeline that

24    extends back 60 years, the burden for Shell and for Kinder

25    Morgan, which now effectively is some of these companies, is

1    staggering.  If we can avoid that 60-year search without any

2    focus, that's -- that's my aim in proceeding further on

3    discovery.

4        We have -- when we talked back on August the 15th, and this

5    is reflected in the -- in the joint discovery case management

6    plan that we -- that we filed, we had agreed with Mr. Poncio

7    that he would file his initial disclosure from whatever date we

8    were looking at, and that we would then have -- after we got a

9    look at these -- at this evidence that he felt that he had, we

10   would then have 60 days to do our research on those identified

11   areas.  And if we -- I would submit, Your Honor, that that is a

12   logical plan.

13           THE COURT:  Is that problematic for you?

14           MR. PONCIO:  We don't have any problem with that.  We

15   talked before you came out, Your Honor, and said using that same

16   plan that we had set out, just setting a 30-day period from

17   whatever date you've decided on the motion to remand, then we

18   can work using that same trial plan initially.

19           THE COURT:  All right.  Here's what -- let me do this.

20   It's the 27th.  And unfortunately, I have two conferences, one

21   this week and one next week.  But let's take it as quasi-gospel

22   that I will rule on the motion to remand by the 14th of

23   November.

24        All right.  Then, Mr. Poncio, what I want the plaintiffs to

25   do -- and I'm going to give you to the end of the year to do

1   this.  That's six weeks, but I know the holidays are sitting in

2   the middle of that; not only Thanksgiving, but Christmas as

3   well -- to produce your information that you gleaned to name

4   these defendants.  And it sounds -- I mean, was he right?  Were

5   we talking Railroad Commission documents or whatever?  But let

6   me not limit it to that, though.  I mean, if you have City of

7   San Benito documents or some correspondence between any of these

8   defendants to the city or whatever that says, "Oh, by the way,

9   we've got a pipeline running down Main Street," I mean, I want

10  you to produce that too, okay?

11       All right.  And then I will go out to the -- let me change

12  calendars -- okay.  Let's just say yours is due -- Mr. Poncio,

13  that's due the 31st of December, so, I mean, right at year's

14  end.  On the 27th of February, in that six -- almost two months

15  there, you know, I want the defendants to do the research that

16  goes along with that, having received these documents to find

17  out exactly where you are.

18       And I'm trying to think the best way of bringing that issue

19  to a resolution.  It may be by, Mr. Poncio, you then sending out

20  the discovery that we talked about.

21            MR. PONCIO:  Right.

22            THE COURT:  You know, give me a list of every company

23  you've ever owned a piece of, you know, however you want to

24  phrase it.  But design it enough to where you pick up not only

25  the defendants, but any subsidiary or parent corporation or

1   whatever you think you need.  But that will give them two months

2   to gather the information they'll need to answer that, and just

3   send them a regular interrogatory.  And why don't you plan on

4   sending that by the -- by February 27th.  And then the

5   defendants will have until March 31st to answer that.

6       All right.  And at that point, we ought to be in a position

7   that by the end of April, that either you can file a motion to

8   dismiss if you've accidentally named somebody that doesn't

9   belong here; or if there's a disagreement about whether they

10  belong here or not, if they feel strongly about it, they can

11  file a motion for summary judgment saying, "We've never been

12  here."

13      Now, having said that, I may allow at that point, depending

14  on what the motion looks like, Mr. Poncio to take further

15  discovery, because it may not be extensive enough to allow him

16  some solace.  I mean, it may be -- he may be put in a situation

17  where he's saying, "I just don't know enough to let you out, and

18  I don't want to get sued for malpractice."  But it may also be

19  clear enough, and I'll go ahead and rule on the motion for

20  summary judgment in that case.

21      Okay.  Now, talk to me about what the other issues in this

22  case will be.  I mean, the one issue will be do they have the --

23  a pipeline.  The second issue, no doubt, would be the amounts

24  that they've delivered in the last -- since 1941.  I take it

25  none of these people have ever paid according to that ordinance?

1    MR. PONCIO:  Except for certain defendants, Your Honor,

2    that had separate franchise fee agreements subject to the

3    ordinance.

4    THE COURT:  Okay.  And so the main issue, once you've

5    established whether a pipeline exists or not or was ever owned

6    or not by these defendants, will be amounts and rent due from

7    your standpoint?

8    MR. PONCIO:  (Nod indicated.)

9    THE COURT:  Now, there may be some -- from the

10    defendants' standpoint, they may have some -- you know, hey,

11    we've been doing this for 60 years.  Where have you been for the

12    last 60 years kind of issues that they want to bring up,

13    although I'm not sure limitations can run against a city, but

14    that's a -- you know, a bridge we'll cross when we get to it.

15    But I would think at this point, once you get their response

16    on the 31st, that you could then frame whatever discovery you

17    need regarding the amount of gas and the -- and, I guess, the

18    price, because it's a percentage of the price is the way I read

19    that, right?

20    MR. PONCIO:  Yes, Your Honor.  And then by June, they'll

21    pay me plus interest, I think.

22    THE COURT:  Well, I wouldn't advise -- not that I give

23    advisory opinions, but I wouldn't advise holding your breath on

24    that.

25    All right.  What's wrong with that scheme, guys from the

1   defense side?  Why can't that work?

2            MR. DYKES:  I think that sounds very workable.

3            THE COURT:  And that will give, Mr. Page, your client,

4   if he truly has never owned a pipeline down here, doesn't own

5   anybody that's owned a pipeline, never seen a pipeline, and the

6   dog didn't bite me and I don't own a dog, you get an opportunity

7   to -- let's answer those issues first before you have to go

8   through and search every accounting folder known to mankind to

9   find your gas sales in South Texas.

10           MR. PAGE:  I think that sounds great.  If Mr. Poncio has

11  a further theory, though -- and, frankly, fraud is something

12  that I -- I'm not sure I had ever really understood, and I

13  thought we had been very straightforward in answering that we

14  don't own a pipeline and haven't owned a pipeline.  And I'm

15  certainly not aware of my clients ever having committed some

16  fraud or subterfuge regarding the ownership of the pipeline, and

17  had never understood that to be even the allegations, if there's

18  something beyond that.

19           THE COURT:  Well, if that's still alive, you can include

20  that in your motion for summary judgment, and then he's going to

21  have to explain it to me or convince me that he's got a cause of

22  action.

23           MR. PAGE:  Actually I've got a motion for summary

24  judgment I can file in short order.

25           THE COURT:  Well, I'm going to let him do this discovery

1    first.

2         MR. PAGE:  Well, I'm just saying, I have a motion for

3    summary judgment I can file in short order because not only a

4    pipeline, and certainly not being aware that we were even

5    being -- that anybody even suggested that if we did own one, we

6    must have engaged in some sort of fraud, we would like to get

7    out and not to go too much further with it.  But I really kind

8    of thought it was inappropriate that we should have been sued in

9    the first place unless somebody could really establish that we

10   owned a pipeline or had some good faith basis.  I don't remember

11   exactly how the rule puts it, but unless somebody really had a

12   good faith basis for bringing us into this lawsuit when we don't

13   own a pipeline and otherwise don't seem to come under the

14   statute.

15        THE COURT:  Well, I'm going to let him do the discovery

16   I talked about, Mr. Page --

17        MR. PAGE:  Yes, sir.

18        THE COURT:  -- and you can file your motion whenever you

19   want to file it, but I'm telling you I'm not ruling on it --

20        MR. PAGE:  Yes.

21        THE COURT:  -- until we get through these stages.

22        MR. PAGE:  I understand, Your Honor.

23        MR. PONCIO:  And just to clarify, Your Honor, we never

24   brought him into the lawsuit.  They decided to join the lawsuit.

25   Just to clarify for the court, they voluntarily came in, even

1    though they've never been served, even though it was sent, the

2    petition was sent with a courtesy letter saying, "We're not

3    joining you as a defendant right now. We're just sending this."

4        THE COURT: Well, they've been sued, though. I know

5    what you're saying, and I'm not --

6        MR. PONCIO: But I'm just saying, I hear his threats;

7    and I'm just telling him, we never joined you.

8        THE COURT: I'm not worried about that. I'm not worried

9    about that.

10       All right. Let's assume, counsel, that either one or more

11   of the counsel sitting at defense counsel table will be here

12   with a viable defendant. Mr. Poncio is going to be here with a

13   viable plaintiff. When can we try this case? Next summer?

14       MR. PONCIO: I think that's what we're looking at, Your

15   Honor, after -- you're talking about -- excuse me. You're

16   talking about the motion to dismiss or a motion for summary

17   judgment by the end of April. If we do this initial discovery,

18   you're probably talking late summer for damage calculations and

19   probably expert depositions.

20       THE COURT: See, that's what I would think would be the

21   time consuming and costly part of this case, will be deposing

22   their accountants --

23       MR. PONCIO: Right.

24       THE COURT: -- their expert economist or gas expert or

25   whatever and vice versa, their deposing yours.

```
1            MR. PONCIO:  So you're probably looking at, I would
2   anticipate, probably next September; next August, next September
3   for doing that.
4            THE COURT:  What do you think?  Is that too optimistic?
5            MR. DYKES:  We had penciled in November of '04, so
6   we're not far off.
7            MR. PONCIO:  That's fine, Your Honor.  September,
8   October of next year.  Even November would work.
9            THE COURT:  Let's see what I -- okay.  Let's do this.
10  We're going to pick juries -- a jury in this case on
11  November 4th at 9:00 o'clock.  Do y'all want to do the voir
12  dire?
13           MR. DYKES:  Yes, Your Honor, we do request lawyer voir
14  dire.
15           THE COURT:  Mr. Poncio?
16           MR. PONCIO:  Your Honor, I -- I don't know that it's
17  really a jury trial issue.
18           THE COURT:  I think there's a jury request that's been
19  made, though.  Didn't I see one?
20           MR. PONCIO:  That's right, Your Honor, but I think when
21  you're looking at the damage calculations -- well, if they're
22  selecting voir dire, I'll be glad to take that, Your Honor.  I
23  just don't see it as a --
24           THE COURT:  Well, let's leave it this way.  Unless y'all
25  decide to try it to the bench, and you can always opt to do
```

```
 1   that, and I'm fine with that, we'll assume that counsel are

 2   going to do the voir dire.

 3              MR. PONCIO:  Sure.

 4              THE COURT:  Any objection to that from anybody?

 5              MR. PONCIO:  No, Your Honor.

 6              THE COURT:  All right.  Now, by saying that, of course,

 7   I don't -- I'd like it to be a little something less than your

 8   final jury argument.  Mix a question in there every once in a

 9   while, but we'll assume that.

10        Now, I'd prefer a 12-person jury.  Now, you know in federal

11   court, you!re going to get a six.  I prefer 12 and with the

12   standard like we do in state court, 10/2 verdict or above.  Are

13   there any objections to that?

14              MR. PONCIO:  No, Your Honor.

15              MR. DYKES:  No, Your Honor.

16              THE COURT:  All right.

17              MR. SWEETMAN:  No objection.

18              THE COURT:  That's what we'll do.  Ms. Ezell?

19              MS. EZELL:  No.

20              THE COURT:  All right.  On Thursday, the 28th of October

21   at 1:30, and we may have to play a little bit with this time,

22   but for your scheduling purposes at 1:30, we're going to have

23   basically a pretrial conference.  And at that, I'm going to want

24   to go through, you know, every issue that we're going to be

25   arguing about.  I'd like to go ahead and admit the exhibits.
```

```
 1    I'd like to go ahead and talk about jury issues, although I

 2    probably won't finalize them by then, and I'd like to go

 3    ahead -- and, obviously, if there's going to be some bone of

 4    contention that's going to come up, although this fact situation

 5    doesn't lend itself to, you know, some smoking gun that you

 6    don't want the other side to know about necessarily, I don't

 7    want any surprises in front of the jury that are going to cause

 8    me to have to send them home early and send me to the library.

 9    So I want to flush those out that Thursday.

10         On Thursday the 14th, I want your joint pretrial order, and

11    that will have all the exhibits, motion in limine, you know, the

12    whole gamut that's under the rules.  All right.

13              MR. PAGE:  Do you have the Louis Moore ace in the hole

14    rule?

15              THE COURT:  I'm sorry, I didn't hear you.

16              MR. PAGE:  Do you have the Louis Moore ace in the hole

17    rule?

18              THE COURT:  Which means?

19              MR. PAGE:  Judge Moore, I remember trying a case in his

20    court, and he said, you know, "No surprises unless you have an

21    ace in the hole."

22              THE COURT:  Well, it better be a really good ace, is all

23    I can say, if it's a surprise to me.

24              MR. PAGE:  I'm just trying to understand the --

25              THE COURT:  I don't want -- this doesn't lend itself to
```

1    it, but a personal injury case would; you know, something where

2    the defendant is sitting there, and he knows the guy has been

3    convicted ten times of, you know, murder, and he's sitting on

4    those convictions, and all of a sudden in front of the jury

5    stands up and starts pulling those convictions out.  I don't

6    want to be surprised by that, and I don't want to lose my jury

7    over that.

8        What I'm really talking about is if you know something is

9    going to be controversial, you know you have a piece of evidence

10   you want to get in, you know Mr. Poncio is going to fight like

11   the dickens to keep it out and vice versa, let's go ahead and

12   have the fight before we have a jury in the box.  I mean, you --

13   rarely is there going to be something.  I mean, if it's

14   absolutely a surprise, I'm not going to keep either side, if

15   it's otherwise admissible, from using it.  But if -- you know,

16   any more we discover these cases to death; rarely is there

17   really a surprise.  I mean, you know, Mr. Poncio comes up with

18   an e-mail that says, "Gee, whatever you do, don't tell the city

19   we snuck a pipeline under their main street."  I mean, you know,

20   he knows you're not going to want that into evidence, and you

21   know you're going to fight it.  So let's go ahead and have the

22   fight before the jury is in the box.  That's all I'm saying.

23       The last couple times I tried a case in Louis Moore's court,

24   by the time we got to trial, neither one of us wanted to face

25   him, so we settled somehow.

1    Mr. Poncio, when can you name experts?  End of June?

2    MR. PONCIO:  I think that's fine, Your Honor.  I mean,

3    pretty much that's fine, Your Honor.

4    THE COURT:  June 30th?

5    MR. PONCIO:  Sure.  Any date is fine.

6    THE COURT:  Let me see what day of the week that is.

7    COURT CLERK:  It's a Wednesday, Judge.

8    THE COURT:  Okay.  June 30th.

9    And then why don't the defendants name experts on

10   August 13th.  That will give you time to depose each other, and

11   I know people will also still have vacations lurking around in

12   there.

13   By October -- I'm sorry, September 17th, I want any

14   dispositive motions filed that I haven't already had.  I mean, I

15   would imagine from the defense side, you guys are going to run

16   in as soon as you possibly can and file your motions for summary

17   judgment.  But if there's something that comes up and you figure

18   out, "Gee, we said we owned this pipeline, but we really don't,"

19   that will be a creative affidavit, but I'd like to have it filed

20   by the 17th of September.  And then discovery cutoff will be

21   October 8th.

22   Now, any of these deadlines, with the exception of the

23   pretrial order, the pretrial conference, and the jury selection,

24   y'all can move around by agreement.  And I don't -- you don't

25   have to file a motion.  I'd like a letter from counsel saying

1   we've agreed to move this deadline from here to here just so I

2   have a record of it.  But anything y'all agree to do is fine

3   with me.

4       All right.  Before -- anything else we need to talk about

5   before we talk about whether you're actually here or not?

6       Okay.  Mr. Dykes, why don't you lead off, and let's talk

7   about your removal of this case, and then I want Mr. Poncio to

8   respond to it.

9       MR. DYKES:  Your Honor, if I may, I'd like to call on

10  Mr. Palmer to address that issue.

11      THE COURT:  That's fine.

12      MR. PALMER:  Your Honor, we removed on the basis of the

13  plaintiff's petition because plaintiffs requested declaratory

14  relief, including injunctive relief, and based on *Grynberg*,

15  decision by the Chief Judge Schell, Eastern District of Texas.

16  And in Texas law, when you plead for an injunction, that makes

17  part of the plaintiff's prima facie case to negate all

18  inferences and essentially brings in the federal constitutional

19  law into the case.

20      In fact, Chief Judge Schell said, "Thus, in an injunction

21  suit under Texas substantive law, many things which might

22  otherwise be characterized as defenses are really not defenses,

23  but essentially elements of the plaintiff's prima facie case."

24      THE COURT:  Okay.  Now, does it make a difference in

25  that -- that case was based on, for lack of a better term,

1    federal common law.  This case is based on state law.  Does it

2    change the rule?

3         MR. PALMER:  No, Your Honor.  Once they seek an

4    injunction, part of their prima facie case then is to negate

5    those inferences; and, therefore, that doesn't matter.

6    Essentially you start looking at what could prevent them from

7    obtaining that injunction, and here you have federal

8    constitutional law.  Essentially we have issues with the taking

9    clause, commerce clause, substantive due process, as well as

10   equal protection.

11        I know plaintiff was talking -- he raised the Tax Injunction

12   Act.  But you will see the cases basically stand for the

13   proposition that that's not applicable where you're seeking to

14   collect taxes.  That's only applicable if we're seeking to

15   enjoin taxes.

16        We would hold that this whole case isn't about taxes; it's

17   about street rental ordinance and street rents.  It's about

18   rentals, not taxes.  And it's pretty clear from the ordinance

19   itself, which is entitled "Street Rental Ordinance" and also

20   refers several times to rentals.

21        He's also raised consent.  And when we filed the removal,

22   Pennzoil Gas Company joined in and consented to the removal.  We

23   had Cinergy, which essentially filed an answer in state court

24   three hours prior to us removing -- filing the actual

25   notification of removal, effectuating removal in state court.

1    And then Gulf Cost answered approximately five days later after

2    the case had already been removed.  Once we found out about

3    Cinergy and Gulf Coast, we contacted them and got them to

4    consent to the removal.

5        If, for whatever reason, you still find consent was not met,

6    the 5th Circuit has adopted the exceptional circumstances

7    exceptions procedural requirements for removal, and we would say

8    this is just a case like that where you have 60-some-odd

9    defendants who have been named, and no one knows who's been

10   served.  And apparently no one has been served, and no one knows

11   who is answering.  We had no idea that anyone was going to

12   answer; and then all of a sudden, we found out Pennzoil

13   answered, and that's why -- although we don't think we had to,

14   we wanted to make sure that we got an answer and removed it

15   within 30 days of their answer, Your Honor.

16          THE COURT:  All right.  Mr. Poncio, you want to talk

17   about why you don't belong here?

18          MR. PONCIO:  Sure, Your Honor.  Just a couple of things.

19   I think everything is pretty clearly set out.

20       But with regard to removal, Your Honor, we think they have

21   the burden to determine who had filed answers before the

22   removal.  They had plenty of time to make that determination.

23   It was noted in the clerk's records.  Nevertheless, they didn't

24   obtain consent.

25       With regard to removal pursuant to 1331, I have a couple of

1  case cites, Your Honor, and I'll follow-up with a letter to the

2  court.

3          THE COURT:  Okay.

4          MR. PONCIO:  But one particular case, the *Appling County*

5  Case, which is 621 F.2d, 1301, a 5th Circuit case, 1980.  It

6  says that the federal court has subject matter jurisdiction only

7  when the plaintiff's statement of his own cause of action shows

8  that it is based on federal law.

9      Clearly, we demonstrate in our petition that it's not based

10 on federal law, but simply state law and a local ordinance.

11 With regard to the *Grynberg* case, it's simply a district court

12 case which has no compelling authority, I believe, in light of

13 these other 5th Circuit opinions.

14     With regard to the injunction act, Your Honor, one other

15 case we'd like to cite, the *A Bonding Company* case, 629 F.2d,

16 1127, another 5th Circuit case out of 1980, which says that the

17 defendant in that case, where we're arguing the Tax Injunction

18 Act and the abstention as to tax issues applies, the defendant

19 in that case did not contend that state remedies are inadequate

20 for the disposition of the case so that the federal court in

21 that particular case must dismiss.  We have the same instance

22 here where they haven't demonstrated that even in light of these

23 other federal issues that they're raising, that the state court

24 is not an adequate -- is not inadequate in order to protect

25 their federal issues.

1    The second point to that case, Your Honor, the court must

2    assume that the state's equitable remedies are sufficient to

3    protect the defendant's federal rights; and, therefore, the

4    federal court must dismiss in light of those particular issues.

5    They cite one particular case arguing that this ordinance

6    is, in fact, not a tax.  That particular case was limited to its

7    issues.  They cite a footnote which is simply dicta and not

8    governing law in that case.  I think it's clear that this is a

9    tax issue with regard to the city.

10    Also, Your Honor, with regard --

11    THE COURT:  Doesn't the ordinance itself say rent?

12    MR. PONCIO:  It says rent, Your Honor; but I think any

13    and all rents are classified as a form of tax when you look at

14    the purpose, and that's to raise money for the city, which is

15    what typically is a tax.

16    With regard to the *City of Santa Monica* case, Your Honor,

17    which they cite as authority, it says that, "To show equal

18    protection issues, you must demonstrate unfair or improper

19    application," which you do not have a demonstration of in this

20    case.  And we think the case was improperly removed, and I don't

21    need to take up too much more of the court's time.

22    THE COURT:  Did you -- in your pleading, Mr. Poncio, you

23    mentioned that some years ago that this court was actually faced

24    with that.  Did you ever find the ruling on that?

25    MR. PONCIO:  Your Honor, I went down to our district

1    court -- I mean the direct clerk's office.  They don't have

2    records going back that far.  But I think if you're not going to

3    rule until the 14th, if I could have another week, I think I

4    could dredge it up.

5         THE COURT:  I think all the old records are kept up in

6    Fort Worth in some -- maybe they're microfilmed, I don't know,

7    but I think that's where they are.  But I think if you contacted

8    them and had the style of the case --

9         MR. PONCIO:  It's a *Rio Grande Valley Gas Company versus*

10   *San Benito* case, Your Honor.  I have the style.

11        THE COURT:  I think they might be able to come up with

12   it.

13        MR. PONCIO:  I think I can obtain that for you, but it

14   was based on the same issues.  And in that case, they argued

15   that the -- they held that the Injunction Act did apply and

16   dismissed the case of Rio Grande Valley Gas Company.

17        THE COURT:  Well, I'd like to see that if you could

18   possibly come up with it.

19        MR. PONCIO:  Okay.  I'll try to get that, Your Honor.

20        THE COURT:  I realize it's 60 years ago, and so it's not

21   going to be an easy thing.

22        MR. PONCIO:  Let me also point out to the court.  If you

23   look at Tejas Gas' answer, they specifically look to it arguing

24   that it's a tax because they say that certain -- it says,

25   "Defendants plead the following sections of the Texas Tax Code

1   which exempts certain sales from the imposition of a sales tax."

2       Then at paragraph 4, they say that it -- "While it may be a

3   tax of a public utility, it may not exceed the amount or amounts

4   prescribed by the statute for sales within the City of San

5   Benito."  I think it's clear from their answers that they're

6   arguing that it is a tax, just for the court's benefit.

7       THE COURT:  I mean, you're not going to take the

8   position, are you, that this wouldn't be interstate commerce,

9   are you; I mean, a pipeline, gas pipeline?

10      MR. PONCIO:  Well, it depends, Your Honor.  I think if

11  you look at the *City of Santa Monica* case, it's only dealing

12  with actual sales within the city in this particular case.  It's

13  not dealing with an issue where you're making sales to another

14  provider who intends to transport them outside of the state,

15  because you don't have that.  It deals with only sales and

16  transport for sale within the city to consumers as that may be

17  defined.

18      THE COURT:  Well, but if they had to go, for instance,

19  and dig up their pipelines and move it, wouldn't that affect

20  interstate commerce?

21      MR. PONCIO:  No.  I think what the cases say, Your

22  Honor, is that they have the right to go to private landowners

23  to create their right of way.  They can go outside the city to

24  create their right of way.  But my argument is even if it does

25  apply, even if interstate commerce would apply, that they have

1    not met the burdens under the Tax Injunction Act which say,

2    well, you've got to show that this state court is inadequate to

3    protect your federal rights, and you haven't done that.

4          THE COURT: Okay. All right. Any reply from the

5    defendants?

6          MR. PALMER: Yes, Your Honor. I apologize. I probably

7    should have started off with this. Essentially, the defendant

8    has a fundamental right to a federal forum once you establish

9    subject matter jurisdiction. That's based on not the

10   characterization of the plaintiff in his lawsuit, but on the

11   face of the petition. It's very clear in his -- in plaintiff's

12   petition, they're seeking an injunction causing defendants to

13   remove any "and all pipelines and/or facilities from the City of

14   San Benito's city limits or right of way.

15       As far as that we had the burden of finding out who had

16   answered lawsuits, like I said -- and I don't know if Mr. Poncio

17   disagrees -- but our records show that Cinergy essentially filed

18   an answer three hours before. We had already gotten certified

19   copies of the state pleadings. We had no idea whatsoever that

20   they had answered; and as soon as we found that out, we got

21   their consents.

22       And again, I want to give you a citation for the exceptional

23   circumstances. It's *White versus White*, 32 F. Supp. 2d, 890.

24   And the pinpoint is 893. And there they found exceptional

25   circumstances where it appeared plaintiff's counsel was taking

```
1   advantage of what they called removal track.  Essentially you
2   serve the dumb defendant first and get him to waive it, and then
3   you serve all the more sophisticated defendants to come in and
4   who will remove.
5           THE COURT:  You're not referring to anybody here in the
6   courtroom, are you?
7           MR. PALMER:  No, no, no.  He didn't serve anyone, so I'm
8   not referring to him.
9       Lastly on the tax issue, one, we contend -- again, we
10  contend it's not a tax, and it's pretty straight from the
11  ordinance itself.  And even if it was a tax, the Tax Injunction
12  Act does not apply because, again, that's about not allowing
13  people to enjoin taxes.  It does not apply when like the
14  plaintiff here is seeking to collect taxes.  That's our position
15  on that, Your Honor.
16          THE COURT:  Counsel, anyone else want to add anything?
17          MR. DYKES:  Your Honor, I might add one more comment on
18  the tax versus rental point.  Mr. Poncio has cited in his
19  pleading the case of Fleming versus Houston Lighting and Power
20  Company decided by the Texas Supreme Court in 1940, one year
21  before the ordinance was enacted.  And I think that's not an
22  accident.  But if we read this Supreme Court case that preceded
23  that ordinance by one year, it's extremely plain that the court
24  is talking about rental and not taxes.
25      The citation, again, is in the pleading, and the court says
```

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CITY OF SAN BENITO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. No. B03-080 |
| v. | § | |
| | § | |
| TEJAS GAS PIPELINE COMPANY, | § | |
| et al., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF, THE CITY OF SAN BENITO'S,
## SUPPLEMENTAL RULE 26 DISCLOSURE STATEMENT

TO: THE DEFENDANTS, as identified herein and listed on the Certificate of Service.

COMES NOW the City of San Benito, and Pursuant to Rule 26 of the Texas Rules of Federal Procedure, submits its initial disclosures, as supplemented herein:

1.      Rule 26(a)(1)(A): Except for each Defendant's own records, Plaintiff relies upon public documents, filings and information as maintained by the Public Utility Commission of Texas (PUC), and the Federal Energy Regulatory Commission (FERC), to support its claims. In addition, the City of San Benito passed an ordinance (No. 478), already disclosed to defendants to support its claims as outlined in its Seventh Amended Original Petition, which is incorporated herein, as if stated in the verbatim.

2.      Rule 26(a)(1)(B): The gas fired electric power plant located inside the City of San Benito, and once owned by Central Power & Light Company, is and has been required to report its fuel purchase and use activities and do so by filing Fuel Purchase Reports with the PUC (on a monthly basis), and by filing FERC Form 423 with FERC. Most relevant of the information reported

EXHIBIT

B2

in those fuel purchase reports, is that part that shows the supplier of the gas at the San Benito Power Plant, and how much gas was sold and consumed at the plant to generate electricity. These reports show the total cost of gas as to each supplier of gas. All of the Defendant's supplied gas to the San Benito Power Plant during certain points in time from 1976 through the year 2000. The reports breakout the gas sales by gas selling company. Copies of the monthly fuel purchase reports filed by CP&L with the PUC can be found at the PUC library in Austin, Texas. In addition, the monthly fuel purchase reports from 1995-2001, can be found and reviewed as they are maintained on the PUC's web site at http://www.puc.state.tx.us/electric/reports/fuel/index.cfm. Furthermore, unless the design and maintenance of the FERC website has changed, the FERC has in the past maintained a web site at http://www.ferc.gov/docs-filing/eforms/form-423/install-manual.asp where information relating to FERC Form 423 can be discovered, which also shows gas purchase, and gas use information.

3.1    Rule 26(a)(1)(C): Damage calculations as to each defendant are based upon the foregoing records maintained by the PUC and FERC, and based upon violations of the previously provided City of San Benito Ordinance No. 478. According to the records maintained by the PUC and, in some cases, FERC, the following lists approximate damages and amounts owed to the City of San Benito from the defendants that have made an appearance in this case.

3.2    Duke Energy Trading and Marketing has sold approximately $9,108,760 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Duke Energy Trading and Marketing owing the City of San Benito approximately $182,175.20 in actual damages.

3.3    The Pan Energy entities have sold approximately $1,613,925 worth of gas at the San Benito. Applying the 2% gross receipts street rental ordinance to those sales equates to the Pan Energy entities owing the City of San Benito approximately $32,278.50

in actual damages.

3.4    Conoco has sold approximately $2,457,169 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Conoco owing the City of San Benito approximately $49,143.38 in actual damages.

3.5    Fina has sold approximately $1,064,902 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Fina owing the City of San Benito approximately $21,298.04 in actual damages.

3.6    The Union Pacific entities sold approximately $264,621 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to the Union Pacific entities owing the City of San Benito approximately $5,292.42 in actual damages.

3.7    Anadarko Energy Services Co. sold approximately $11,868,462 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Anadarko Energy Services Co. owing the City of San Benito approximately $237,369.24 in actual damages.

3.8    Natural Gas Clearinghouse sold approximately $1,020,375 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Natural Gas Clearinghouse owing the City of San Benito approximately $20,407.50 in actual damages.

3.9    Pennzoil Gas Marketing n/k/a Devon sold $576,334 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Pennzoil Gas Marketing n/k/a Devon owing the City of San Benito

approximately $11,526.68.

3.10 Texaco Natural Gas, Inc. sold approximately $12,898,648 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Texaco Natural Gas, Inc. owing the City of San Benito approximately $257,972 in actual damages.

3.11 Texaco Gas Marketing, Inc sold approximately $9,087,487 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Texas Gas Marketing, Inc. owing the City of San Benito approximately $181,749.74 in actual damages.

3.12 Texaco Exploration and Production, Inc. sold approximately $257,685 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Texaco Exploration and Production, Inc. owing the City of San Benito approximately $5,513.70 in actual damages.

3.13 Chevron sold approximately $29,359 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Chevron owing the City of San Benito approximately $587.18 in actual damages.

3.14 BP Energy Company sold approximately $1,787,190 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to BP Energy Company the City of San Benito approximately $35,743.80 in actual damages.

3.15 Amoco Energy Trading Corp. sold approximately $16,773,563 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Amoco Energy Trading Corp. owing the City of San Benito

approximately $335,471.26 in actual damages.

3.16   Arco Natural Gas Marketing, Inc. sold approximately $1,120,406 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Arco Natural Gas Marketing, Inc. owing the City of San Benito approximately $22,480.12 in actual damages.

3.17   Vastar Gas Marketing, Inc. sold approximately $1,827,903 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Vastar Ga Marketing, Inc. owing the City of San Benito approximately $36,558.06 in actual damages.

3.18   Houston Pipeline Co. sold approximately $136,672 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Houston Pipeline Co. owing the City of San Benito approximately $2,733.44 in actual damages.

3.19   HPL Resources Co. sold approximately $302,175 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to HPL Resources Co. owing the City of San Benito approximately $6,043.50 in actual damages.

3.20   The Transok entities sold approximately sold approximately $3,549,750 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to the Transok entities owing the City of San Benito approximately $70,995.00 in actual damages.

3.21   The documents by which Plaintiff relies upon in calculating the foregoing actual damages are public information maintained by the FERC and by the PUC of Texas, as described

above. Any Defendant may visit the PUC library, the PUC website, the FERC library, and/or FERC website to obtain copies of the records and/or public filings as maintained by those agencies. Please see the initial disclosure statement provided in Paragraph 2 above, which is incorporated herein, as if stated in the verbatim.

4.    Rule 26(1)(D): The City of San Benito does not know of any insurance agreements under which any person carrying on an insurance business may be liable to satisfy part or all of the judgment which may be entered in this action.

5.    Rule 26(2)(A): The City of San Benito has not retained or otherwise employed any expert witness at this time, but will supplement this answer in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence. Furthermore, it is anticipated that the City will retain an accounting expert and/or an oil and gas expert to testify to the damages as outlined above. Once an expert is retained, the City of San Benito will make the above mentioned public records that are the basis for the damage calculations available for review at a mutually agreeable time and place, and at each Defendant's own cost for such production.

6.    Rule 26(2)(B) and (C): Please see the City of San Benito's disclosure detailed in Paragraph above. The City of San Benito will supplement this disclosure in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

7.    Rule 26(3)(A), (B), and (C): The City of San Benito will supplement this disclosure as required by the Rules of Federal Procedure or as directed by this Court.

## CERTIFICATE OF SERVICE

I, the undersigned attorney of record, do hereby certify that I have on this _16th_ day of December, 2003, forwarded a true and correct copy of the above document to counsel of record as follows, pursuant to Rule 5 of the Federal Rules of Civil Procedure:

Ramon Garcia                                        **VIA US FIRST CLASS MAIL**
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, Texas 78539

OSBORNE J. Dykes, III                               **VIA US FIRST CLASS MAIL**
Jeffrey D. Palmer
FULBRIGHT & JAWORSKI, LLP
1301 McKinney, Suite 5100
Houston, Texas 77010

Julie L. Ezell                                      **VIA US FIRST CLASS MAIL**
CINERGY MARKETING & TRADING, L.P.
1000 East Main Street
Plainfield, Indiana 46168

Randy Beevis                                        **VIA US FIRST CLASS MAIL**
1100 Louisiana, Suite 4900
Houston, Texas 77002

J.D. Page                                           **VIA US FIRST CLASS MAIL**
3040 Post Oak Boulevard, Suite 85G
Houston, Texas 77056

Bradley Whalen                                      **VIA US FIRST CLASS MAIL**
DOYLE, RESTREP, HARVING & ROBBINS,
L.L.P
4700 Chase Tower
600 Travis Street
Houston, Texas   77002

Rene G. Oliveira                                    **VIA US FIRST CLASS MAIL**
David G. Oliveira
ROERIG, OLIVEIRA & FISHER
855 West Price Road, Suite 9
Brownsville, Texas 78520

Frances I. Gandy
148 American Bank Plaza
Corpus Christi, Texas 78475

**VIA US FIRST CLASS MAIL**

Robert Galligan
JONES, GALLIGAN, KEY & LOZANO, L.L.P.
2300 W. Pike, Suite 300
P. O. Drawer 1247
Weslaco, Texas 78599-1247

**VIA FIRST CLASS MAIL**

**ADAM PONCIO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| CITY OF SAN BENITO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. No. B03-080 |
| v. | § | |
| | § | |
| TEJAS GAS PIPELINE COMPANY, | § | |
| et al., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF, THE CITY OF SAN BENITO'S,**
**SECOND SUPPLEMENTAL RULE 26 DISCLOSURE STATEMENT**

TO: THE DEFENDANTS, as identified herein and listed on the Certificate of Service.

COMES NOW the City of San Benito, and Pursuant to Rule 26 of the Texas Rules of Federal Procedure, submits its initial disclosures, as supplemented herein:

1.    Rule 26(a)(1)(A): Except for each Defendant's own records, Plaintiff relies upon public documents, filings and information as maintained by the Public Utility Commission of Texas (PUC), and the Federal Energy Regulatory Commission (FERC), to support its claims. In addition, the City of San Benito passed an ordinance (No. 478), already disclosed to defendants to support its claims as outlined in its Seventh Amended Original Petition, which is incorporated herein, as if stated in the verbatim.

2.    Rule 26(a)(1)(B): The gas fired electric power plant located inside the City of San Benito, and once owned by Central Power & Light Company, is and has been required to report its fuel purchase and use activities and do so by filing Fuel Purchase Reports with the PUC (on a monthly basis), and by filing FERC Form 423 with FERC. Most relevant of the information reported

**EXHIBIT**
B3

in those fuel purchase reports, is that part that shows the supplier of the gas at the San Benito Power

Plant, and how much gas was sold and consumed at the plant to generate electricity. These reports

show the total cost of gas as to each supplier of gas. All of the Defendant's supplied gas to the San

Benito Power Plant during certain points in time from 1976 through the year 2000. The reports

breakout the gas sales by gas selling company. Copies of the monthly fuel purchase reports filed by

CP&L with the PUC can be found at the PUC library in Austin, Texas. In addition, the monthly fuel

purchase reports from 1995-2001, can be found and reviewed as they are maintained on the PUC's

web site at http://www.puc.state.tx.us/electric/reports/fuel/index.cfm. Furthermore, unless the design

and maintenance of the FERC website has changed, the FERC has in the past maintained a web site

at http://www.ferc.gov/docs-filing/eforms/form-423/install-manual.asp where information relating

to FERC Form 423 can be discovered, which also shows gas purchase, and gas use information.

   3.1    Rule 26(a)(1)(C): Damage calculations as to each defendant are based upon the

foregoing records maintained by the PUC and FERC, and based upon violations of the previously

provided City of San Benito Ordinance No. 478.  Specifically, each Defendant below used certain

pipelines inside the City of San Benito to sell gas at the San Benito CP&L power plant. According

to the records maintained by the PUC and, in some cases, FERC, the following lists approximate

damages and amounts owed to the City of San Benito from the defendants that have made an

appearance in this case. All such sales made by the Defendants below were sales made by

Defendants using pipelines located in the City of San Benito.

   3.2    Duke Energy Trading and Marketing has sold approximately $9,108,760 worth of gas

        at the San Benito Power Plant. Applying the 2% gross receipts street rental

        ordinance to those sales equates to Duke Energy Trading and Marketing owing the

        City of San Benito approximately $182,175.20 in actual damages.

3.3    The Pan Energy entities have sold approximately $1,613,925 worth of gas at the San Benito. Applying the 2% gross receipts street rental ordinance to those sales equates to the Pan Energy entities owing the City of San Benito approximately $32,278.50 in actual damages.

3.4    Conoco has sold approximately $2,457,169 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Conoco owing the City of San Benito approximately $49,143.38 in actual damages.

3.5    Fina has sold approximately $1,064,902 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Fina owing the City of San Benito approximately $21,298.04 in actual damages.

3.6    The Union Pacific entities sold approximately $264,621 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to the Union Pacific entities owing the City of San Benito approximately $5,292.42 in actual damages.

3.7    Anadarko Energy Services Co. sold approximately $11,868,462 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Anadarko Energy Services Co. owing the City of San Benito approximately $237,369.24 in actual damages.

3.8    Natural Gas Clearinghouse sold approximately $1,020,375 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Natural Gas Clearinghouse owing the City of San Benito approximately $20,407.50 in actual damages.

3.9     Pennzoil Gas Marketing n/k/a Devon sold $576,334 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Pennzoil Gas Marketing n/k/a Devon owing the City of San Benito approximately $11,526.68.

3.10    Texaco Natural Gas, Inc. sold approximately $12,898,648 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Texaco Natural Gas, Inc. owing the City of San Benito approximately $257,972 in actual damages.

3.11    Texaco Gas Marketing, Inc sold approximately $9,087,487 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Texas Gas Marketing, Inc. owing the City of San Benito approximately $181,749.74 in actual damages.

3.12    Texaco Exploration and Production, Inc. sold approximately $257,685 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Texaco Exploration and Production, Inc. owing the City of San Benito approximately $5,513.70 in actual damages.

3.13    Chevron sold approximately $29,359 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Chevron owing the City of San Benito approximately $587.18 in actual damages.

3.14    BP Energy Company sold approximately $1,787,190 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to BP Energy Company the City of San Benito approximately $35,743.80 in actual damages.

3.15    Amoco Energy Trading Corp. sold approximately $16,773,563 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to Amoco Energy Trading Corp. owing the City of San Benito approximately $335,471.26 in actual damages.

3.16    Arco Natural Gas Marketing, Inc. sold approximately $1,120,406 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to Arco Natural Gas Marketing, Inc. owing the City of San Benito approximately $22,480.12 in actual damages.

3.17    Vastar Gas Marketing, Inc. sold approximately $1,827,903 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to Vastar Ga Marketing, Inc. owing the City of San Benito approximately $36,558.06 in actual damages.

3.18    Houston Pipeline Co. sold approximately $136,672 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to Houston Pipeline Co. owing the City of San Benito approximately $2,733.44 in actual damages.

3.19    HPL Resources Co. sold approximately $302,175 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to HPL Resources Co. owing the City of San Benito approximately $6,043.50 in actual damages.

3.20    The Transok entities sold approximately sold approximately $3,549,750 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to the Transok entities owing the City of San Benito

approximately $70,995.00 in actual damages.

3.21    The Tejas entities sold approximately $32,584,057.69 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to the Tejas entities owing the City of San Benito approximately $651,681.15 in actual damages.

3.22    Gulf Coast Energy sold approximately $1,923,757.45 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Gulf Coast Energy owing the City of San Benito approximately $38,475.14 in actual damages.

3.23    Gulf Coast Energy Marketing sold approximately $44,458,755.00 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Gulf Coast Energy Marketing owing the City of San Benito approximately $889,175.10 in actual damages.

3.24    Gulf Coast Gas sold approximately $5,937,806.40 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Gulf Coast Gas owing the City of San Benito approximately $118,756.12 in actual damages.

3.25    The Gulf Energy entities sold approximately $29,861,881.00 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to the Gulf Energy entities owing the City of San Benito approximately $597,237.62 in actual damages.

3.26    Petro Source sold approximately $576.334.00 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates

to Petro Source owing the City of San Benito approximately $11,526.68 in actual damages.

3.27    Southern Gas Pipeline Company sold approximately $660,332.02 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Southern Gas Pipeline Company owing the City of San Benito approximately $13,206.64 in actual damages.

3.28    The documents by which Plaintiff relies upon in calculating the foregoing actual damages are public information maintained by the FERC and by the PUC of Texas, as described above. Any Defendant may visit the PUC library, the PUC website, the FERC library, and/or FERC website to obtain copies of the records and/or public filings as maintained by those agencies. Please see the initial disclosure statement provided in Paragraph 2 above, which is incorporated herein, as if stated in the verbatim.

4.      Rule 26(1)(D): The City of San Benito does not know of any insurance agreements under which any person carrying on an insurance business may be liable to satisfy part or all of the judgment which may be entered in this action.

5.      Rule 26(2)(A): The City of San Benito has not retained or otherwise employed any expert witness at this time, but will supplement this answer in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence. Furthermore, it is anticipated that the City will retain an accounting expert and/or an oil and gas expert to testify to the damages as outlined above. Once an expert is retained, the City of San Benito will make the above mentioned public records that are the basis for the damage calculations available for review at a mutually agreeable time and place, and at each Defendant's own cost for such production.

6.      Rule 26(2)(B) and (C): Please see the City of San Benito's disclosure detailed in

Paragraph above. The City of San Benito will supplement this disclosure in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

      7.      Rule 26(3)(A), (B), and (C): The City of San Benito will supplement this disclosure as required by the Rules of Federal Procedure or as directed by this Court.

<div style="text-align: center;">Respectfully submitted,</div>

**ADAM PONCIO**
**State Bar No. 16109800**
**LAW OFFICES OF CERDA & PONCIO**
**A Professional Corporation**
**924 McCullough**
**San Antonio, Texas 778215-1642**
**Telephone (210) 212-7979**
**Telecopier (210) 212-5880**
**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I, the undersigned attorney of record, do hereby certify that I have on this _26_ day of January, 2004, forwarded a true and correct copy of the above document to counsel of record as follows, pursuant to Rule 5 of the Federal Rules of Civil Procedure:

Ramon Garcia                                    **VIA US FIRST CLASS MAIL**
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, Texas 78539

Osborne J. Dykes, III                           **VIA US FIRST CLASS MAIL**
Jeffrey D. Palmer
FULBRIGHT & JAWORSKI, LLP
1301 McKinney, Suite 5100
Houston, Texas 77010

Julie L. Ezell                                  **VIA US FIRST CLASS MAIL**
CINERGY MARKETING & TRADING, L.P.
1000 East Main Street
Plainfield, Indiana 46168

Randy Beevis                                    **VIA US FIRST CLASS MAIL**
1100 Louisiana, Suite 4900
Houston, Texas 77002

J.D. Page                                       **VIA US FIRST CLASS MAIL**
3040 Post Oak Boulevard, Suite 85G
Houston, Texas 77056

Bradley Whalen                                  **VIA US FIRST CLASS MAIL**
DOYLE, RESTREP, HARVING & ROBBINS,
L.L.P
4700 Chase Tower
600 Travis Street
Houston, Texas  77002

Rene G. Oliveira                                **VIA US FIRST CLASS MAIL**
David G. Oliveira
ROERIG, OLIVEIRA & FISHER
855 West Price Road, Suite 9
Brownsville, Texas 78520

Frances I. Gandy
148 American Bank Plaza
Corpus Christi, Texas 78475

**VIA US FIRST CLASS MAIL**

Robert Galligan
JONES, GALLIGAN, KEY & LOZANO, L.L.P.
2300 W. Pike, Suite 300
P. O. Drawer 1247
Weslaco, Texas 78599-1247

**VIA FIRST CLASS MAIL**

**ADAM PONCIO**

1    the ordinance, speaking of the one in issue in that case, "The

2    ordinance required all telegraph, telephone, electric and gas

3    companies using the streets or other public places within the

4    corporate limits of the city to pay, for the privilege of such

5    occupancy, a rental."

6        And it comes back to that point at the end of the opinion

7    and again on rehearing.  And I don't want to take a long time to

8    go into that, but I'll just read this one sentence from the

9    rehearing opinion of the Texas Supreme Court in that case.  It

10   said, "The authority has recognized a distinction between a

11   rental charge and a tax or charge for the privilege of doing

12   business."  So that distinction is not one that has escaped the

13   courts.  It's specifically recognized.

14       Cities have essentially three ways, besides gifts, perhaps

15   other unusual ways for a city to get assets or revenue.  They

16   have essentially three ways to get revenue.  One of them is

17   taxes, one of them is rentals, and one of them is regulatory

18   fees.  And the court recognizes that there, perhaps, in this

19   case was some confusion about which was being talked about, but

20   the court wasn't confused and made it very, very plain that it's

21   talking about rental.  And that's the same thing that Mr. Poncio

22   is making claim for.  It's very plain from the ordinance that he

23   is suing on as well as from the case that he cites.

24           THE COURT:  All right.  Counsel, anything else?

25   Here's -- let me tell you.  If you need to communicate with the

1    you need to copy the other side with it.  But, you know, I'm not

2    going to give you a deadline, but you know I'm working on this,

3    so the sooner the better.  All right.  Thank you.

4        (Court adjourned)

5                                    * * *

6        (End of requested transcript)

7                                    -oOo-

8        I certify that the foregoing is a correct transcript from

9    the record of proceedings in the above matter.

10

11   Date:  January 21, 2004

12

13

14                        Signature of Court Reporter
                          Barbara Barnard

15

16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| CITY OF SAN BENITO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. No. B03-080 |
| v. | § | |
| | § | |
| TEJAS GAS PIPELINE COMPANY, | § | |
| et al., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF, THE CITY OF SAN BENITO'S,**
**<u>RULE 26 DISCLOSURE STATEMENT</u>**

TO: THE DEFENDANTS, as identified herein and listed on the Certificate of Service.

COMES NOW the City of San Benito, and Pursuant to Rule 26 of the Texas Rules of Federal Procedure, submits its initial disclosures:

1.      Rule 26(a)(1)(A): Except for each Defendant's own records, Plaintiff relies upon public documents, filings and information as maintained by the Public Utility Commission of Texas (PUC), and the Federal Energy Regulatory Commission (FERC), to support its claims. In addition, the City of San Benito passed an ordinance (No. 478), already disclosed to defendants to support its claims as outlined in its Seventh Amended Original Petition, which is incorporated herein, as if stated in the verbatim.

2.      Rule 26(a)(1)(B): The gas fired electric power plant located inside the City of San Benito, and once owned by Central Power & Light Company, is and has been required to report its fuel purchase and use activities and do so by filing Fuel Purchase Reports with the PUC (on a monthly basis), and by filing FERC Form 423 with FERC. Most relevant of the information reported



in those fuel purchase reports, is that part that shows the supplier of the gas at the San Benito Power Plant, and how much gas was sold and consumed at the plant to generate electricity. These reports show the total cost of gas as to each supplier of gas. All of the Defendant's supplied gas to the San Benito Power Plant during certain points in time from 1976 through the year 2000. The reports breakout the gas sales by gas selling company. Copies of the monthly fuel purchase reports filed by CP&L with the PUC can be found at the PUC library in Austin, Texas. In addition, the monthly fuel purchase reports from 1995-2001, can be found and reviewed as they are maintained on the PUC's web site at http://www.puc.state.tx.us/electric/reports/fuel/index.cfm. Furthermore, unless the design and maintenance of the FERC website has changed, the FERC has in the past maintained a web site at http://www.ferc.gov/docs-filing/eforms/form-423/install-manual.asp where information relating to FERC Form 423 can be discovered, which also shows gas purchase, and gas use information.

      3.1     Rule 26(a)(1)(C): Damage calculations as to each defendant are based upon the foregoing records maintained by the PUC and FERC, and based upon violations of the previously provided City of San Benito Ordinance No. 478. According to the records maintained by the PUC and, in some cases, FERC, the following lists approximate damages and amounts owed to the City of San Benito from the defendants that have made an appearance in this case.

      3.2     Duke Energy Trading and Marketing has sold approximately $9,108,760 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Duke Energy Trading and Marketing owing the City of San Benito approximately $182,175.20 in actual damages.

      3.3     The Pan Energy entities have sold approximately $1,613,925 worth of gas at the San Benito. Applying the 2% gross receipts street rental ordinance to those sales equates to the Pan Energy entities owing the City of San Benito approximately $32,278.50

in actual damages.

3.4    Conoco has sold approximately $2,457,169 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to Conoco owing the City of San Benito approximately $49,143.38 in actual damages.

3.5    Fina has sold approximately $1,064,902 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Fina owing the City of San Benito approximately $21,298.04 in actual damages.

3.6    The Union Pacific entities sold approximately $264,621 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to the Union Pacific entities owing the City of San Benito approximately $5,292.42 in actual damages.

3.7    Anadarko Energy Services Co. sold approximately $11,868,462 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to Anadarko Energy Services Co. owing the City of San Benito approximately $237,369.24 in actual damages.

3.8    Natural Gas Clearinghouse sold approximately $1,020,375 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to Natural Gas Clearinghouse owing the City of San Benito approximately $20,407.50 in actual damages.

3.9    Texaco Natural Gas, Inc. sold approximately $12,898,648 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to Texaco Natural Gas, Inc. owing the City of San Benito

approximately $257,972 in actual damages.

3.10    Texaco Gas Marketing, Inc sold approximately $9,087,487 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Texas Gas Marketing, Inc. owing the City of San Benito approximately $181,749.74 in actual damages.

3.11    Texaco Exploration and Production, Inc. sold approximately $257,685 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Texaco Exploration and Production, Inc. owing the City of San Benito approximately $5,513.70 in actual damages.

3.12    Chevron sold approximately $29,359 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Chevron owing the City of San Benito approximately $587.18 in actual damages.

3.13    BP Energy Company sold approximately $1,787,190 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to BP Energy Company the City of San Benito approximately $35,743.80 in actual damages.

3.14    Amoco Energy Trading Corp. sold approximately $16,773,563 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Amoco Energy Trading Corp. owing the City of San Benito approximately $335,471.26 in actual damages.

3.15    Arco Natural Gas Marketing, Inc. sold approximately $1,120,406 worth of gas at the San Benito Power Plant. Applying the 2% gross receipts street rental ordinance to those sales equates to Arco Natural Gas Marketing, Inc. owing the City of San Benito

approximately $22,480.12 in actual damages.

3.16    Vastar Gas Marketing, Inc. sold approximately $1,827,903 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to Vastar Ga Marketing, Inc. owing the City of San Benito approximately $36,558.06 in actual damages.

3.17    Houston Pipeline Co. sold approximately $136,672 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to Houston Pipeline Co. owing the City of San Benito approximately $2,733.44 in actual damages.

3.18    HPL Resources Co. sold approximately $302,175 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to HPL Resources Co. owing the City of San Benito approximately $6,043.50 in actual damages.

3.19    The Transok entities sold approximately sold approximately $3,549,750 worth of gas at the San Benito Power Plant.  Applying the 2% gross receipts street rental ordinance to those sales equates to the Transok entities owing the City of San Benito approximately $70,995.00 in actual damages.

3.20    The documents by which Plaintiff relies upon in calculating the foregoing actual damages are public information maintained by the FERC and by the PUC of Texas, as described above. Any Defendant may visit the PUC library, the PUC website, the FERC library, and/or FERC website to obtain copies of the records and/or public filings as maintained by those agencies. Please see the initial disclosure statement provided in Paragraph 2 above, which is incorporated herein, as if stated in the verbatim.

4.      Rule 26(1)(D): The City of San Benito does not know of any insurance agreements under which any person carrying on an insurance business may be liable to satisfy part or all of the judgment which may be entered in this action.

5.      Rule 26(2)(A): The City of San Benito has not retained or otherwise employed any expert witness at this time, but will supplement this answer in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.  Furthermore, it is anticipated that the City will retain an accounting expert and/or an oil and gas expert to testify to the damages as outlined above. Once an expert is retained, the City of San Benito will make the above mentioned public records that are the basis for the damage calculations available for review at a mutually agreeable time and place, and at each Defendant's own cost for such production.

6.      Rule 26(2)(B) and (C): Please see the City of San Benito's disclosure detailed in Paragraph  above.  The City of San Benito will supplement this disclosure in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

7.      Rule 26(3)(A), (B), and (C): The City of San Benito will supplement this disclosure as required by the Rules of Federal Procedure or as directed by this Court.

Respectfully submitted,


ADAM PONCIO
State Bar No. 16109800
LAW OFFICES OF CERDA & PONCIO
A Professional Corporation
924 McCullough
San Antonio, Texas 778215-1642
Telephone (210) 212-7979
Telecopier (210) 212-5880
ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I, the undersigned attorney of record, do hereby certify that I have on this *31st* day of December, 2003, forwarded a true and correct copy of the above document to counsel of record as follows, pursuant to Rule 5 of the Federal Rules of Civil Procedure:

Ramon Garcia                                          **VIA US FIRST CLASS MAIL**
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, Texas 78539


OSBORNE J. Dykes, III                                 **VIA US FIRST CLASS MAIL**
Jeffrey D. Palmer
FULBRIGHT & JAWORSKI, LLP
1301 McKinney, Suite 5100
Houston, Texas 77010


Julie L. Ezell                                        **VIA US FIRST CLASS MAIL**
CINERGY MARKETING & TRADING, L.P.
1000 East Main Street
Plainfield, Indiana 46168


Randy Beevis                                          **VIA US FIRST CLASS MAIL**
1100 Louisiana, Suite 4900
Houston, Texas 77002


J.D. Page                                             **VIA US FIRST CLASS MAIL**
3040 Post Oak Boulevard, Suite 85G
Houston, Texas 77056


Bradley Whalen                                        **VIA US FIRST CLASS MAIL**
DOYLE, RESTREP, HARVING & ROBBINS,
L.L.P
4700 Chase Tower
600 Travis Street
Houston, Texas   77002


Rene G. Oliveira                                      **VIA US FIRST CLASS MAIL**
David G. Oliveira
ROERIG, OLIVEIRA & FISHER
855 West Price Road, Suite 9
Brownsville, Texas 78520

Frances I. Gandy                    **VIA US FIRST CLASS MAIL**
148 American Bank Plaza
Corpus Christi, Texas 78475


Robert Galligan                     **VIA FIRST CLASS MAIL**
JONES, GALLIGAN, KEY & LOZANO, L.L.P.
2300 W. Pike, Suite 300
P. O. Drawer 1247
Weslaco, Texas 78599-1247




**ADAM PONCIO**

EXHIBIT C

 

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**—BROWNSVILLE DIVISION—**

United States District Court
Southern District of Texas
ENTERED

JUN 1 6 2004

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | | |
|---|---|---|
| CITY OF SAN BENITO | § | |
| | § | |
| VS. | § | CIVIL NO. B-03-080 |
| | § | |
| TEJAS GAS PIPELINE CO. ET AL. | § | |

## ORDER

Pending is the plaintiff's Motion for Reconsideration, Docket No. 66, of this court's March 18, 2004 order of dismissal and judgment in favor of defendants Tejas Gas Pipeline Co., Tejas Gas Pipeline, L.L.C., Tejas Gas Pipeline, L.P., Tejas Gas, L.L.C., Tejas Gas Mktg., L.L.C., Gulf Energy Mktg. Co., Gulf Energy Mktg. L.L.C., Coral Energy Servs. L.L.C., Coral Energy Resources L.P., Shell Gas Trading Co., Conoco, Inc., Total E&P USA, Inc. (successor in interest to FINA), Union Pacific Resources Co. (n/k/a Anadarko E&P Co. LP), Natural Gas Clearinghouse, Inc., Anadarko Energy Servs. Co., Texaco Gas Mktg., Inc., Texaco Natural Gas, Inc., Chevron U.S.A., Inc., Texaco Exploration and Production, Inc., BP Energy Co., Amoco Energy Trading Corp. (n/k/a BP Energy Co.), Arco Natural Gas Mktg. Inc. (n/k/a Vastar Gas Mktg., Inc.), Vastar Gas Mktg., Inc., and Transco Petro Source Co. (n/k/a Transco P-S Co.). As a basis for this Order, the plaintiff claims its total failure to follow the rules of this court was the result of an "accident or mistake." As set forth below, the court conditionally grants the plaintiff's motion.

## I.    PROCEDURAL POSTURE

As the Federal Rules of Civil Procedure do not provide for a "motion for reconsideration" per se, the court must first decide what procedural rule controls the plaintiff's motion before considering its substance. The plaintiff does not invoke any specific rule in its request for relief.



The court perceives two options as to how it can categorize plaintiff's motion. It could construe plaintiff's motion as one for new trial under FED. R. CIV. P. 59 or as a motion filed pursuant to FED. R. CIV. P. 60(b).

But for when it was filed, the plaintiff's motion might appropriately considered a "motion for new trial" under Rule 59. The court's order of dismissal and entry of judgment in favor of specified defendants was entered on March 18, 2004. Plaintiff's motion was filed on April 2, 2004—more than ten days after the entry of the judgment. Accordingly, the plaintiff's motion for reconsideration was not sufficiently timely to be considered as one for new trial. FED. R. CIV. P. 59(b) (specifying that motions for new trial "shall be filed no later than 10 days after entry of the judgment").

The other rule under which the court could consider this motion is under FED. R. CIV. P. 60(b), which, of course, allows relief from an order or judgment due to mistake, inadvertence or excusable neglect. The rule provides for an outside deadline of one year for such a motion and sets as a standard that it must be filed within a "reasonable time." Given the language employed by the plaintiff in its motion for reconsideration and the timing (or lack thereof) of the filing of its motion, the court will consider the pending motion pursuant to Rule 60(b). Relief under Rule 60(b) lies within the sound discretion of the trial court. Provident Life and Accident Ins. Co. v. Goel, 274 F.3d 984, 997 (5th Cir. 2001). Similarly, a court's enforcement of a scheduling order and the local rules—both of which are at relevant to plaintiff's request for reconsideration—are also reviewed under an abuse of discretion standard. Geiserman v. MacDonald, 893 F.2d 787, 790 (5th Cir. 1990).

2

 

## II.    DISCUSSION

### A.    Grounds Asserted In Support of Reconsideration

The excuses given for plaintiff's "mistake, inadvertence, surprise, or excusable neglect" are multiple, but this court has heard better excuses for lost homework from elementary school children. The most plausible of plaintiff's excuses concerns the bankruptcy of Southern Gas Pipeline Company. However, plaintiff's excuse is not supported by well-settled bankruptcy law. Bankruptcy stays under 11 U.S.C. § 362 do not generally halt the litigation as to other litigants. Arnold v. Garlock, Inc., 278 F.3d 426, 436 (5th Cir. 2001); Matter of S.I. Acquisition, Inc., 817 F.2d 1142, 1147-48 (5th Cir. 1987). Moreover, the Fifth Circuit has already characterized the contention that a debtor subject to a § 362 stay must be severed in order for litigation to continue against the non-bankrupt defendants as "border[ing] on frivolousness." GATX Aircraft Corp. v. M/V Courtney Leigh, 768 F.2d 711, 716 (5th Cir. 1985). Counsel's unfounded legal assumptions hardly constitute grounds for reconsideration. See Halicki v. Louisiana Casino Cruises, Inc., 151 F.3d 465, 470 (5th Cir. 1998); Pryor v. U.S. Postal Serv., 769 F.2d 281, 287 (5th Cir. 1985). The court also deems it significant that the "bankrupt party" has never been served nor has it appeared in this lawsuit.

Counsel's less credible excuses were that he had scheduling and vacation conflicts. He writes that he "was scheduled for a spring break vacation out of state from March 13 to March 19, 2004" and that he was in an arbitration from February 23 to March 1, 2004, and that the week prior he was getting ready for the arbitration and that after March 1, 2004, he had a variety of mediations and depositions.

Initially, this court notes that the foregoing recitation is factually no excuse for the lack of cooperation in this case. The discovery about which the defendants' motions urging dismissal

3

 

revolve was ordered on October 27, 2003—literally months before this court's order and judgment of March 18, 2004. Also at that same hearing, this court instructed all attorneys to respond to all motions pursuant to Local Rule 7.4 and even went well beyond the norm and told all counsel:

> And then secondly, I do consider—and the local rules provide for this . . . I do consider <u>an unresponded to motion as being unopposed.  So if somebody files a motion and you don't like it, you'd better respond to it, because otherwise I'm going to grant it.</u>[1]

<u>Docket No. 44</u> at 37 (transcript of October 27, 2003 hearing) (emphasis added).  However, even if plaintiff's counsel's scheduling excuses were factually more substantive, they would not be grounds for excusable neglect under the governing legal standards.  Conflicting personal and professional obligations do not constitute excusable neglect.  <u>McKenzie v. Principi</u>, No. 03-30653, 2003 WL 22964867, at *1-2 (5th Cir. Dec. 16, 2003) (per curiam) (unpublished opinion); <u>Prior Products v. Southwest Wheel-NCL, Co.</u>, 805 F.2d 543, 546 (5th Cir. 1986).

Counsel's reliance on the court's scheduling order, <u>Docket No. 38</u>, is also without merit.  The scheduling order's provision to the effect that the court would not consider a motion for summary judgment prior to April 30, 2004 was based upon both sides producing the ordered discovery, which, to date, the plaintiff has refused to produce.  The scheduling order contemplated motions on the merits and was designed to give the parties adequate time and means to either make or respond to those types of motions.  The court's order of dismissal and judgment in favor of specified defendants was not initiated by way of summary judgment motions, but rather was premised on plaintiff's

---

[1] Plaintiff's current motion for reconsideration also fails to follow the court's immediately preceding admonition regarding certificates of conference.  See <u>Docket No. 44</u> at 37 (noting that no motion will be granted without a proper certificate of conference).  However, given the nature of plaintiff's instant motion, the court feels that it falls into the same category as a summary judgment motion, which is presumed to be opposed.  LOCAL RULE 7.1(D).

4




failure to comply with the court's orders, including the scheduling order, and various procedural rules. The plaintiff cannot simultaneously flout court-ordered discovery and then try to wield the same order as a shield.

### B. Appropriate Sanctions

In its motion for reconsideration, the plaintiff also asks this court to consider lesser sanctions (i.e., some sanction less than dismissal with prejudice). The appropriate time to debate the merits of defendants' motions for dismissal was when their motions were filed. LOCAL RULE 7.4. This local rule—the very rule that the court highlighted for all the parties at the October 27, 2003 hearing—states "failure to respond will be taken as a representation of no opposition" (emphasis added). Thus, at the time the motions were considered, the plaintiff had no opposition on record to the proposed dismissal. The only question left before this court is why the plaintiff's hitherto unannounced opposition should be considered at this juncture.

The rules seem clear. Rule 41(b) contemplates dismissal with prejudice under the instant circumstances. See FED. R. CIV. P. 41(b) ("For failure of the plaintiff to prosecute or to comply with these rules or any order of the court, a defendant may move for dismissal of an action or of any claim against the defendant."). The phrasing "any order" conveys the impression that a single instance of noncompliance could properly result in dismissal. Similarly, "a federal district court possesses the inherent authority to dismiss an action for want of prosecution." Gonzalez v. Firestone Tire & Rubber Co., 610 F.2d 241, 247 (5th Cir. 1980). In addition, other relevant procedural rules also provide for dismissal as a sanction for failure to abide by scheduling orders or court-ordered discovery. FED. R. CIV. P. 16(f), 37(b)(2)(C). The aforementioned local rule effectively add failure to respond to a motion to dismiss as an additional ground for dismissal. See LOCAL RULE 7.4.

5

Nevertheless, the Fifth Circuit seems to have restricted the application of Rule 41(b) and the other rules, as well as the inherent authority of district courts, to far narrower circumstances than the rules' language or the general statement of the courts' inherent authority might otherwise indicate. Although such orders of dismissal are purportedly reviewed under an abuse of discretion standard, dismissal with prejudice is generally considered an abuse of discretion in the absence of certain factors on account of the due process concerns implicated by involuntary adjudication on other than the merits. Brinkmann v. Dallas County Deputy Sheriff Abner, 813 F.2d 744, 749 (5th Cir. 1987); Riggs v. City of Pearland, 177 F.R.D. 395, 401 (S.D. Tex. 1997). Ordinarily, dismissal with prejudice must be made with reference to five distinct considerations, namely whether: (1) the noncompliance at issue was wilful or in bad faith; (2) it was accompanied by an unambiguous record of delay or reniitency; (3) the conduct is attributable not only to the attorney but to the client as well; (4) the conduct resulted in substantial prejudice to the opposing parties; and (5) the record indicates that lesser sanctions were considered but rejected as being inadequate as a deterrent. Coane v. Ferrara Pan Candy Co., 898 F.2d 1030, 1032 (5th Cir. 1990). However, these are merely "general principles" and "the facts of each case largely determine the appropriateness of dismissal." Brinkmann, 813 F.2d at 749. Not all of the foregoing factors need be present in order for dismissal to be warranted. See Callip v. Harris County Child Welfare Dept., 757 F.2d 1513, 1519 (5th Cir. 1985) (per curiam) ("[M]ost of the cases affirming dismissals with prejudice have involved the presence of one or more of three 'aggravating factors': (1) delay attributable directly to the plaintiff rather than his attorney; (2) actual prejudice to the defendant; and (3) delay caused by intentional conduct.") (emphasis added). However, dismissal is reserved for "the most egregious circumstances." Id. (internal quotation marks omitted).



J D PAGE Fax:713-840-9217 Jun 16 2004 18:58 P.07



If the record in this case in any way presents a close call, it is only because prior precedent sets a very high standard where an involuntary dismissal with prejudice is concerned. When viewed in context, plaintiff's failings thus far are substantial. Nonetheless, they are probably not sufficient to warrant dismissal with prejudice under the stringent governing legal standard. The relevant factual context for considering whether dismissal with prejudice was too harsh a sanction is elaborated below.

This case was removed to this Court on April 30, 2003. Docket No. 1; however, the litigation had already been pending in state court for some time. The plaintiff's most recent state court petition, the Seventh Amended Petition, was filed on March 14, 2003. Id. at Exhibit 22. It is unclear when this suit was initially filed in state court, but it dates from at least May of 2000. Id. at Exhibit 1. The earliest version of the petition in the record, the Fourth Amended Petition, dates from May 8, 2001, but does not appear to include any of the present defendants.[2] Id. at Exhibit 12. Although there are some differences in the parties named in each petition, almost forty (of the over sixty) defendants named in the Seventh Amended Petition were listed as defendants in the Fifth Amended Petition, which was filed on January 8, 2002. Id. at Exhibits 18, 22. The defendants in the instant suit were never served with process, however, and only became aware of its existence when the plaintiff informed them about it by letter at some imprecisely identified subsequent point in time.[3] Docket No. 44 at 5, 14.

---

[2] The record is not entirely clear on this point, as the second page of the referenced exhibit is blank. Whether this is by design or accident is not clear. It may be that additional parties, including some of the instant defendants, appear on this page in the original.

[3] Of course, there was substantial delay in bringing this lawsuit as well. The plaintiff appears to believe that its cause of action dates back to the 1940s. See Docket No. 72 at Exhibit A (San Benito's requests for production seeking documents from 1941 to present).

7




Quite apart from plaintiff's aforementioned noncompliance with the court's orders, more than one opposing counsel has indicated that counsel for plaintiff has been unresponsive to general inquiries and discovery. Counsel for plaintiff disputes this. See Docket No. 66 at 3 (stating that documents concerning gas sales within the city limits of San Benito "were produced and/or were made available for inspection and copying" and averring that no defendant "has contacted Plaintiff's counsel to obtain a copy of the documents available"). In some measure, the parties may simply be talking past one another (i.e., the defendants are referring to documents pertinent to pipeline ownership while the plaintiff is referencing documents concerning sales of gas). See, e.g., Docket No. 70 at 3-4, 7-8 (defendant Pennzoil's uncontested contention that no documents pertaining to pipeline ownership have been produced). However, defense counsel have complained not just of nonresponsiveness (i.e., answers that fail to genuinely respond to the query posed), but also outright unresponsiveness (i.e., failure to respond to queries altogether). Docket No. 72 at Exhibit D (apparently unanswered correspondence concerning pipeline ownership and possible dismissal); Docket No. 73 at 3 (stating that correspondence early in the litigation went unanswered). In addition, at least one defendant claims that the plaintiff has failed to make any documents available. See Docket No. 70 at 8 ("Even as to the alleged sale of gas—the only issue which San Benito now wants to discuss, San Benito has not produced any documents or any meaningful information.").

Although such accusations might ordinarily be discounted in litigation,[4] other facts render these complaints unusually credible. Plaintiff's counsel has more than once failed to return phone calls concerning opposition to motions filed by opposing counsel. Docket No. 60 at 4; Docket No.

---

[4] Indeed, in the two years this judge has been on the bench, this court has not yet felt the need to sanction any lawyer or party appearing before it, notwithstanding multiple requests.

8



<u>65</u> at 1; <u>Docket No. 69</u> at 2. In addition, counsel for several defendants has never been properly served with multiple filings in violation of FED. R. CIV. P. 5. <u>Docket No. 73</u> at 2-3. Under the Guidelines for Professional Conduct in this District, counsel have a duty to punctually communicate and cooperate with opposing counsel when possible. LOCAL RULES APPENDIX D.[5] Such communication and cooperation appears to be lacking in this case where plaintiff's counsel is concerned.

The foregoing background is the relevant backdrop in which the court's prior order of dismissal and judgment and the plaintiff's present motion for reconsideration should be viewed. The dismissal with prejudice was premised on: (1) the plaintiff's failure to provide the threshold discovery ordered by this court; (2) the plaintiff's failure to respond to the defendants' motions to dismiss; and (3) the plaintiff's failure to comply with the local rules of the Southern District of Texas. There is an unambiguous record of delay in this case. This case was pending against nearly forty of the present defendants in state court for over two years before they were even apprised of its existence. Now, over a year after the case was removed, no meaningful discovery has taken place. Cf. <u>Gonzalez</u>, 610 F.2d at 247 (finding abuse of discretion for dismissal where the record did not indicate "any significant period of inactivity"). Although plaintiff's counsel offers various excuses for the failures that finally resulted in dismissal, he does not actually claim to have been unaware of defendants' motions to dismiss. See <u>Anthony v. Marion County Gen. Hosp.</u>, 617 F.2d 1164, 1168 (5th Cir. 1980) (party offered no explanation for failure to prosecute and did not claim to have been

---

[5] Multiple sections of APPENDIX D are relevant. For example, section C states that "[a] lawyer owes, to opposing counsel, a duty of courtesy and cooperation," while section I requires "punctual[ity] in communication with others" and admonishes against "neglect and tardiness." Finally, section J requires attorneys not to unreasonably refuse to cooperate with "a just request for cooperation."

9




ignorant of hearing, deposition, and correspondence that was neglected). Counsel for plaintiff was undeniably aware of the court-ordered discovery, and he was equally aware of the fact that the discovery in question was considered the threshold issue in this litigation. See Brinkmann, 813 F.2d at 749 ("The court's . . . order could not have been more clear and unequivocal, and [the plaintiff] never claims that it confused him."). Moreover, the court flatly stated during the October 27, 2003 hearing that it would consider failure to respond to motions to be an indication that there was no opposition. Docket No. 44 at 37; cf. Brinkmann, 813 F.2d at 750 ("The . . . order warned that failure to timely comply with it would result in dismissal."). Given the parties' apparent agreement that pipeline ownership was the threshold issue during the aforesaid hearing, it was not at all unreasonable for the court to assume that the plaintiff was, in fact, unopposed to dismissal after having failed to produce any evidence of pipeline ownership. See infra Part II.C. (concerning the consensus that pipeline ownership was the threshold issue).

However, a clear record of delay standing alone may not always be sufficient to warrant dismissal with prejudice. Callip, 757 F.2d at 1521. Moreover, a fairly long line of cases indicates that "noncompliance with two or three orders or rules of the district court" is also insufficient. Id. at 1520-21 & n.10. Such noncompliance has been considered insufficient where, as here, the lawyer's failures are arguably as attributable to simple neglect or incompetence as wilful disregard when the record is viewed as a whole. Cf. Gonzalez, 610 F.2d at 248 ("While the attempts of Gonzalez's counsel to explain his absence at the conference are less than adequate, the district court had no reason to believe that his failure to appear resulted from intentional misconduct rather than inadvertence."). Though the sheer duration of this litigation and the delay in bringing the suit implicates the client in its counsel's dawdling, the specific conduct that triggered dismissal may well

10

 

pertain solely to the attorney, which does counsel against dismissal. See Callip, 757 F.2d at 1522 ("We of course have been reluctant to affirm dismissals based on conduct attributable to counsel, rather than the plaintiff."). In addition, the Fifth Circuit has expressly disapproved of dismissal solely on the basis of failure to respond to motions as required by local rules. John v. State of Louisiana, 757 F.2d 698, 709 (5th Cir. 1985). Such disapproval would, no doubt, be accentuated in a case such as this one where lesser sanctions were neither contemplated not imposed as a prior to dismissal. Callip, 757 F.2d at 1521.

Accordingly, while the record does fairly establish that plaintiff's counsel has failed to meet his obligations to both opposing counsel and this court, it may not justify dismissal with prejudice solely on procedural grounds. However, nothing prevents this court from imposing an alternative sanction for the aforementioned failings of counsel as a condition to the reinstatement of this lawsuit against the dismissed defendants. See Gonzalez, 610 F.2d at 248 (reversing dismissal but stating that the district court was free to impose reasonable and appropriate sanctions short of dismissal on remand). The Fifth Circuit has "suggested alternatives to dismissal, including the assessments of fines, costs, or damages against the plaintiff or his counsel, attorney disciplinary measures, conditional dismissal, dismissal without prejudice, and explicit warnings." Callip, 757 F.2d at 1521. Accordingly, while the court does feel that it is constrained to reconsider and rescind its prior order of dismissal and entry of judgment, it conditions the reinstatement of the lawsuit on plaintiff's compliance with the alternative lesser sanctions imposed infra in Part III of this opinion.

**C.    The Bases of Liability**

Finally, the plaintiff also contends that dismissal was improper because the defendants' liability is not premised on pipeline ownership alone—the subject matter of the discovery that

11

 

plaintiff failed to produce in accordance with the court's scheduling order. The court need not

determine whether this is sufficient basis for reconsideration of its dismissal and entry of judgment,

given that the court has determined that conditional reinstatement of plaintiff's lawsuit against the

previously dismissed defendants is in order on other grounds. However, the court is compelled to

comment on this matter inasmuch as it highlights the nature of plaintiff's conduct in this lawsuit thus

far and involves issues that must be resolved if and when this lawsuit resumes.

The plaintiff has addressed the current discovery situation in his motion for reconsideration.

In particular, the plaintiff now contends that pipeline ownership is not dispositive. Docket No. 66

at 2-4. Specifically, the plaintiff argues that "[p]ipeline ownership is just one of the issues before

this court" and that the defendants' sale of gas that was transported via the pipelines in question is

sufficient to establish liability under the 1941 municipal ordinance that underlies this suit. Id. In

addition, the plaintiff maintains that documents relevant to the issue of gas sales "were produced

and/or were made available for inspection or copying." Id. at 3.

The plaintiff's argument is unexpected to say the least. Although such a claim may well lurk

within the plaintiff's state court petition, see Docket No. 1 at Exhibit 22 (Seventh Amended

Petition), such was not apparent to the parties or the court. For example, the Joint Discovery/Case

Management Plan filed by the parties contains the following statement:

> 21.   Indicate other matters peculiar to this case, including discovery, that deserve
>       the special attention of the court at the conference.
>
>       Defendants would like to alert the court as to the threshold liability question
>       in this lawsuit:  Whether any of the defendants own or owned pipelines
>       within the city limits of the City of San Benito.

Docket No. 15. The plaintiff has never demurred from this characterization of the suit. This

12

 

characterization was not controverted during the October 27, 2003, hearing. Indeed, this mutual understanding of the case permeated that hearing and served as the basis of the court's scheduling order. Docket No. 44 at 9-20. The only alternative theory of liability hinted at during the hearing was the possibility that the plaintiff might allege some sort of fraudulent corporate structuring on the part of defendants (i.e., some kind of single business enterprise theory) akin to that alleged in S. Union v. City of Edinburg, 129 S.W.3d 74, 85-90 (Tex. 2003). See Docket No. 44 at 11, 19 (discussion of shell companies and fraud). The court clearly articulated a two-stage discovery plan, in which any progress beyond the initial stage was predicated on satisfaction of the threshold issue of ownership. Id. at 12, 17-18. Notwithstanding the obvious assumptions of the discovery plan contemplated by the court and the announced position of the defendants that ownership was the threshold issue concerning liability, counsel for plaintiff never once objected or indicated that any issue other than pipeline ownership was relevant. In fact, counsel for plaintiff embraced a two-tiered discovery plan in which the first stage was centered on pipeline ownership. Id. at 14-15. Given plaintiff's present contrary contentions concerning the potential bases of liability, most if not all of the court's time and effort and the efforts of the defendants (both those which were dismissed and those that have motions pending) have been wasted. The court has designed certain of the conditions enumerated infra in Part III of the opinion to prevent any further confusion or waste of resources.

## III.    CONCLUSION

While it comes as somewhat of a shock to this court that "mere disobedience" with court orders and obstinate, obstreperous conduct have been held to be insufficient to dismiss a case with prejudice, the court notes that the aforementioned Fifth Circuit rulings seem to have arisen in a context in which, as here, there is no proof that the client participated in the conduct. That being the

13



case, the court will conditionally grant the motion to reconsider upon plaintiff's compliance to the conditions set out below. However, with the issuance of this order, the court now considers the plaintiff on notice and will hold it responsible for its counsel's similar failings, if any, in the future.

The court hereby conditionally grants the motion to reconsider and thereby reinstates the causes of action against Tejas Gas Pipeline Co., Tejas Gas Pipeline, L.L.C., Tejas Gas Pipeline, L.P., Tejas Gas, L.L.C., Tejas Gas Mktg, L.L.C., Gulf Energy Mktg. Co., Gulf Energy Mktg. L.L.C., Coral Energy Servs. L.L.C., Coral Energy Resources L.P., Shell Gas Trading Co., Conoco, Inc., Total E&P USA, Inc. (successor in interest to FINA), Union Pacific Resources Co. (n/k/a Anadarko E&P Co. LP), Natural Gas Clearinghouse, Inc., Anadarko Energy Servs. Co., Texaco Gas Mktg., Inc., Texaco Natural Gas, Inc., Chevron U.S.A., Inc., Texaco Exploration and Production, Inc., BP Energy Co., Amoco Energy Trading Corp. (n/k/a BP Energy Co.), Arco Natural Gas Mktg, Inc. (n/k/a Vastar Gas Mktg., Inc.), Vastar Gas Mktg., Inc., Transco Petro Source Co. (n/k/a Transco P-S Co.), if the plaintiff does each of the following in the time prescribed:

1.    Provide each and every defendant that has appeared in this suit (i.e., not just those dismissed by the court's March 18, 2003, order) proof of pipeline ownership concerning a pipeline covered by the San Benito City ordinance at issue in this case or send each defendant through its counsel of record a stipulation that the plaintiff has no evidence that the defendant in question ever owned or operated a pipeline within the city limits of San Benito with 10 business days of the date of this order;

2.    Dismiss all those defendants named in the Seventh Amended Petition that have not appeared in this suit, as per plaintiff's counsel's representation at the October 27, 2003 hearing. This may be done in conjunction with the supplemental complaint

14

 

required in the third paragraph below;

3.  File a supplemental complaint within 10 business days of this order if it intends to rely on any theory of liability <u>other than ownership</u> of a pipeline covered by the San Benito ordinance. Such supplemental pleading shall be concise and shall also be both factually and legally unambiguous;

4.  Provide to each defendant within 20 business days of this order plaintiff's evidence as to any theory of liability raised either in the original complaint (<u>i.e.</u>, the Seventh Amended Petition) or the supplemental complaint referred to in paragraph 3; and

5.  Finally, each defendant (including those not previously dismissed from this lawsuit) has 20 business days from the date of this order to file a motion for costs in connection with any motion to dismiss, motions to compel compliance with the court's orders or this motion for rehearing concerning the court's prior order of dismissal;[6] within 10 business days of the approval of these costs by the court, plaintiff or plaintiff's counsel will pay those costs and file proof of such payment with the clerk of this court.[7]

If the plaintiff complies with the conditions stated in paragraphs 1-5, then this court will reinstate this matter against the previously dismissed defendants. If the plaintiff does not comply with the

---

[6] The court has also contemplated ordering the plaintiff to pay the costs involved for the October 27, 2003 hearing. While the court considers the plaintiff's conduct in connection with that hearing to have been wasteful, it has limited its order to those items most directly involved in the plaintiff's failure to comply with the court's orders and rules.

[7] The court notes that, in the absence of direct evidence that the client was complicit in its attorney's misdeeds, the court's order with regard to fees and costs will not specify which is responsible. Suffice it to say the court will leave that to the plaintiff and its counsel, but it does expect the fees specified to be timely paid.

15




foregoing conditions, its motion for reconsideration concerning the dismissal of the specified defendants will be denied.

The court's resolution of plaintiff's motion for reconsideration renders all pending motions pertinent to discovery and costs, including Docket Nos. 59, 62-64, 68, moot, and they are hereby denied. The court's prior scheduling order and discovery plan, Docket No. 38, is void. If the plaintiff complies with the conditions requisite to reconsideration of this court's prior order of dismissal and reinstatement of this lawsuit against the dismissed defendants, the court and the parties will subsequently revisit discovery and scheduling deadlines.

Concerning the additional motions to dismiss that were not granted in this court's March 18, 2004 order and judgment, Docket Nos. 56-58, 60-61, 69, they remain pending before the court. The court hereby defers consideration of these additional motions to dismiss pending plaintiff's decision to comply or not comply with the court's conditions concerning the reinstatement of its claims against the previously dismissed defendants. If the plaintiff fails to timely comply with the conditions set forth by the court above, these motions will also be granted and the remainder of the case will also be dismissed pursuant to those pending motions of the defendants.

Signed in Brownsville, Texas on this 16th day of June, 2004.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE

16




FAX   FROM:713-250-5441 USDC-SDTX   TO: 9-713-840-9217   PAGE: 1 OF 17   CONTROL: #012817-CV

# UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF TEXAS

MICHAEL N. MILBY
CLERK OF COURT
P.O BOX 61010
HOUSTON, TEXAS 77208

06/16/04

www.txs.uscourts.gov

To:    John David Page (aty)

Re:    Notice of Entry of Order or Judgment

---

Enclosed Order or Judgment entered in:

case number:    1:03-cv-00080

instrument number:    74

If after three attempts this fax fails, then we will print this notice and mail it to you. For questions, please call (713) 250-5768.

Number of pages including cover sheet:    17

*[handwritten note:] To: ANDREA — please calendar the due date for our application for costs*

# EXHIBIT D





LAW OFFICES

# CERDA
# C&P
# PONCIO
A PROFESSIONAL CORPORATION

VICTOR I. CERDA
ATTORNEY-AT-LAW

ADAM PONCIO
ATTORNEY-AT-LAW
Board Certified Civil Appellate Law
Texas Board of Legal Specialization



924 McCullough — San Antonio, Texas 78215-1642
Tel: (210) 212-7979 — Fax: (210) 212-5880

RECEIVED

JUL 0 2 2004

June 30, 2004

Frances I. Gandy                     **VIA US FIRST CLASS MAIL**
148 American Bank Plaza
Corpus Christi, Texas 78475

Ramon Garcia                         **VIA US FIRST CLASS MAIL**
LAW OFFICES OF RAMON GARCIA, P.C.
222 West University Drive
Edinburg, Texas 78539

Osborne J. Dykes, III                **VIA US FIRST CLASS MAIL**
Jeffrey D. Palmer
FULBRIGHT & JAWORSKI, LLP
1301 McKinney, Suite 5100
Houston, Texas 77010

Julie L. Ezell                       **VIA US FIRST CLASS MAIL**
CINERGY MARKETING & TRADING, L.P.
1000 East Main Street
Plainfield, Indiana 46168

Mr. David Van Susteren               **VIA US FIRST CLASS MAIL**
1301 McKinney, Suite 5100
Houston, TX 77010

Randy Beevis                         **VIA US FIRST CLASS MAIL**
1100 Louisiana, Suite 4900
Houston, Texas 77002

Ms. Jerry K. Clements                **VIA US FIRST CLASS MAIL**
2200 Ross Avenue, Suite 2200
Dallas, TX 75201-6776

J.D. Page                                               **VIA US FIRST CLASS MAIL**
3040 Post Oak Boulevard, Suite 85G
Houston, Texas 77056

Bradley Whalen                                          **VIA US FIRST CLASS MAIL**
DOYLE, RESTREP, HARVING & ROBBINS,
L.L.P
4700 Chase Tower
600 Travis Street
Houston, Texas   77002

Rene G. Oliveira                                        **VIA US FIRST CLASS MAIL**
David G. Oliveira
ROERIG, OLIVEIRA & FISHER
855 West Price Road, Suite 9
Brownsville, Texas 78520

Robert Galligan                                         **VIA US FIRST CLASS MAIL**
JONES, GALLIGAN, KEY & LOZANO, L.L.P.
2300 W. Pike, Suite 300
P. O. Drawer 1247
Weslaco, Texas 78599-1247

Re:     Civil Action No. B03-080
        *City of San Benito v. Tejas Gas Pipeline Company, et al*
        In the United States District Court for the Southern District of Texas
        Brownsville Division

Dear Counsel:

Pursuant to the Honorable Andrew S. Hanen's Order of June 16, 2004, please find enclosed a **"MEMO" and letter dated March 15, 2004, from Osborne J. Dykes, III** which serves as evidence of pipeline ownership by Tejas Gas Pipeline Company and its former, successor, related and/or merged entities.   As indicated by our Amended Petition, ownership is not necessary for liability under the San Benito Ordinance.  Plaintiff hereby stipulates that it does not currently have evidence of pipeline ownership by any other Defendant who has appeared in this cause, subject to their responses to Requests for Production, Second Requests for Production and Request for Admissions previously served on all Defendants.  Attached hereto are copes of the discovery requests previously served on Defendants on February 27, 2004.  Upon the Court's final Order reinstating the dismissed Defendants, the discovery will be re-served.  The discovery requests are being sent in advance as a courtesy so that each Defendant may begin gathering documents which may be responsive to these requests.

Thank you for your attention to these matters.

Sincerely,

**LAW OFFICES OF CERDA & PONCIO**
**A Professional Corporation**

**ADAM PONCIO**

AP:djh
Enclosures as stated.

cc:    United States District Clerk         **VIA US FIRST CLASS MAIL**
       Southern District of Texas
       Brownsville Division
       600 E. Harrison, 1st Floor
       Brownsville, Texas 78520
       (Letter Only)

       Honorable Andrew S. Hanen      **VIA US FIRST CLASS MAIL**
       United States District Judge
       Southern District of Texas
       600 E. Harrison, 1st Floor
       Brownsville, Texas 78520
       (Letter Only)

MEMO

RE:    PIPELINE LOCATIONS – CAMERON BY CITY

BROWNSVILLE
10,2000
HENRY GONZALEZ
VALERO
8" AND 10"

HARLINGEN
48,735
H. WM. CARD, JR.
VALERO GAS
10" AND 12"
TEJAS
6"

SAN BENITO
23,000
CHARLES F. WEEKLY
VALERO GAS
10", 12", AND 8"
TEJAS
6"

PORT ISABEL
4,467
CALVIN BYRD
VALERO
6"
TEJAS (?)
8"

LA FERIA
4,360
PAUL F. BEECHNER
VALERO GAS
12"

LOS FRESNOS
2,473
MANUEL ABREGO
VALERO GAS
4" AND 6"
TEJAS
8"

SANTA ROSA
2,223
ANDRES MARROQUIN
VALERO GAS
10"

PRIMERA
2,030
JOSE RAMIREZ
VALERO GAS
10"

COMBES
2,004
SILVESTRE GARCIA
NONE

RIO HONDO
1,793
ALEX CHAVEZ
NONE

SOUTH PADRE ISLAND
1,677
PEGGY TRAHAN
NONE

PALM VALLEY
1,200
JOHN PHUL
NONE (10" VALERO GAS SKIRTS CLOSE)

LAGUNA VISTA
1,166
RAFAEL HINOJOSA, JR.
KGS CRUDE
8"

RANCHO VIEJO
885
WALTER F. HALLEMAN
VALERO GAS
8"

RANGERVILLE
280
WAYNE HALBERT
VALERO GAS
16" AND 6"
TEJAS GAS
8"



# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
1301 McKINNEY, SUITE 5100
HOUSTON, TEXAS 77010-3095
WWW.FULBRIGHT.COM

OSBORNE J. DYKES, III
PARTNER
JDYKES@FULBRIGHT.COM

DIRECT DIAL:    (713) 651-5545
TELEPHONE:    (713) 651-5151
FACSIMILE:    (713) 651-5246

March 15, 2004

Mr. Adam Poncio
Cerda & Poncio
924 McCullough
San Antonio, TX 78215-1642

Re:    Cause No. B03-080; *City of San Benito v. Tejas Gas Pipeline Company, et al.*, In the United States District Court for the Southern District of Texas, Brownsville Division

Dear Mr. Poncio:

After my letter to you of January 15, 2004, the following information has come to my attention. Before January 1, 2004, Kinder Morgan South Texas Pipeline, L.P. (not a defendant in this suit) owned a pipeline partially located in San Benito. As of January 1, 2004, Kinder Morgan South Texas Pipeline, L.P. was merged into Kinder Morgan Tejas Pipeline, LP.

Previously, Tejas Gas Pipeline Company was converted into Tejas Gas Pipeline LLC, which in turn was converted into Tejas Gas Pipeline LP. This entity and Texas Gas Marketing LLC were also merged into Kinder Morgan Tejas Pipeline, LP.

Yours very truly,

Osborne J. Dykes, III

OJD/jag

cc:    Mr. Jeff Palmer (firm)

30665019.2

# EXHIBIT E

## ORDINANCE NO. 478

AN ORDINANCE FIXING RENTALS TO BE PAID BY NATURAL GAS UTILITIES FOR
THE PRIVILEGE OF USING WITH THEIR NATURAL GAS AUXILIARY LINES, APPUR-
TENANCES AND FIXTURES, THE STREETS, ALLEYS AND PUBLIC WAYS, WITHIN
THE CORPORATE LIMITS OF THE CITY OF SAN BENITO, TEXAS; PROVIDING
THAT SUCH UTILITIES SHALL MAKE SEMI-ANNUAL REPORTS, PROVIDING
PENALTIES FOR THE VIOLATION HEREOF, REPEALING ALL LAWS IN CON-
FLICT HEREWITH, AND DECLARING AN EMERGENCY.

BE IT ORDAINED BY THE CITY COMMISSION OF THE CITY OF SAN BENITO, TEXAS:

### SECTION 1.

That all persons and corporations using and maintaining any main
and auxiliary lines, appurtenances and fixtures for the sale and dis-
tribution of natural gas in any of the streets, alleys, parks and other
public places within the corporate limits of the City of San Benito,
Texas shall within thirty (30) days after the 30th day of September
and the 31st day of March of each year file with the City Secretary a
report sworn to by the auditor of such person or corporation showing
the gross receipts derived from the sale by gas utilities of natural
gas sold for heat, power or other purposes from consumer of such
natural gas located within and using such natural gas within the cor-
porate limits of the City of San Benito, Texas, for the six (6) months
preceding each of said dates.

### SECTION 11.

That upon the 1st day of November and the 1st day of May of each
year hereafter every person or corporation using the streets, highways,
alleys, parks or other public places within the City of San Benito, Texas,
with main and/or auxiliary lines, fixtures and appurtenances for the
sale and distribution of natural gas to consumers, shall pay to the
City of San Benito, Texas, a rental equal to two per cent. (2%) of the
gross receipts received by such person or corporation from its sale of
natural gas for heat, power and for other purposes derived from con-
sumers of such natural gas located within and using within the cor-
porate limits of the City of San Benito, Texas, for the six (6) months
preceding September 30th and March 31st of each year, which sum shall
be paid to the Tax Collector of the City of San Benito, Texas, who
shall thereupon deliver to the person or corporation paying the same
a receipt for the amount so paid as rental.

### SECTION 111.

Any special taxes, rentals, contributions or charges accruing
before the effective date of this ordinance under the terms of any pre-
existing ordinance contract or franchise against any such person or cor-
poration, when paid to said City, shall be credited on the amount owed
by such person or corporation as a charge or rental imposed for the use
of the streets, alleys and other public places and ways within the said
City, and the Tax Collector of said City is hereby authorized to give
credit to such person or corporation when it or they pay the street
rental charges in the manner described herein and for all sums and for
special taxes, rentals, contributions, charges or otherwise under the
terms of any pre-existing ordinance, contract or franchise.

### SECTION IV.

That any person or corporation and the local manager or agent of
any such person or corporation, willfully failing or refusing after
thirty (30) days written notice from the City to make the report re-
quired above herein shall, upon conviction in the Corporation Court of
the said City, be fined in a sum not to exceed $50.00, and each day's
failure or refusal shall be deemed a separate offense.

### SECTION V.

All ordinances and parts of ordinances in conflict herewith are
hereby repealed.

## SECTION VI.

The fact that the legislature of the State of Texas, has, by proper enactment permitted incorporated cities and towns to levy a tax against all persons and corporations occupying the public streets, alleys, public ways and places; as a rental or charge for the use and occupancy of said streets, alleys, public ways and places, and the fact that the general fund of said City is in need of immediate replenishment, creates and emergency, and the rule requiring the reading of all ordinances at two separate meetings is hereby suspended and this ordinance shall take effect immediately upon its passage, approval, and publication as provided by the charter of the City of San Benito.

Passed and approved this 25th day of June, A.D. 1941.

LOUIS S. WITTE, Mayor

Attest:

J. G. RUSSELL, City Secretary.