

# THE ATTORNEY GENERAL OF TEXAS

AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

February 3, 1950

Hon. Robert S. Calvert
Comptroller of Public Accounts
Austin, Texas

Opinion No. V-994.

Re: The authority of the Comptroller to collect gross receipts tax from the El Paso Natural Gas Company under facts submitted.

Dear Sir:

Your request for an opinion reads in part:

"Please advise me if under the following facts the El Paso Natural Gas Company is subject to the gross receipts tax provided for under Article 7060, R. C. S. 1925.

"The Company has five industrial customers within the State of Texas, as follows-

"1 - Phelps Dodge Corporation (successor to Nichols Copper Company) under a renewal contract dated February 20, 1939 (effective June, 1941) for a term expiring December 4, 1951. This contract is in renewal and extension of an original contract dated June 19, 1929 between El Paso Gas Utilities Corporation (later assigned to El Paso Natural Gas Co.) and Nichols Copper Company (later assigned to Phelps Dodge Corporation).

"2 - Standard Oil Company of Texas under a renewal contract dated March 6, 1947 for a term expiring March 5, 1952.

"3 - The Texas Company under a renewal contract dated March 17, 1947 for an additional term of five years.

"4 - American Smelter & Refining Company under a renewal contract dated January 1, 1948 for a term of ten years.

"5 - Southwestern Portland Cement Company under a renewal contract dated May 23, 1945 for a term of five years.

EXHIBIT E

"6 - In addition, residue gas is sold to Sid Richardson Carbon Co. for utilization in its carbon black plant in Ector County under contract dated November 24, 1948 for a term ending December 31, 1953.

"Prior to April 1, 1948 none of the industrial customers were located in the City limits of El Paso. Effective April 1, 1948 the city extended its limits so as to include three of the plants."

Article 7060, V.C.S., reads in part:

"Each individual, company, corporation, or association owning, operating, managing, or controlling any gas . . . works . . . located within any incorporated town or city in this State, and used for local sale and distribution in said town or city, and charging for such gas . . . shall make quarterly, on the first day of January, April, July, and October of each year, a report to the Comptroller under oath . . . showing the gross amount received from such business done in each such incorporated city or town within this State in the payment of charges for such gas . . . for the quarter next preceding. Said individual, company, corporation, or association, at the time of making said report . . . for any incorporated town or city of ten thousand (10,000) inhabitants or more, according to the last Federal Census next preceding the filing of said report, the said individual, company, corporation, or association, at the time of making said report, shall pay to the Treasurer of this State an occupation tax for the quarter beginning on said date an amount equal to one and five thousand one hundred twenty-five ten-thousandths (1,5125) per cent of said gross receipts, as shown by said report." (Emphasis added throughout.)

The facts which have been submitted in connection with this request are that prior to April 1, 1948, none of the company's industrial customers were located within the city limits of El Paso, but effective April 1, 1948, the city extended its limits so as to include the plants of the Phelps Dodge Corporation, the Standard Oil Company of Texas, and The Texas Company. The gas which is delivered to the three above-mentioned customers is transported from the gas fields located in New Mexico and delivered directly to the three customers for their own consumption and not for resale. The gas moves in a continuous stream from New Mexico to the plants of the three industrial customers. The terms of the gas sales contracts provide for delivery by the seller to the premises of the customers' plants.

We must first determine if the El Paso Natural Gas Company is a "gas works" and subject to the occupation tax levied by Article 7060, V.C.S.

The only case which has construed the statute with regard to the meaning of "gas works", as used in the statute, is Utilities Natural Gas Co. v. State, 133 Tex. 313, 128 S.W.2d 1153 (1939). That case involved the liability of a gas pipe line company for taxes levied by Article 7060, V.C.S., on sales to a public utility company of gas which was used as fuel to produce steam for an electric generating plant. The Court said (at page 1155):

> ". . . we have no doubt that the simple fact that a delivery of gas is made in the city, by means of said pipe line, to a single customer, and to nobody else, was not intended by the legislature to be comprehended by the term 'distribution' as used. This term as used does not mean the transfer of the possession of gas, by means of the pipe line, to a single purchaser where such purchaser is the only customer to whom the gas company sells gas in the city. It means the transfer of possession of gas to various individuals or concerns in the city. Any other construction of the term would, in our opinion, involve a departure from the legislative intent."

The test laid down by that decision is that there must be a sale of gas to "various" purchasers or consumers for there to be a "distribution" of gas as this term is used in the statute.

In Opinion No. O-3776, dated August 1, 1941, this office held that if there was a sale of gas to more than one customer or purchaser within a city the distributor was a "gas works" under the statute and subject to the tax. We quote from that opinion:

> "It is the opinion of this department in line with the above quoted cases that any individual or corporation selling or distributing liquid petroleum gas to more than one consumer in any incorporated city within the population brackets stated in Article 7060 . . . would be subject to the gross receipts tax levied therein."

It is thus our opinion that the El Paso Natural Gas Company, by virtue of the fact that it sells and distributes natural gas to three industrial consumers within an incorporated city, is a "gas works" and subject to the occupation tax on the gross receipts of such sales as levied by Article 7060, V.C.S.

The next problem is that of determining whether the sales to the three industrial consumers are exempt from State taxation under

the "Commerce Clause", Article I, Section 8, of the Constitution of the United States.

It is elemental that a State cannot levy a tax so as to place a direct burden on, discriminate against, or interfere with interstate commerce.

We will not attempt to review or to reconcile the decisions of the U. S. Supreme Court on this subject. It is an area of "nice distinctions".[1] The Constitution has granted to Congress, by the Commerce Clause, the power to regulate the taxation of interstate commerce. Congress has, however, left the determination of what State taxes are permissible, and are not permissible, to the courts. It is consequently impossible to determine with exactness, or lay down inflexible rules with respect to, the power of the States to tax instrumentalities of commerce. The U. S. Supreme Court recognized this fact when it said, "The federal courts have sought over the years to determine the scope of a state's power to tax in the light of the competing interests of interstate commerce, and of the states, with their power to impose reasonable taxes upon incidents connected with that commerce . . . We continue at that task . . ."[2] The scope of that power, in view of the recent decisions, is apparently growing larger.[3]

For many years it was well settled that gross receipts from interstate commerce, or sales, could not be directly taxed by a State. This rule of law has, however, been greatly narrowed by the decisions of the Supreme Court. While the Court has said that the principle of the immunity of interstate commerce from State taxation will be "jealously guarded", the tendency has been to limit the field of immunities from State taxation. The Circuit Court of Appeals, in Stone v. Interstate Natural Gas Co., 103 F.2d 544, 549 (C.C.A. 5th 1939, aff. 308 U.S. 522), said:

> "The principle of stare decisis in constitutional interpretations has recently received shattering blows in the Supreme Court, and especially in the field of immunities from general taxation. The increasing social burdens assumed by our governments, both State and national, will require increasing and more searching

---

1 G., H. and S. A. R. Co. v. Texas, 210 U.S. 217, 225 (1908).

2 Memphis Natural Gas v. Stone, 335 U.S. 80, 85 (1948).

3 Interstate Oil Pipe Line v. Stone, 337 U.S. 662 (1949); Central Greyhound Lines v. Mealey, 334 U.S. 653 (1948); Memphis Natural Gas v. Stone, supra.

> taxation for their support. Any immunity from equal general taxation appears more and more inconvenient and unjust. The recent reexamination of the basis for such immunities has resulted in an upheaval. The current of authority has been turned. For the judicial navigator the cases are no longer the beacons marking out a fixed if tortuous channel. He must for awhile fix his eyes anew upon the Constitution as the pole star of his firmament and steer his course rather by principle than by precedent."[4]

The Supreme Court formerly used various tests in determining the validity of State tax laws. In Illinois Natural Gas Co. v. Central Illinois Public Service Co., 314 U.S. 498, 504 (1942), the Court said:

> "This Court has held that the retail sale of gas at the burner tips by one who pipes the gas into the state, or by one who is a local distributor acquiring the gas from another who has similarly brought it into the state, is a sale in intrastate commerce, since the interstate commerce was said to end upon the introduction of the gas into the service pipes of the distributor. Public Utilities Commission v. Landon, 249 U.S. 236; East Ohio Gas Co. v. Tax Commission, 283 U.S. 465. In applying this mechanical test for determining when interstate commerce ends and intrastate commerce begins, this Court has held that the interstate transportation and the sale of gas at wholesale to local distributing companies is not subject to state control of rates, Missouri v. Kansas Gas Co., supra; see Public Utilities Commission v. Landon, supra, 245; cf. Public Utilities Commission v. Attleboro Co., 273 U.S. 83, 89, or to a state privilege tax, State Tax Commission v. Interstate Gas Co., supra. Yet, state regulation of local retail rates to ultimate consumers has been sustained where the gas so distributed was purchased at wholesale from one who had piped the gas into the state, Public Utilities Commission v. Landon, supra, as has a state tax measured by receipts from local retail sales of gas by one who has similarly brought the gas into the state. East Ohio Gas Co. v. Tax Commission, supra.
>
> "In other cases, the Court, in determining the validity of state regulations, has been less concerned to find a point in time and space where the interstate commerce in

---

4 See also Coverdale v. Arkansas-Louisiana Pipe Line Co., 303 U.S. 604 (1938).

gas ends and intrastate commerce begins, and has looked to the nature of the state regulation involved, the objective of the state, and the effect of the regulation upon the national interest in the commerce. Cf. South Carolina Highway Dept. v. Barnwell Bros., 303 U.S. 177, 185, 187, et seq.; California v. Thompson, 313 U.S. 109, 113, 114; Duckworth v. Arkansas, ante, p. 390. Thus, in Pennsylvania Gas Co. v. Public Service Commission, 252 U.S. 23, where natural gas was transported by pipe line from one state into another and there sold directly to ultimate local consumers, it was held that, although the sale was a part of interstate commerce, a state public service commission could regulate the rates for service to such consumers. While the Court recognized that this local regulation would to some extent affect interstate commerce in gas, it was thought that the control of rates was a matter so peculiarly of local concern that the regulation should be deemed within state power. Cf. Arkansas Louisiana Gas Co. v. Dept. of Public Utilities, 304 U.S. 61. And, similarly, this Court has sustained a non-discriminatory tax on the sale to a buyer within the taxing state of a commodity shipped interstate in performance of the sales contract, not upon the ground that the delivery was not a part of interstate commerce, see East Ohio Gas Co. v. Tax Commission, supra, but because the tax was not a prohibited regulation of, or burden on, that commerce. Wiloil Corporation v. Pennsylvania, 294 U.S. 169; McGoldrick v. Berwind-White Co., 309 U.S. 33, 50. In Southern Gas Corp. v. Alabama, 301 U.S. 148, 156-57, on which the Illinois Supreme Court relied, we held only that the sale of gas to a local industrial consumer by one who was piping the gas into the state was a local business sufficient to sustain a franchise tax on the privilege of doing business within the state, measured by all the taxpayer's property located there, including that used for wholesale distribution of gas to local public service companies.

"In the absence of any controlling act of Congress, we should now be faced with the question whether the interest of the state in the present regulation of the sale and distribution of gas transported into the state, balanced against the effect of such control on the commerce in its national aspect, is a more reliable touchstone for ascertaining state power than the mechanical distinctions on which appellee relies."

While there may have been doubt under the older decisions as to the point at which interstate commerce ended and intrastate commerce began, there is little doubt, in view of recent decisions, that the sales by the El Paso Natural Gas Company to the

three industrial consumers in El Paso are interstate sales. The case of Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 332 U.S. 507 (1947), involved the regulation by Indiana of the sale of natural gas which had been transported from gas fields in Texas and Kansas by an interstate pipe line directly to industrial consumers in Indiana. The Court said (at page 512):

> "Nor do we question that these sales are interstate transactions. The contrary suggestion left open in the state supreme court's treatment rests upon the view that gas transported interstate takes on the character of a commodity which has come to rest or broken bulk when it leaves the main transmission line and, under reduced pressure, enters branch lines or laterals irrevocably on its way to final distribution or consumption. Those merely mechanical considerations are no longer effective, if ever they were exclusively, to determine for regulatory purposes the interstate or intrastate character of the continuous movement and resulting sales we have here.
>
> "Thus gas furnished to local utilities for resale is supplied unquestionably, both as to transportation and as to sale, in interstate commerce. Yet it is subjected to practically identical changes in pressure with the gas sold by appellant directly for industrial use. Neither practical common sense nor constitutional sense would tolerate holding that reduction in pressure makes the industrial sales to Anchor-Hocking wholly intrastate for purposes of local regulation while deliveries at similar pressure to utility companies remain exclusively interstate. Variations in main pressure are not the criterion of the state's regulatory powers under the commerce clause. Cf. Interstate Natural Gas Co. v. Federal Power Comm., 331 U.S. 682, 689, 67 S.Ct. 1482, 1486. The sales here were clearly in interstate commerce." [5]

Section 1(b) of the Natural Gas Act of 1938 [6] provides:

> "The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas

---

5 See also Illinois Natural Gas Co. v. Central Illinois Public Service Co., 314 U.S. 498 (1942).

6 15 U.S.C.A. § 717, et seq.

companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

The Court in the Panhandle Eastern Pipe Line case, in upholding the power of the State to regulate direct sales to industrial consumers, said (at page 516):

"The omission of any reference to other sales, that is, to direct sales for consumptive use, in the affirmative declaration of coverage was not inadvertent. It was deliberate. For Congress made sure its intent could not be mistaken by adding the explicit prohibition that the Act 'shall not apply to any other *** sale ***.' (Emphasis added.) Those words plainly mean that the Act shall not apply to any sales other than sales 'for resale for ultimate public consumption for domestic, commercial, industrial, or any other use.' Direct sales for consumptive use of whatever sort were excluded.

"The line of the statute was thus clear and complete. It cut sharply and cleanly between sales for resale and direct sales for consumptive uses. No exceptions were made in either category for particular uses, quantities or otherwise. And the line drawn was that one at which the decisions had arrived in distributing regulatory power before the Act was passed."

The Court further said (at page 519):

"Congress, it is true, occupied a field. But it was meticulous to take in only territory which this Court had held the states could not reach. That area did not include direct consumer sales, whether for industrial or other uses. Those sales had been regulated by the states and the regulation had been repeatedly sustained. In no instance reaching this Court had it been stricken down.

"It is true that no case came here involving state regulation of direct industrial sales wholly apart from sales for other uses. In the cases sustaining state power, whether to regulate or to tax, the company making the industrial sales was selling also to domestic and commercial users. But there was no suggestion, certainly no decision, that a different result would follow if only direct industrial sales were being made. Neither the prior judicial line nor the statutory line was drawn

between kinds of use or on the relation between sales for different uses. Both lines were drawn between sales for use, of whatever kind, and sales for resale. Cf. Colorado Interstate Gas Co. v. Federal Power Comm., 324 U.S. 581, 595, 596, 65 S.Ct. 829, 836, 89 L.Ed. 1206.

". . . .

"The Natural Gas Act therefore was not merely ineffective to exclude the sales now in question from state control. Rather both its policy and its terms confirm that control. More than 'silence' of Congress is involved . . . ."

We may point out here that the Court has said:

"In a case like this nothing is gained, and clarity is lost, by not starting with recognition of the fact that it is interstate commerce which the State is seeking to reach and candidly facing the real question whether what the State is exacting is a constitutionally fair demand by the State for that aspect of the interstate commerce to which the State bears a special relation . . . distinctions would be clearer and more reasonably made if . . . a tax . . . had been frankly sustained on the ground that the tax did not burden interstate commerce in the constitutional sense rather than on the ground that it was not interstate commerce."[7]

The Supreme Court has sustained State taxation on, and regulation of, the sale of gas and electricity to customers for actual consumption. In Missouri v. Kansas Natural Gas Co., 265 U.S. 298, 309 (1924), the Court said:

"The business of supplying, on demand, local consumers is a local business, even though the gas be brought from another State and drawn for distribution directly from interstate mains; and this is so whether the local distribution be made by the transporting company or by independent distributing companies. In such case the local interest is paramount, and the interference with interstate commerce, if any, indirect and of minor importance."[8]

---

7 Central Greyhound Lines v. Mealey, 334 U.S. 653, 661 (1948).

8 See also Southern Natural Gas Corp. v. Alabama, 301 U.S. 148 (1937); East Ohio Gas Co. v. Tax Commission, 283 U.S. 465 (1931); Public Utilities Commission v. Landon, 249 U.S. 236 (1919).

The Court in Memphis Natural Gas Co. v. Beeler, 315 U.S. 649, 653 (1942), said:

"This Court has often had occasion to rule that the retail sale of gas at the burner tips by one who pipes the gas into the state or by a local distributor acquiring the gas from another who has similarly brought it into the state is subject to state taxation and regulation."

The Court in McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 45 (1940), held:

"Section 8 of the Constitution declares that 'Congress shall have power . . . to regulate commerce with foreign Nations, and among the several States . . . .' In imposing taxes for state purposes a state is not exercising any power which the Constitution has conferred upon Congress. It is only when the tax operates to regulate commerce between the states or with foreign nations to an extent which infringes the authority conferred upon Congress, that the tax can be said to exceed constitutional limitations. See Gibbons v. Ogden, 9 Wheat. 1, 187; South Carolina Highway Dept. v. Barnwell Bros., 303 U.S. 177, 185. Forms of state taxation whose tendency is to prohibit the commerce or place it at a disadvantage as compared or in competition with intrastate commerce, and any state tax which discriminates against the commerce, are familiar examples of the exercise of state taxing power in an unconstitutional manner, because of its obvious regulatory effect upon commerce between the states.

"But it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business, Western Live Stock v. Bureau, 303 U.S. 250, 254. Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless fall short of the regulation of the commerce which the Constitution leaves to Congress. A tax may be levied on net income wholly derived from interstate commerce. Non-discriminatory taxation of the instrumentalities of interstate commerce is not prohibited."

The most recent decision by the U. S. Supreme Court on this subject is Interstate Oil Pipe Line Co. v. Stone, 337 U.S. 662 (1949). That case involved the validity of a Mississippi statute which imposed a gross receipts tax on the privilege of operating a pipe line within that State. The Court (at page 666) said:

"The statute is not invalidated by the commerce clause of the Federal Constitution merely because, unlike the statute attacked in Memphis Natural Gas Co. v. Stone (US) supra, it imposes a 'direct' tax on the 'privilege' of engaging in interstate commerce. Any notions to the contrary should not have survived Maine v. Grand Trunk R. Co., 142 US 217, 35 L.ed. 994, 12 S Ct 121, 163, 3 Inters Com 807, which flatly rules the case at bar. That case sustained a state statute which imposed upon an interstate railroad corporation 'an annual excise tax [measured by apportioned gross receipts], for the privilege of exercising its franchises in this State.' The Grand Trunk decision has been approved by this Court as recently as the other controlling case of Central Greyhound Lines v. Mealey, supra (334 US at 658, 663, 92 L ed 1639, 1641, 68 S Ct 1260), in which the Court permitted New York to impose a tax on the gross receipts from the operation of an interstate bus line, provided that tax was apportioned according to mileage traveled within the state. The Mealey Case is not distinguished by saying that it involved only a tax on gross receipts and not a tax on interstate commerce itself, for gross receipts taxes have long been regarded as 'direct' in cases which are supposed to support the proposition that 'direct' taxes on interstate commerce are invalid under the commerce clause.

"Since all the activities upon which the tax is imposed are carried on in Mississippi, there is no due process objection to the tax. The tax does not discriminate against interstate commerce in favor of competing intrastate commerce of like character. The nature of the subject of taxation makes apportionment unnecessary; there is no attempt to tax interstate activity carried on outside Mississippi's borders. No other state can repeat the tax. For these reasons the commerce clause does not invalidate this tax."

The tax in this instance is levied upon the local sale to the ultimate consumer. The tax is not discriminatory, nor does it lay a direct burden on interstate commerce. The tax cannot result in multiple taxation because no other state can repeat the tax. The tax is thus not prohibited by the Commerce Clause. Opinion No. 2998, dated February 2, 1937, is overruled in so far as it conflicts.

It is our conclusion that, inasmuch as the City of El Paso has a population of more than 10,000, the El Paso Natural Gas Company is liable for an occupation tax equal to one and five thousand one hundred twenty-five ten-thousandths (1.5125) per cent of the gross receipts from business done within the city from April 1, 1948, the date the company began operating a "gas works" within that city.

## SUMMARY

A pipe line which sells to three industrial consumers within a city is operating a "gas works" and is liable for the occupation tax levied by Article 7060, V.C.S. Opinion No. O-3776.

Taxes on the local sale of gas to ultimate consumers is not prohibited by the "Commerce Clause" of the U.S. Constitution. Opinion No. 2998 overruled in so far as it conflicts.

Yours very truly

PRICE DANIEL
Attorney General

By *Frank Lake*
Frank Lake
Assistant

APPROVED:

W. V. Geppert
Taxation Division

Charles D. Mathews
Executive Assistant

FL:wb:mwb